**James M. Cleavenger, JD, LLM**
jamescleavenger@hotmail.com
405 E. 8th Ave. #5700
Eugene, OR 97401
Tel: (503) 990-9368

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

**JAMES M. CLEAVENGER,**

      Plaintiff,

  v.

**UNIVERSITY OF OREGON (an Agency
and Instrumentality of the State of Oregon),
UNIVERSITY OF OREGON POLICE
DEPARTMENT (a Department of the
University of Oregon), CAROLYN
MCDERMED, MICHAEL MORROW,
BRANDON LEBRECHT, SCOTT
CAMERON, RANDY WARDLOW,
BRIAN CAUFIELD, and LINDA KING,
personally and individually,**

      Defendants.

**Case No.:  6:13-cv-01908**

**FIRST AMENDED COMPLAINT -**
42 U.S.C. 1983;
WHISTLEBLOWING; RETALIATION;
WRONGFUL DISHCHARGE;
INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS;
DEFAMATION; and ORS 236.360, et al

(Jury Trial Requested)

1 - FIRST AMENDED COMPLAINT

## PRELIMINARY STATEMENT

Plaintiff brings this claim under 42 U.S.C. § 1983 and additional causes of action based on Oregon state law claims arising out of the same nucleus of operative facts claims. Plaintiff alleges that Defendants violated his Fourth and Fourteenth Amendment rights, as well as violated numerous state laws, employment practices, department administrative procedures and policies, and collective bargaining contracts, which ultimately resulted in the Plaintiff's wrongful termination (discharge) on October 26th, 2012, causing Plaintiff substantial harms as described herein. This action seeks declaratory, injunctive, and monetary relief, including compensatory and punitive damages, and reasonable attorney fees and costs, in order to redress Plaintiff's federally protected and state statutory and common law rights.

## JURISDICTION

1.

Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and brought pursuant to a claim under 42 U.S.C. 1983. All conditions precedent to initiation of this lawsuit have been met.

## VENUE and PARTIES

2.

Venue is appropriate in this Court under 28 U.S.C. § 1391, Local Rule 3.2(a)(3), because all of Plaintiff's claims in this complaint arose in Lane County, Oregon.

3.

Plaintiff is currently, and has been a resident of Lane County, Oregon since 2005 (at all times relevant to this matter).

2 - FIRST AMENDED COMPLAINT

4.

Plaintiff is a graduate of the University of Oregon School of Law (JD) and the University of Liverpool Law School (LLM – International Human Rights Law), and is admitted to practice law in Washington State (WSB#41398), but is filing this claim *Pro Se* at this time. Plaintiff is currently employed as a Judicial Clerk in the Eugene Division of the United States District Court for the District of Oregon. Plaintiff is aware that recusal of Eugene Division U.S. District Court Judges and/or a change of venue may be requested by the Defendants.

5.

At all times relevant to this complaint, Defendant **University of Oregon (UofO),** was a public body and an agency and instrumentality of the State of Oregon, responsible by law for the acts and omissions of its employees, including those whose actions and conduct is at issue herein. At all relevant times, UofO's employees were acting within the course and scope of their employment. The University of Oregon is part of the **Oregon University System (OUS).** UofO is a public employer pursuant to ORS 659A.200 *et seq.*

6.

At all times relevant to this complaint, Defendant **University of Oregon Police Department ("UOPD")**, was a department of the University of Oregon, responsible by law for the acts and omissions of its employees, including those whose actions and conduct is at issue herein. At all relevant times, UOPD's employees were acting within the course and scope of their employment. The University of Oregon *Police Department* ("UO*PD*") was previously known as the University of Oregon *Department of Public Safety* ("UO*DPS*"), until the department changed its name to University of Oregon Police Department ("UOPD") in September 2012. The department's current name (UOPD) is used for clarity in this complaint.

3 – FIRST AMENDED COMPLAINT

7.

At all times relevant to this complaint, Defendants **Carolyn McDermed** (Acting Chief), **Michael Morrow** (Professional Standards & Internal Affairs Lieutenant), **Brandon Lebrecht** (Lieutenant), and **Scott Cameron** (Sergeant), were employees of UOPD (a UofO department), and at all relevant times acted under color of law, as employees of UOPD, within the course and scope of their agency or employment, and are sued in their official and individual capacities.

8.

At all times relevant to this complaint, Defendants **Linda L. King** (Associate Vice President for Human Resources), and **Randy Wardlow** (former UofO Employee and Labor Relations Manager), were employees of the UofO, and at all relevant times acted under color of law, as employees of UofO, within the course and scope of their agency or employment, and are sued in their official and individual capacities.

9.

At all times relevant to this complaint, Defendant **Brian Caufield** (OUS Associate General Counsel for Labor & Employment), was an employee of Oregon University System (OUS), to which UofO is a member, and at all relevant times acted under color of law, as an agent of UofO (for OUS), within the course and scope of his agency or employment, and are sued in his official and individual capacity.

## JURY TRIAL REQUESTED

10.

Plaintiff requests a jury trial on all claims and issues to the extent allowed under the law.

4 - FIRST AMENDED COMPLAINT

## SUPPLEMENTAL JURISDICTION

11.

This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state law claims are so closely related to his federal law claims that they are part of the same case or controversy under Article III of the United States Constitution.

## MOTION FOR STAY

12.

Plaintiff is currently participating in related arbitration proceedings against Oregon University System, which represents one of the named Defendants (University of Oregon) in this complaint. It is unclear which (if any) claims or aspects of this complaint will be addressed and/or resolved through the arbitration proceedings (Service Employees International Union Local 503 [SEIU] Oregon Public Employees Union [Cleavenger] v. Oregon University System [University of Oregon]), which is currently scheduled for December 2013. Plaintiff intends to request a stay from this Court, once the commencement of this action is complete (so to preserve the causes of action as required by statute of limitations), until the conclusion of the arbitration, in fulfillment of Plaintiff's duty to try to avoid unnecessary expenses.

## STATEMENT OF FACTS

13.

Plaintiff was first hired by UOPD as a part-time "Auxiliary Public Safety Officer" (APSO) in March of 2010. In July of 2010, Plaintiff was also hired part-time as UOPD's "Traffic Petitions Officer" (TPO), responsible for reviewing appeals of traffic and parking tickets

5 – FIRST AMENDED COMPLAINT

issued by UOPD Officers. Plaintiff held both part-time positions (APSO and TPO) until he was hired by UOPD as a full-time "Public Safety Officer" (PSO), in March of 2011, at which point he stopped working as an APSO, but continued as the TPO until a replacement was hired in August of 2011. On 8/18/2011, Defendant Lt. Mike Morrow, who was the Plaintiff's supervisor, emailed Plaintiff to thank him for his service as the TPO. Morrow emphasized Plaintiff's "...good judgment and sound decisions."

15.

During this same time period (and at all times relevant to this complaint), Plaintiff also worked as a Reserve Police Officer with the City of Junction City, Oregon (beginning in January of 2010). He worked paid and unpaid shifts as a fully-sworn police officer for the Junction City Police Department (JCPD) with the same authority and responsibilities as regular full-time police officers. In the summer of 2013, Plaintiff transferred to the Coburg, Oregon Police Department, where he continues to work as a volunteer Reserve Police Officer with full police authority.

16.

Plaintiff has excelled as a police officer. He graduated #1 in his six-month Reserve Police Academy class and received an award at graduation in 2010. Based on his legal education and success in the academy, Plaintiff returned in 2011 to teach law classes. Plaintiff has received several internal and public commendations and recommendations including a "Letter of Recommendation and Support" signed by *all* of the regular full-time police officers, all Reserve officers, and dispatchers at the Junction City Police Department. Plaintiff's UOPD performance statistics also show him to be an extremely productive officer.

6 - FIRST AMENDED COMPLAINT

17.

Plaintiff has never been disciplined or fired from any job, has no disciplinary records outside of those created by UOPD, and has never filed any type of complaint, grievance, or lawsuit against an employer until this action.

18.

When Plaintiff became a full-time PSO with UOPD in March 2011, he began a 6-month Field Training Evaluation Program (FTEP), coinciding with a 6-month Trial Period ending on or about September 7th, 2011. During these six months, UOPD was free to terminate Plaintiff *without* having to show Just Cause. Plaintiff's primary Field Training Officer (FTO) was Michael Drake. His second FTO was Chris Phillips. Plaintiff's direct supervisor during this time was Lt. (then Sgt.) Andy Bechdolt. During this time period, Plaintiff's work was evaluated on a *daily* basis by his FTO and other supervisors via written Daily Observation Reports (DOR's). Plaintiff received very positive DOR's throughout the 6 month FTEP process. Plaintiff also earned positive "End of Phase Evaluations" on 7/4/11 and 8/22/11 (#124.2) signed by FTO Drake and Field Training Supervisor Sgt. Bechdolt. These evaluations were very positive and noted his "good officer safety skills" and "knowledge of the law." Officer Drake reconfirmed that Plaintiff "excelled" during the FTEP, in an email from 4/2/2013, stating Plaintiff was an "*above average*" officer. Other UOPD officers have confirmed Plaintiff was well liked and highly competent.

19.

Plaintiff was also later issued a positive 6-Month "Trial Period Evaluation" (#85) written by Defendant Lt. Lebrecht, which covered March-September 2011, but which was not actually signed or given to Plaintiff until December 2011. This evaluation gave Plaintiff scores of

7 – FIRST AMENDED COMPLAINT

"Highly Competent" or "Competent" in 6 of the 7 major categories. Curiously, when you compare this evaluation to Plaintiff's "Annual Performance Evaluation" (which was created by Lebrecht and given to the plaintiff on 5/31/2012, *after* Plaintiff told Lebrecht he would be filing a grievance in regards to the Letter of Reprimand Lebrecht had recently issued him, and while Plaintiff was also demoted and under the "special investigation" instigated by Lebrecht), it did not give Plaintiff *any* scores within the "Competent" range even though the Annual Evaluation covered most of the same time period as the Trial Period Evaluation.

20.

When Plaintiff started working full-time for UOPD in March 2011, he was assigned to the graveyard shift, commanded by Lebrecht. Before each shift, Lebrecht would conduct a "Pre-Shift Briefing" with all the officers on the shift (Plaintiff, Kent Abbott, Michael Drake, Adam Lillengreen, Eric LeRoy, and Sgt. Bechdolt). During many of these briefings, Lebrecht allowed for a discussion of a "Bowl of Dicks List." This was an actual list of people and entities who participating officers disliked and thought should "eat a bowl of dicks." The list was kept on LeRoy's cell phone. The list was discussed and added to on numerous occasions during "Pre-Shift Briefings," and on several occasions, LeRoy and Lebrecht would continue discussing the Bowl of Dicks List in Lebrecht's office after the Pre-Shift Briefing concluded. On multiple occasions Lebrecht and LeRoy spent the majority of their 8-hour shifts talking inside Lebrecht's office instead of working, as verifiable by Computer Aided Dispatch (CAD) records and UOPD Dispatch audio recordings.

21.

8 - FIRST AMENDED COMPLAINT

The Bowl of Dicks List contained dozens of entries such as; the ACLU, US 9th District Judge Ann Aiken, Oprah Winfrey, OJ Simpson, civil rights activist Al Sharpton, Rev. Jesse Jackson, Civil Liberties Defense Center lawyer Lauren Regan, Eugene Mayor Kitty Piercy, Democratic Party politicians including Al Gore and Hilary Clinton, 2010/2011 ASUO Student Body President Amelie Rousseau, UofO Housing Staff and RA's deemed unfriendly to UOPD, defense lawyers, and "dirty hippies," etc. Plaintiff did not support the making or discussion of the Bowl of Dicks List, as he felt it was reprehensible and an act of waste. Plaintiff does not have a copy of this list, but there are officers who will confirm its existence. Plaintiff also has saved text messages from LeRoy acknowledging the existence of the "Bowl of Dicks" List.

22.

Plaintiff felt it would be dangerous to complain about the practice at the time, because he was still an "at-will" employee in his Trial Service Period and could be terminated without "Just Cause." However, Plaintiff did later report this practice to supervisors once he was no longer on trial service, and also on 10/02/12 in a meeting with Brian Smith of the UofO President's Office (and SEIU Union Steward Lois Yoshishige). Smith ignored this allegation (and others), and then left the UofO for another job out-of-state within days of the meeting.

23.

Also during this time period, Lebrecht asked Plaintiff if he wanted to purchase a $35 2012 "Entertainment" Coupon Book that his daughter was selling for a school fundraiser. Plaintiff felt pressured to make the purchase because Lebrecht was his supervisor. Such solicitations of subordinates by supervisors are prohibited by UOPD Policy and law. To his knowledge, Plaintiff was the only officer asked to purchase a book. Plaintiff still has the actual book and membership card (#07015990255).

9 – FIRST AMENDED COMPLAINT

24.

On October 1st, 2011, Defendant Sgt. Scott Cameron became Plaintiff's direct supervisor when Andy Bechdolt became a Lieutenant and moved to a different shift. Once Cameron became Plaintiff's direct supervisor, Plaintiff became subject to constant harassment and intimidation by Cameron and Lebrecht.

25.

Sgt. Cameron once told Plaintiff directly, "I never liked you and never thought they (UOPD) should have hired you in the first place." Cameron made similar statements to other officers. Cameron's personal dislike of Plaintiff was common knowledge in the department.

26.

On multiple occasions Cameron publicly criticized Plaintiff in front of other officers. It was also reported in an interview with another UOPD officer that Cameron showed a youtube.com video of Plaintiff speaking on behalf of the ASUO (UofO student government) as the Graduate Student Representative against UOPD obtaining Tasers in 2008, while Plaintiff was still in law school. Cameron knowingly made false statements regarding Plaintiff's opinions on Tasers in order to harass, belittle, and intimidate the Plaintiff.

26.

On at least two occasions Cameron intentionally made defamatory statements in front of other employees that Plaintiff's UofO law degree was "worthless" and a "waste of money."

10 - FIRST AMENDED COMPLAINT

27.

It was also after Cameron became Plaintiff's supervisor that Lt. Lebrecht was made aware of Plaintiff's previous work history and involvement in Democratic Party politics, i.e., a motorcade driver for former Vice President Al Gore in 2000 and President Barack Obama when he campaigned in Oregon in 2008, as well as a paid staff member for a Democratic politician in Chicago. Lebrecht is a pronounced, vehement Republican and made his dislike of Democrats well known. Plaintiff tried to avoid political discussions in the workplace, especially in front of Lebrecht because Lebrecht would become angry. Plaintiff also publicly claimed on many occasions that he was no longer involved in politics. However, in law enforcement jobs, officers are required to disclose all of their prior work history, regardless of its applicability, so Plaintiff's previous history was included in his personnel files. Lebrecht began discussing politics at work more frequently, despite Plaintiff's repeated requests not to do so. During Pre-Shift Briefings with other officers present, Lebrecht told Plaintiff that President Obama was "definitely not born in America," and so was not a US Citizen and thus an illegitimate President. Lebrecht also claimed President Obama was "secretly Muslim."

28.

Lebrecht also once stated publicly during a briefing that Bill and Hilary Clinton ordered the murders of "dozens" of people they didn't like or who had evidence of Clintons' crimes.

29.

Lebrecht also publically alleged that "Democrats were responsible for the death of Pat Tillman in Afghanistan."

30.

11 - FIRST AMENDED COMPLAINT

In September 2012, a photocopy of a magazine cover with Ronald Reagan on the cover was posted on a bulletin board inside the officer's East Station briefing room alongside other photos of UO Administrators as part of an organizational structure/hierarchy chart. Plaintiff had previously seen this magazine on Lebrecht's desk in Lebrecht's office. Plaintiff took a photo of the bulletin board.

31.

On 10/30/2011, during a briefing overseen by Lt. Lebrecht to discuss UOPD's Operation Plan for dealing with the Occupy Eugene Movement which had been located on UO property since 10/25/11, another officer likened the Occupy Camp to the movie "District 9" (http://www.d-9.com) because the camp was only full of "dirty hippies," "dirtbags" (criminals), and "lazy democrats who don't want to get a job!" Plaintiff briefly tried to explain what the Occupy Movement was about and that it included "normal people" such as students, professors, professionals, etc., but was cut-off. After the briefing, Lebrecht appeared angry and confronted Plaintiff in the hallway and asked, "Why weren't you laughing like everyone else (at the jokes about the Occupy movement)?!" This episode is even mentioned in Lebrecht's Supervisory Files, wherein Lebrecht states, "I asked Plaintiff why he appeared upset in briefing. I asked him if it was because other officers referred to Occupy Eugene as 'District 9.'" Plaintiff tried to avoid confrontation by trying to change the subject and telling Lebrecht that he was not upset by the unprofessional comments, even though he actually was. Lebrecht continued to press the issue and eventually Plaintiff told him he was upset at the assignment he had been given (to sit inside a parked patrol car all night to keep an eye on the Occupy Camp) because he felt it would be "boring." Lebrecht claims Plaintiff "raised his voice" when he denied being upset by the

12 - FIRST AMENDED COMPLAINT

briefing. Plaintiff denies having raised his voice, but that he was dismayed by his coworkers' distasteful remarks and fearful of further retaliation from Lebrecht.

32.

On 11/04/2011, a few days after the Occupy Eugene events, Lebrecht called Plaintiff into his office and told him he would be issuing Plaintiff a "Clarification of Expectations Letter." Plaintiff received the Clarification Letter on 11/18/2011, which was for not shaving often enough (every day) "on at least two occasions," and for "officer safety concerns" including an event almost 3 months prior on 8/27/2011 (Case #11-1664), while Plaintiff was still in training.

33.

In this incident, Plaintiff allowed a man to reach into his bag to get his phone and then call his girlfriend to tell her he was being arrested so he could not meet her as planned. This man had previously been arrested while carrying a "javelin." Plaintiff does not deny allowing the phone call, and admits he could have waited until after he handcuffed him and then make the call for him. Plaintiff's explanation was that he did not feel threatened at the time because he did not see a javelin in the vacinity or a bag big enough to contain one. There were 6 officers present as well. Plaintiff said he could see the man's phone lying on top of his bag, and that he did not search the full contents of the bag because he did not receive consent to do so, but since Eugene Police (EPD) officers were in route to transport the man to jail, they would be able to search the bag without consent prior to transporting him. Plaintiff and Lebrecht discussed this incident later that same night as part of Plaintiff's training, but Plaintiff was unaware it would be used against him 3 months later in a disciplinary letter, and then again a year later when he was terminated. This act was in retaliation for Plaintiff's attempt to report his concerns.

13 - FIRST AMENDED COMPLAINT

34.

In regards to the "lack of grooming standards" Plaintiff does not dispute his breach of the policy, but does believe it was applied discriminatorily, as many other officers would also skip shaving on occasion. Plaintiff also claims that shaving daily caused him to get a rash. Plaintiff has a note from his physician backing this claim. Plaintiff also has photographic evidence of other UODP employees not cleanly shaven, but who have never been disciplined. To Plaintiff's knowledge, no other UOPD officers have ever been formally disciplined for violating grooming standards. Plaintiff did not appeal the letter or attach a rebuttal statement, based on his fear that doing so might jeopardize his successful completion of the special weekly evaluations.

35.

Plaintiff's decision not to appeal was also based on his reliance on Lt. Lebrecht's promise not to include or ever reduce to writing, additional transgressions such as the "ESPN Gameday" episode (wherein Plaintiff momentarily placed a pair of discarded angel wings over his uniform for humor), which was later cited in Plaintiff's original Annual Performance Review.

36.

When Plaintiff received his first *and only* Letter of Clarification (#3) on 11/18/2011, he was also placed on special "weekly evaluation summaries to track your progress" in the same letter. To Plaintiff's knowledge (based on information requests and interviews), these special "weekly evaluation summaries" had never been used by the department. Lebrecht created them on his own, despite there being no written policy authorizing them.

37.

14 – FIRST AMENDED COMPLAINT

These evaluations were supposed to last for "8 to 10 weeks," but only lasted 5 weeks
(until 12/17/2011) because during the evaluation period Lebrecht decided it was unnecessary due
to Plaintiff's successful improvements. On his last weekly evaluation (see #32), Lebrecht wrote,
"Officer Plaintiff's overall performance was at an acceptable level this week. Plaintiff's overall
performance continues to improve in all areas. I don't see it as necessary to continue weekly
evaluations at this point as Officer Plaintiff immediately took it upon himself to quickly correct
the points that were to be addressed. He is working at a level that is equal to that of his peers."

38.

On 12/07/2011 Lebrecht also issued Plaintiff a positive "6-Month Trial Period
Evaluation" (#85), which described Plaintiff as "Highly Competent" or "Competent" in 6 of the 7
major categories, as previously described.

39.

On 1/18/2012, Chief Doug Tripp and Lt. Mike Morrow both gave speeches "encouraging
officers to find and request any additional training opportunities" at an all-staff meeting in the
UofO Alumni Center building.

40.

On 1/23/2012, Plaintiff submitted the first five of his eventual 33 total Training Requests
(#16 & #17) to Sgt. Cameron. Cameron verbally denied all the requests on 1/26/2012. Plaintiff
continued making additional training requests for the next 9 months. In making his training
requests, Plaintiff offered to drive himself using his own car and "flex" his schedule so as not to
incur overtime. *All* 33 of Plaintiff's requests were denied or in some cases completely ignored
(no response given), as outlined below:

15 - FIRST AMENDED COMPLAINT

| **Class Title:** | **Date of Training:** |
|---|---|
| 1. Mobile Dash-Cam Video Tactics | 2/7/12 |
| 2. Railroad Crimes & Investigations | 2/9/12 |
| 3. Sex Assault Drugs (at UO) | 2/27/12 |
| 4. Youth Alcohol & Drug Culture | 3/5/12 |
| 5. Concealed Compartments (DEA, free) | 3/8/12* |
| 6. High-Risk Traffic Stops | 3/9/12 |
| 7. The Moral Crucible of Policing (Ethics) | 3/13/12 |
| 8. Use of Force Legal Updates (at UO) | 5/9/12* |
| 9. Tactical Silence | 4/26/12 |
| 10. 10. Gangs | 5/23/12 |
| 11. Pepperballs | 5/7/12 |
| 12. Active Shooter | 4/28/12 |
| 13. Interdiction | 6/12/12 |
| 14. Search & Seizure Law | 5/14/12 |
| 15. FBI National Academy Spring Training | 5/16/12* |
| 16. Indoor Marijuana Growing | 7/26/12 |
| 17. Reading Body language | 7/26/12 |
| 18. Tactical Silence | 7/27/12 |
| 19. Bullet Proof Mind | 8/13/12 |
| 20. Street Crimes Seminar | 9/10/12 |
| 21. Dealing with Veterans | 9/20/12 |
| 22. Dealing with Veterans II | 9/27/12 |
| 23. Gordon Graham (Safety) | 9/20/12 |
| 24. Identity Theft (free) | 10/2/12 |
| 25. Online Investigative Resources | 10/3/12 |
| 26. Detecting Fraud/Fake IDs | 10/17/12 |
| 27. Gang Trends | 10/30/12 |
| 28. Bike Patrol Tactics | 10/15/12 |
| 29. Assertive Communication (UO ODT) | 10/16/12 |
| 30. Listening Skills (UO ODT) | 11/14/12 |
| 31. Emotional Intelligence (UO ODT) | 11/29/12 |
| 32. Emotional Intelligence II (UO ODT) | 12/12/12 |
| 33. Emergency Man. ICS-800 (UO ODT) | online |

*Plaintiff attended anyway, in his capacity as a Junction City Police Officer*

16 – FIRST AMENDED COMPLAINT

41.

Plaintiff submitted 4 more requests to Cameron shortly after his initial 5 requests, but did not hear a response for over a month. So on 2/20/2012 Plaintiff sent an email to Lt. Morrow (#17), who oversees the department's "Professional Standards and Training," to inquire as to the status of his requests and to "seek clarification" on how the request process worked.

42.

Morrow responded the same day by email, acknowledging he was aware of Plaintiff's training requests and explained that an officer's immediate supervisor(s) such as Cameron and Lebrecht could make "recommendations" regarding an officer's training request, but that the "final" review would be made by the Chief (then D. Tripp) or Assistant Chief (then McDermed).

43.

Plaintiff never received any notifications from Chief Tripp or Assistant Chief McDermed regarding any of his 33 training requests.

44.

A few days after Plaintiff emailed Lt. Morrow regarding his training requests, Lebrecht called Plaintiff into his office and asked him to shut the door. Lebrecht appeared angry and said to Plaintiff, "Don't think you can go behind my back and complain about me to Morrow! I will always know if you do because I'm friends with Mike (Morrow) and he'll tell me! I can even show you the email he (Morrow) sent me that you sent to him to prove it!" Lebrecht was obviously referring to the email Plaintiff sent Morrow on 2/20/12.

45.

Plaintiff alleges that Lebrecht meant this meeting to be a clear threat, in that if Plaintiff ever tried to file a complaint about him to Morrow, Lebrecht would find out from Morrow, even

17 - FIRST AMENDED COMPLAINT

though such internal complaints to Morrow as the "Professional Standards and Training Lieutenant" are supposed to be confidential. This type of threat is prohibited by UOPD Policy, the Union Contract (#13), the "Respectful Workplace" Memo dated 1/31/12 from UofO HR (#84), and by law ORS 236.350-370.

46.

It is alleged that Morrow passed on to Lebrecht additional complaints or concerns made by Plaintiff, but since UOPD has refused requests for such emails, plaintiff has so far been unable to investigate this further without the aid of court ordered Discovery.

47.

On 4/1/2012, Plaintiff responded to a call for service at the UO's Spencer View Apartments. This incident did not seem remarkable or troublesome at all and Plaintiff was never advised of any problems with it until he was asked to meet with Lebrecht and Cameron a week later on 4/8/2012.

48.

During this meeting on 4/8/2012, Plaintiff was asked to make statements about the incident without being shown any of the available video footage from his vehicle's dash-camera prior to or at the meeting.

49.

Plaintiff access to his own videos were also later blocked. Plaintiff has documented proof of the videos being removed from his view, without explanation and outside of policy.

18 - FIRST AMENDED COMPLAINT

50.

Plaintiff was led to believe by Cameron and Lebrecht that this 4/8/12 meeting was not a "big deal" and would most likely *not* lead to any form of discipline, and therefore he did not need Union representation, as afforded to him by Union Contract.

51.

Despite these assurances, on 5/18/12, UOPD Officer Plaintiff received a Letter of Reprimand (#1) from his supervisors Lebrecht and Cameron.

52.

The Reprimand referenced an incident at the Spencer View Apartments on 4/1/12, wherein Plaintiff was accused of "continued failure to follow department standards regarding officer safety tactics and procedures."

53.

On the same day and time (5/18/12), Plaintiff received another letter (#2) from Lebrecht, but signed by Assistant Chief McDermed, informing him he was being temporarily "reassigned" (what amounted to a "demotion" and transfer to another department as explained further below) to parking enforcement duties, pending a "special investigation" concerning Plaintiff's "ability to safely and legally perform the duties of a Public Safety Officer."

54.

The special Investigation Letter did not outline *who* would be conducting the investigation or *what* the specific allegations were (as required in Union Contract Article 17, Section 2(A) and UOPD General Orders 1102.1&2 and by O.R.S. 236.350 to 236.370).

55.

Plaintiff was ordered to sign both documents that day "without any discussion."

19 – FIRST AMENDED COMPLAINT

56.

If Plaintiff's "reassignment" is deemed not to amount to a demotion, then it would fall under "Investigatory Suspensions with Pay" in Article 17, Section 2(B), which would also require written notice of the specific allegations within 7 days under Union Contract.

57.

Neither disciplinary document provided Plaintiff with contact information for SEIU Steward(s), as required under Union Contract Article 17, Section 2(C).

58.

On 5/19/12, the day after Plaintiff received his Letter of Reprimand, Plaintiff informed his supervisors of his intent to appeal the Reprimand through the grievance process. After this date, Defendants Cameron, Lebrecht, and Morrow began retaliating against Plaintiff for filing a complaint.

59.

During one of Plaintiff's meetings with Wardlow and Lebrecht (which was audio recorded and attended by SEIU steward Lois Yoshishige), Lebrecht told Plaintiff that "it didn't have to come to this," insinuating that if Plaintiff had not filed a complaint, that he would not have been subject to continued "investigations" and discipline.

60.

Beginning 5/18/2012, Plaintiff was subject to the following conditions for his reassignment: Relieved of all job duties (including taking any enforcement actions) except for; A) writing parking tickets and B) impounding abandoned bikes.

20 - FIRST AMENDED COMPLAINT

Both of these activities are duties of UofO Department of Parking & Transportation employees, which became a separate department.

Plaintiff was also not allowed to drive any UOPD vehicles. Plaintiff was only allowed to drive two trucks clearly marked "Department of Parking and Transportation."

Plaintiff was not allowed to wear a UOPD badge or regular uniform (*except* for during the Olympic Trials, 2 baseball games, and 1 football game because they needed more officers and wanted Plaintiff to look like a regular officer).

Plaintiff was revoked access to all 3 officer key sets (general buildings, student housing, and fire), making it impossible for Plaintiff to carry out many of his original job functions as a Public Safety Officer. However, in August Plaintiff was allowed access to the general set, because officers were tired of having to open so many doors for him to get bikes, etc.

61.

While Plaintiff was not allowed to take any "enforcement action" or to back up any officers, he was allowed to report any crimes in progress he witnessed, which is also what he was sworn to do. During his reassignment period, Plaintiff "called out" on the radio numerous instances of crimes in progress including: trespassing, public intoxication, public nudity, warrant arrests, drug use, etc. In doing so, every officer on Plaintiff shift benefited by gaining at least one arrest from something Plaintiff witnessed. In fact, there were days when the only enforcement actions on record were from incidents Plaintiff alerted other officers to during his shift.

62.

According to interviews with other officers, this type of "reassignment" is unprecedented in UOPD history. The only other former UOPD employee who was ever subject to this type of

21 – FIRST AMENDED COMPLAINT

demotion (to "parking duties only") was a former employee named McIntyre. McIntyre was fired around 2005 (by then Chief Herb Horner), but the Union was able to get him reinstated a few months later into a different position, according to interviews of other UOPD employees by Donna Laue.

63.

When Plaintiff was "reassigned" he was also removed from a large number of extra assignments he was scheduled to work including baseball games and special events. Removal from these events prevented Plaintiff from earning a considerable amount of money he would have. In addition to being a breach of contract, this reassignment constituted a violation of Union Contract Articles 52 & 53 regarding job reclassification.

64.

On 5/21/12, Plaintiff met with Cameron in an attempt to try to avoid having to file a grievance and to try to understand *why* he was being investigated and by *whom*. Cameron claimed not to know anything about Plaintiff being investigated and/or who was conducting investigations. Plaintiff later learned in a tape-recorded interview with Lebrecht, that Cameron *did* in fact know, but had lied to the Plaintiff.

65.

On the same day, Cameron told Plaintiff that Randy Wardlow (of UO HR) "made him" write the Letter of Reprimand, even though Cameron's personal opinion was that it was "only a training issue."

22 - FIRST AMENDED COMPLAINT

66.

On 6/13/2012, Plaintiff's Union Stewards met with Wardlow and told him what Plaintiff said about Cameron: that Cameron told Plaintiff he didn't want to give Plaintiff the reprimand, but that Wardlow told him to. According to the stewards as noted in an email on 6/13/12, Wardlow's response was, "That's an interesting statement," and that Wardlow responded to this "in a tone that made me think he (Wardlow) was angry... I asked Randy if he would give a yes or no answer to my question and he said he would not."

67.

On 5/31/12, Lt. Lebrecht gave Plaintiff an Annual Performance Review and ordered him to sign it "without discussion, because it was written by Sgt. Cameron" who was not there. Lebrecht signed the Annual Performance Review on the supervisor's signature line, even though he supposedly did not write it, in violation of UOPD policy.

68.

Plaintiff later learned that Lebrecht had in fact written the Annual Performance Review even though it was presented as if Cameron had. That way if Plaintiff were to appeal it he would have to do so to Lebrecht (who in reality wrote the letter and would deny the appeal.)

69.

Plaintiff's Annual Performance Review was also later used as part of the disciplinary actions leading to his termination (as prohibited by Union Contract Article 54 Section 2). At the same time, Lebrecht was engaged in an investigation of Plaintiff regarding the same underlying allegations that he fabricated.

23 - FIRST AMENDED COMPLAINT

70.

The next day (6/1/12), Plaintiff was informed verbally by Lt. Morrow that he was also under an internal affairs investigation for "two citizen's complaints," stemming from incidents on 4/1/12 and 4/2/12, which was two months prior to the start of the investigation and alleged "complaints."

71.

Even though no actual citizen complaints were ever filed (they were supposedly "found" and then created in absentia by Lt. Morrow and Lt. Lebrecht), this investigation lasted over 4 months and eventually led to Plaintiff's termination.

72.

After Plaintiff announced his intent to file a grievance, he was subject to increased and unfair scrutiny and disparate treatment, which amounted to a reprisal (as prohibited by Union Contract Article 18, Section 9), for his filing of the grievance. Specifically, the Annual Review and aspects of both investigations amounted to reprisals, since they were received and/or conducted after Plaintiff's supervisors had knowledge of Plaintiff's intent to initiate a grievance. Plaintiff's supervisors' actions also amounted to an "Intimidating Work Environment" as predicated on the "Letter of Agreement - Inappropriate Workplace Conduct," found on page 87 of the Union Contract.

73.

Plaintiff filed his first grievance of the Letter of Reprimand on 6/18/2012. Plaintiff always maintained his hope and desire to try to address the grievance "in-house" (within the department at Step-1). Plaintiff initially came to an agreement over email with AIC Chief

24 - FIRST AMENDED COMPLAINT

Carolyn McDermed on 6/14/2012, to start at Step-1 and address the Letter of Reprimand in a meeting to be set with Sgt. Cameron, Chief McDermed, HR Associate Director Wardlow, and Union Steward(s). Chief McDermed also agreed to attend a separate meeting between Plaintiff and Sgt. Cameron to facilitate the initial discussion regarding the Annual Performance Evaluation that Plaintiff was entitled to under Union Contract Article 54, Section 2. McDermed never honored either of these agreements.

74.

McDermed became the "Interim Chief" on 6/21/2012 and from then on (throughout the rest of the relevant time herein) was in the application process for the permanent position.

75.

On 8/15/2012 after UOPD and UO HR ignored and refused the Union's request for a Step-1 Hearing even after multiple extensions were granted, the Letter of Reprimand Grievance was "bumped" to Step-2 by Plaintiff Steward, Lois Yoshishige.

76.

On 8/9/2012, the UO Parking and Transportation Department was transferred out of the UOPD and into the UofO Department of Finance. Plaintiff continued his parking and transportation duties while driving a truck clearly marked "Department of Parking and Transportation" but was still under UOPD command.

77.

On 8/13/2012, Plaintiff again met with McDermed for over an hour to discuss his concerns over his treatment by Lebrecht, Cameron, and Morrow, including allegations reasonably believed to be evidence of violations of federal laws, state laws, rules and/or regulations, and were acts of mismanagement, abuse of authority, and gross waste of funds, as

25 - FIRST AMENDED COMPLAINT

alleged in this complaint. McDermed took written notes during the meeting and told Plaintiff she would "look into it" but no action or follow-up was ever mentioned to Plaintiff.

78.

On 8/21/2012, Plaintiff was presented with a special offer from Randy Wardlow (through SEIU Stewards). The offer was for Plaintiff to participate in a special additional FTEP process, and if he successfully passed it he would be allowed to be a regular officer again. Plaintiff wanted to know more about the details of the offer, such as how long it would be, what the requirements would be, and who the FTO would be. Plaintiff's concerns were borne out of his fear that the process may not be fair and would be "rigged" so that he would be sure to "fail" so they could terminate him. Wardlow did not provide any more details of the deal, but on 9/10/2012 Plaintiff accepted the offer anyway (with noted reservations and concerns).

79.

Wardlow never responded to Plaintiff's acceptance of the offer and it was withdrawn without any explanation.

80.

On 9/7/12 Plaintiff was ordered by Cameron & Lebrecht (in a closed door meeting) that from now on, he was not allowed to report any crimes in progress that he witnessed, unless it was a felony. In other words, if he saw someone stealing a bike he could not report it. Or if he saw someone he knew had an UofO Letter of Trespass he could not report it. Or if he saw people fighting (unless they had weapons, making it a felony) he could not report it. When he saw a drunk driver (DUII – is only a misdemeanor), he could not report it. But Plaintiff did keep a record of the crimes he witnessed during this period. Also on 9/7/12, Plaintiff was told to report

26 - FIRST AMENDED COMPLAINT

to West Station to meet with an "APSO/Auxiliary Public Safety Officer" (a part-time and non-Union represented position) to be trained on "Academic Lock-Up Duties" (going around and locking up all the doors on campus). When Cameron told Plaintiff to do this, he called it "a promotion." Plaintiff complied with the further demotion.

81.

On 9/20/12, when Plaintiff arrived at work for his shift he was placed on paid administrative leave and escorted off UOPD property by Mike Morrow. This was a complete surprise to Plaintiff and the Union. It was also the Plaintiff's birthday, which the Plaintiff knows that the Defendants were aware of because it was UOPD custom to have all employees sign a card to give to the officer on their birthday. Plaintiff had received one on his previous birthday.

82.

Morrow also told Plaintiff he was no longer entitled to see the results of his "internal investigation" of Plaintiff regarding the supposed "citizen complaints" on 4/1/12, because of Plaintiff's leave status. Plaintiff was not allowed to see it until days before his termination.

83.

On 9/25/2012, after additional extensions were made, Plaintiff was finally afforded a Step-2 Hearing in front of Brian Smith. Lebrecht, Wardlow, Yoshishige, Smith's assistant "Kelly," and SEIU staffer Sean Brailey were also present.

84.

Plaintiff spent over 2 hours presenting convincing evidence including photos and videos proving that the allegations made by Lebrecht and Cameron were false and fabricated.

27 – FIRST AMENDED COMPLAINT

85.

Plaintiff also presented records of 2 incidents involving identical set of circumstances (same apartment number, tenants and officers) that occurred after the Plaintiff's incident (4/1/12). These 2 incidents on 4/16/2012 (case #12-786) and 2/24/2012 (case #12-448) did not result in any inquiries or discipline, which Plaintiff used to show disparate treatment.

86.

As soon as Plaintiff was finished presenting his case at the Step-2 Hearing, he was handed a "Notification of Investigatory Suspension" Letter, placing him on paid Administrative Leave and pending the results of a yet *another* new investigation into 3 new allegations of "incidents." No details or dates were ever provided as to the allegations or circumstances of these new "incidents," despite multiple requests by Plaintiff and SEIU stewards.

87.

On 10/4/2012 Brian Smith issued his denial letter for Plaintiff's Step-2 Grievance Hearing. The letter did not address *any* of the merits of Plaintiff's claims or arguments. Smith soon left the state (within days) for a new job. Smith's short and unresponsive letter demonstrated the lack of attention paid to the matter.

88.

When Plaintiff was placed on un-paid Administrative Leave via a Pre-Dismissal Letter, the letter did not provide the dates to the 3 new allegations of "problematic call-outs."

89.

On 10/12/2012 Plaintiff attended his Pre-Dismissal Hearing with Linda King and Randy Wardlow. Plaintiff presented additional information but was unable to fully address the 3 new

28 – FIRST AMENDED COMPLAINT

allegations because he was not given enough information about them (including any dates), so he had to guess what they were referring to. Plaintiff did not guess correctly and has therefore *never* been allowed to rebut all the claims against him used in his termination (a violation of employment law, Union Contract, Constitutional Due Process and ORS 236.350-236.370).

90.

On 10/26/2012, Plaintiff received his Letter of Termination from the UofO.

91.

Since termination, Plaintiff and all SEIU employees have been denied access to UOPD's 3 separate kinds of "personnel files" despite UOPD policy to the contrary.

92.

Plaintiff was never afforded a meaningful hearing to defend against these allegations at any time prior to termination. It became clear that Defendants had set out at the very start to discharge the Plaintiff, regardless of legality, proof, or merit.

93.

On 10/30/12, John Ahlen took over as the steward of record for Plaintiff's Step 3 letter of reprimand grievance hearing on 10/30/12. Ryan Hagemann represented OUS/UofO during this hearing. Plaintiff presented, despite not having all of the information that had been requested of UOPD over 20 times beginning 5 months earlier. Again, Plaintiff provided susbstantial proof that the claims were without merit and were instead a form of retaliation by Defendants.

94.

Shortly after Plaintiff was terminated, access to his UofO email account was turned-off without warning or explanation. Plaintiff and Union Stewards made multiple requests to regain

29 – FIRST AMENDED COMPLAINT

access to the account, believing it could contain substantial exculpatory or favorable evidence.
All requests were denied or ignored by UofO.

95.

Plaintiff also filed an additional grievance alleging he was denied due process because he
was unable to ask questions, interview, or otherwise investigate the accusations levied against
him by his accusers. This grievance was denied by OUS, on the grounds that it was not filed at
step 1. SEIU maintained that grievances for terminated employees should be filed at step 3.
Plaintiff then grieved the fact that OUS was unwilling to hold the due process hearing. This was
also denied, on the grounds that it was not filed at step 1.

96.

On 11/12/12, Brian Caufield, representing OUS, granted a partial extension for the
termination grievance until 12/10/12 and again assigned Ryan Hagemann to hear the termination
grievance. Hagemann asked for permission to finish the letter of reprimand adjudication.
Plaintiff agreed, but thought that is what he had been doing since he heard the case on 10/30/12.
Hagemann never finished or never submitted his decision.

97.

Plaintiff believes it is possible that Hagemann *did* in fact write an opinion letter from the
10/30/12 hearing, but that he was prevented from issuing it by Brian Caufield. Plaintiff and
SEIU were never allowed to speak to Hagemann regarding this.

98.

Three more months passed without fulfillment of Plaintiff's information requests, and
without receiving notice of an extension, adjudication, or response by OUS, so on 2/7/13 SEIU

30 - FIRST AMENDED COMPLAINT

moved the letter of reprimand grievance to arbitration. Defendants continued to withhold the decision and refused to comply with information requests. SEIU asked to see the adjudication before deciding whether to bundle both matters for arbitration.

99.

On 2/13/13 Caufield *unilaterally* held the reprimand adjudication "in abeyance" despite protests of illegality and unfair labor practices from SEIU.

100.

SEIU filed another step three due process grievance, stating that Plaintiff was denied an opportunity to speak with those responsible for rendering discipline. Caufield refused to schedule a termination grievance, and denied the due process grievance, without a hearing.

101.

On 2/26/13 OUS asked for an extension to schedule the termination grievance hearing the week of March 18th. On 3/12/13 OUS asked for a termination grievance hearing extension until 4/3/13 from 10am-noon, and continuing from 1–3. On 3/27/13 Caufield unilaterally and without explanation issued a sequestration order for any witnesses attending the hearing. ready by that date. On 4/3/13, Caufield did not allow the scheduled hearing to proceed.

102.

On 4/22/13 Caufield issued a reprimand and termination grievance adjudication together in one letter, even though he was not the adjudicator for the reprimand hearing and never allowed one for the termination. It does not address the merits of any of Plaintiff's claims or defenses.

31 – FIRST AMENDED COMPLAINT

103.

UofO and OUS did not act in good faith, either with the information requests, or their willingness to hold a termination hearing. It was clear that Caufield had no intention of letting Plaintiff have a fair termination hearing, and that UofO never intended to fulfill our information requests. Plaintiff was denied due process in multiple instances and at multiple levels of the grievance process and in his termination.

104.

Plaintiff communicated all of the concerns and complaints mentioned above to one or more of the following supervisory or administrative officials in the method(s) described: UOPD supervisors **Carolyn McDermed** (Acting Chief) via emails and in meetings on 6/1/2012 and 8/13/2012, **Michael Morrow** (Professional Standards & Internal Affairs Lieutenant) via emails and in meetings on 6/1/2012, 6/18/2012, 7/6/2012, and 9/15/2012, **Andy Bechdolt** (Lieutenant) in a meeting on 6/29/2012, as well as to UofO and OUS administrators **Linda L. King** (Associate Vice President for Human Resources) in a meeting on 10/12/2012, **Brian Smith** (former Assistant Vice President for Administration) via email and in meetings on 9/25/2012 and 10/2/2012, **Randy Wardlow** (former UofO Employee and Labor Relations Manager) via emails and in meetings on 6/13/2012, 7/13/2012, 8/13/2012, 8/21/2012, 9/25/2012, and 10/12/2012, **Ryan Hagemann** (OUS Legal Counsel and Secretary to the Oregon State Board of Higher Education) via emails and in a meeting on 10/30/2012, and **Brian Caufield** (OUS Associate General Counsel for Labor & Employment) via email and in a meeting on 4/3/2013. SEIU Union Stewards Lois Yoshishige, Donna Laue, and/or John Ahlen were also present during the majority of these meetings. Copies of emails have been preserved (except perhaps those emails using

32 - FIRST AMENDED COMPLAINT

Plaintiff's UofO email address, which UofO blocked Plaintiff from accessing after termination and refused to release to Plaintiff or the union in their information requests.)

105.

On 10/5/2012, as follow-up from their 10/2/12 meeting, Plaintiff emailed Brian Smith a 4-page statement written by another UOPD officer, detailing additional allegations against Cameron for abuse of force, making illegal arrests, issuing illegal orders, untruthfulness, and waste. Plaintiff never received a response from Smith and no investigation or action was made.

106.

Shortly after Plaintiff was terminated, another UOPD officer was called to a surprise meeting and told the following by their supervisors. Using Plaintiff's termination as an example, this officer was warned that if they started to complain like the Plaintiff did, they would be fired too. The metaphor, "The squeaky wheel gets the axe" was used to further convey this point.

107.

Plaintiff vehemently denies all the allegations within UOPD's Letter of Reprimand and Letter of Termination. But even if the allegations *were* true, the alleged acts or omissions did not rise to the level of a terminable offense. A Junction City Police Officer was assigned to complete an independent investigation into this and he came to the same conclusion as Plaintiff.

108.

UOPD, UofO, and OUS ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

109.

All the claims and allegations herein are likely to have additional evidentiary support and more definite and certain dates of occurrence after a reasonable opportunity for further

33 - FIRST AMENDED COMPLAINT

investigation through Discovery. Separate/additional claims and causes of action are also likely

to be uncovered during Discovery.

110.

Plaintiff was subject to disparate treatment, harassment, threats, and intimidation from these UOPD Supervisors who instigated his termination. In addition, UOPD and UO HR committed a large number of Collective Bargaining Agreement (Union Contract), UOPD policy, state and federal law violations when reprimanding, investigating, and terminating Plaintiff, as outlined in this complaint. The following is a non-exhaustive list of some of those violations:

Violations of SEIU Collective Bargaining Agreement (Union Contract):

Article 17, Section 1 – Discipline shall be imposed only for just cause

Article 18, Section 9 – Prohibition against Reprisals (retaliation)

Article 17, Section 2 (A-B) – Requirement to inform employees of specific charges in a timely manner

Article 17, Section 2(C) – Requirement to list contact information for Steward(s) on disciplinary notices

Article 52 & 53 - Reclassification Standards

Article 54, Section 2 – Requirement to discuss Annual Performance Evaluations (required), and to allow for employee's input prior to an Evaluation's initial completion (encouraged)

Article 54 Section 2 – Prohibition against using Annual Evaluations for disciplinary actions

"Letter of Agreement - Inappropriate Workplace Conduct and Intimidating Work Environment" (page 87 of the Union Contract)

Violations of UOPD Policy:

General Order 308.2, Part I (B) (4-5)

General Order 1102.1 – Complaints, Inquiries, and Commendations Procedures

General Order 1102.2 – Complaints of Misconduct Procedures

General Order 1101.1, Standards of Conduct 2 – Aiding Other Members

General Order 1101.1, Standards of Conduct 8 – Cooperation with Members

General Order 1101.1, Standards of Conduct 9 – Respect Towards Subordinates

General Order 1101.1, Standards of Conduct 10 – Discrimination

General Order 1101.1, Standards of Conduct 11 – Dishonesty or Untruthfulness

"Respectful Workplace" Memo dated 1/31/12 from UO HR

Public Safety Officer's Bill of Rights:
ORS 236.350 to ORS 236.370

111.

All claims for relief as outlined below are for all Defendants.

34 - FIRST AMENDED COMPLAINT

## 1st CLAIM FOR RELIEF – 42 U.S.C. § 1983 – Freedom of Speech

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

112.

42 U.S.C. § 1983 provides that a party shall be liable when it "subjects, or causes to be subjected, any person of the United States ... deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States."

113.

Defendants violated Plaintiff's right to free speech under the 1st and 14th Amendments. Plaintiff engaged in protected speech as alleged above, including but not limited to:

a. Plaintiff complained about corruption, wrongdoing, misconduct, abuse of authority, and wastefulness of UOPD employees in violation of the law or policy.

b. Plaintiff complained about UOPD's violations of the Collective Bargaining Agreement with the union (SEIU).

c. Plaintiff complained about UOPD's violations of its own policies, procedures, and standards.

d. Plaintiff complained about the treatment and dehumanization of certain groups of people.

e. Plaintiff complained about Defendants issuing unlawful orders.

f. Plaintiff complained about receiving disparate treatment.

g. Plaintiff complained about UOPD's non-compliance and non-implementation with state laws including but not limited to O.R.S. 236.350 to 236.370.

114.

The subject matter of Plaintiff's protected speech were matter of public concern. Plaintiff's statements did not disrupt the efficiency of the office. Defendants took actions to dissuade and prohibit Plaintiff from engaging in the speech. Defendants took adverse

employment actions against Plaintiff in retaliation for Plaintiff engaging in this speech.

Plaintiff's speech was a substantial and motivating factor for the adverse employment actions.

115.

At all times relevant to this complaint, the individual Defendants alleged herein, acted or purported to act in the performance of their official duties, under state, county, or municipal law, ordinances, or policies on behalf of their respective employers UOPD, UofO, and/or OUS. UOPD, UofO, and/or OUS are responsible by law for the acts and omissions of its employees, and ratified the conduct of their employees by their actions and/or inactions as alleged.

Defendants' conduct was defined by law and Defendants knew or reasonably should have known that their conduct was not within the standards prescribed by law and/or policy. Defendants misused their official powers with a willful and malicious intent to deprive Plaintiff of his due process rights and caused him harm. In doing so, Defendants deprived Plaintiff of his due process rights by acting intentionally, knowingly, willfully, and with gross disregard to Plaintiff's constitutional rights. At least in part, one or more of these acts or omissions of the Defendants and their respective officials, was a cause of Plaintiff's injuries.

116.

The above mentioned actions of Defendants, in interfering with and retaliating against Plaintiff for engaging in protected speech, constitutes a violation of 42 U.S.C. § 1983 for which Plaintiff is entitled to relief. The violations of 42 U.S.C. § 1983 by Defendants resulted in Plaintiff being deprived of his rights, privileges, or immunities guaranteed by the Constitution and laws of the United States.

117.

As a direct and proximate cause of Defendants' violations of Plaintiff's Fourth and Fourteenth Amendment rights, Plaintiff has suffered economic and non-economic damages in an amount to be determined at trial.

118.

Plaintiff seeks recovery of all equitable relief, compensatory damages, and punitive damages provided by law, in addition to reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988.

119.

The Defendants' conduct toward Plaintiff demonstrated a wanton, reckless or callous indifference to the constitutional rights of Plaintiff, which warrants an imposition of punitive damages in such amount as the jury may deem appropriate to punish Defendants for their wanton misconduct, and to deter the Defendants from callously disregarding the Plaintiff's constitutional rights, or the constitutional rights of future employees.

## **2nd CLAIM FOR RELIEF – 42 U.S.C. § 1983 – Due Process**

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

120.

Plaintiff has constitutional rights under the Fourth and Fourteenth Amendments to be secure in his person, his right of privacy, right to be free from unreasonable searches and seizures, right to be free from involuntary servitude, his right to due process of law, before being deprived his liberty, his right to equal protection under the laws, and his right to be secure in his

person. These rights were violated by Defendants. 42 U.S.C. § 1983 provides that a party shall be liable when it "subjects, or causes to be subjected, any person of the United States ... deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States."

121.

Defendants misused their official powers with a willful and malicious intent to deprive Plaintiff of his due process rights and cause him grievous injuries thereby. Defendants, in acting to deprive Plaintiff of his due process rights, acted intentionally, knowingly, willfully, and with gross disregard to Plaintiff's rights. Plaintiff was denied process due by law and any process given to him was not meaningful or effectual.

122.

UOPD and UofO ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

## 3rd CLAIM FOR RELIEF – O.R.S. 659A.203 – Whistleblowing

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

123.

Plaintiff reported information he reasonably believed to be evidence of violations of federal laws, state laws, rules and/or regulations, and were acts of mismanagement, abuse of authority, and gross waste of funds, as alleged herein.

38 – FIRST AMENDED COMPLAINT

124.

In response, the UOPD and UofO threatened to take and took disciplinary action against him in retaliation. UOPD and UofO also discouraged, restrained, dissuaded, coerced, prevented, ignored, and otherwise interfered with Plaintiff's disclosures and complaints as referenced above, and which also constitute retaliation.

125.

UOPD and UofO ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

## 4th CLAIM FOR RELIEF – O.R.S. 659A.199 and 659A.030 – Retaliation

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

126.

Defendants retaliated against Plaintiff by taking adverse employment actions against him, as set forth in detail above, because of Plaintiff's complaints and oppositional conduct.

127.

Plaintiff engaged in protected activity when he opposed and complained about what he reasonably believed were Defendants' unlawful employment practices as described herein.

128.

Plaintiff requests an award of damages, equitable relief, costs, and attorney's fees as alleged

129.

UOPD and UofO ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

39 – FIRST AMENDED COMPLAINT

## 5th CLAIM FOR RELIEF – O.R.S. 659A.218 – Prohibited Disclosure

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

130.

Defendants participated in and assisted in discrimination and retaliation against Plaintiff, as alleged herein, with the knowledge that their conduct was unlawful.

131.

Defendants' unlawful conduct towards Plaintiff consisted of concerted, coordinated efforts in which they knowingly aided, abetted and/or incited discriminatory and/or adverse employment actions against Plaintiff.

132.

Defendants violated ORS 659A.030(1)(g) by aiding, abetting and/or inciting discrimination and/or adverse employment actions against Plaintiff, causing Plaintiff to suffer damages.

133.

Plaintiff requests an award of damages, equitable relief, costs, and attorney's fees as alleged herein.

134.

UOPD and UofO ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

40 – FIRST AMENDED COMPLAINT

## 6th CLAIM FOR RELIEF – Defamation

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

135.

At all times relevant to this complaint, the individual Defendants alleged herein, acted or purported to act in the performance of their official duties, under state, county, or municipal law, ordinances, or policies on behalf of their respective employers UOPD, UofO, and/or OUS. UOPD, UofO, and/or OUS are responsible by law for the acts and omissions of its employees, and ratified the conduct of their employees by their actions and/or inactions as alleged.

136.

The defamatory statements by the above mentioned Defendants were made intentionally, in order to subject Plaintiff to hatred, contempt or ridicule from other UOPD employees, and to excite adverse and derogatory feelings or opinions against, and to diminish Plaintiff's esteem, respect, or confidence in his workplace. Such attacks on a person's *professional* character or standing is considered defamation *per se*, and Article I, section 10 of the Oregon Constitution provides that "every man shall have remedy by due course of law for injury done to him in his… reputation."

137.

UOPD and UofO ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

41 – FIRST AMENDED COMPLAINT

# 7th CLAIM FOR RELIEF – Intentional Infliction of Emotional Distress

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

## 138.

The aforementioned defamatory statements consisted of extraordinary transgressions and departures of contemporary standards of civilized conduct toward an employees and amounted to intentional infliction of emotional distress, and also violated UOPD Policy 1101.1 "21 Standards of Conduct" - Standard #9, and constituted an "Intimidating Work Environment" as predicated on the "Letter of Agreement - Inappropriate Workplace Conduct," found on page 87 of the Union Contract, as well as prohibited by the "Respectful Workplace" Memo dated 1/31/12 from UofO Human Resources.

## 139.

Plaintiff had an employer-employee relationship with the above named Defendants. These Defendants knew that the aforementioned conduct would cause severe mental or emotional distress, or they acted despite a high degree of probability that the mental or emotional distress would result.

## 140.

The Defendants' conduct caused Plaintiff severe mental or emotional distress from the foreseeable and highly unpleasant emotional reactions including fright, grief, shame, humiliation, embarrassment, anger, disappointment, worry, anxiety, and lack of sleep. In addition, their conduct caused Plaintiff to withdraw from family and friends, which ultimately contributed to Plaintiff's separation from his wife.

141.

As a result of Defendants' intentional actions, Plaintiff suffered non-economic damages in an amount to be determined at trial. Plaintiff also requests his costs and disbursements as provided by law.

142.

The Defendants' conduct toward Plaintiff demonstrated a wanton, reckless or callous indifference to the Plaintiff, which warrants an imposition of punitive damages in such amount as the jury may deem appropriate to punish Defendants for their misconduct, and to deter the Defendants from callously injuring the Plaintiff or any other future employees.

143.

UOPD and UofO ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

## 8th CLAIM FOR RELIEF – Wrongful Discharge

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

144.

Defendants' unlawful conduct towards Plaintiff was prohibited by law, policy, and employment contract, which culminated in discriminatory and/or adverse employment actions against Plaintiff, to include wrongful termination.

145.

As a result of Defendants' intentional actions (and inactions), Plaintiff suffered economic and non-economic damages in amounts to be determined at trial. Plaintiff also requests his costs and disbursements as provided by law.

146.

UOPD and UofO ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

## **PRAYER FOR RELIEF**

147.

WHEREFORE, Plaintiff requests the following judgments and relief awarded according to proof:

1. A declaration that Defendants wrongfully discharged and unlawfully discriminated against Plaintiff based upon protected activity (Letter of Exoneration).

2. A permanent injunction enjoining Defendants from engaging in any future discriminatory employment practices as alleged in this complaint.

3. A permanent injunction enjoining Defendant UOPD to adopt written procedures to implement the provisions of ORS 236.350 to 236.370, as required by law under ORS 236.360(1).

4. Economic damages, in an amount to be determined at trial.

44 - FIRST AMENDED COMPLAINT

5. Non-economic damages, in an amount to be determined at trial.

6. Compensatory damages, in an amount to be determined at trial.

7. Liquidated damages, in an amount to be determined at trial

8. Equitable relief including reinstatement to Plaintiff's former position, or the reasonable value of such reinstatement as back-wages,

9. Punitive damages, as alleged herein and as deemed appropriate.

10. Prejudgment and post-judgment interest as appropriate and allowed by law as well as the amount necessary to offset the income tax consequences of any award of damages, pursuant to ORS 659A.885(1) and/or as special damages under common law.

11. Reasonable costs and attorney's fees, per the statutes cited herein.

12. Such other and further relief, either at law or in equity, general or special, that the Court may deem just and equitable.

DATED this 12th day of November, 2013.

s/ James M. Cleavenger

**James M. Cleavenger, JD, LLM**
**Pro Se Plaintiff (WSB#41398)**
**405 E. 8th Ave. #5700**
**Eugene, Oregon 97401**
**(503) 990-9368**
**jamescleavenger@hotmail.com**

45 - FIRST AMENDED COMPLAINT