Gregory Kafoury (OSB #741663)
kafoury@kafourymcdougal.com
Mark G. McDougal (OSB #890869)
mcdougal@kafourymcdougal.com
Jason L. Kafoury (OSB #091200)
jkafoury@kafourymcdougal.com
Kafoury & McDougal
411 SW Second Avenue, Suite 200
Portland, OR 97204
(503) 224-2647
Fax: (503) 224-2673
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **JAMES M. CLEAVENGER,** | **Case No.:   6:13-cv-01908-DOC** |
| Plaintiff, | |
| v. | |
| **UNIVERSITY OF OREGON** (an Agency and Instrumentality of the State of Oregon, and formerly part of the Oregon University System), employees CAROLYN MCDERMED, BRANDON LEBRECHT, SCOTT CAMERON, and BRIAN CAUFIELD, personally and individually,** | |
| | **SECOND AMENDED COMPLAINT  -** 42 U.S.C. 1983; WHISTLEBLOWING; RETALIATION; WRONGFUL DISCHARGE; and ORS 236.360, et al |
| Defendants. | (Jury Trial Requested) |

1 - SECOND AMENDED COMPLAINT

## PRELIMINARY STATEMENT

Plaintiff brings this claim under 42 U.S.C. § 1983 and additional causes of action based on Oregon state law claims arising out of the same nucleus of operative facts claims.  Plaintiff alleges that Defendants violated his Fourth and Fourteenth Amendment rights, as well as violated numerous state laws, employment practices, department administrative procedures and policies, and collective bargaining contracts, which ultimately resulted in the Plaintiff's wrongful termination (discharge) on October 26th, 2012, causing Plaintiff substantial harms as described herein.  This action seeks declaratory, injunctive, and monetary relief, including compensatory and punitive damages, and reasonable attorney fees and costs, in order to redress Plaintiff's federally protected and state statutory and common law rights.

## JURISDICTION

1.

Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331 and brought pursuant to a claim under 42 U.S.C. 1983.  All conditions precedent to initiation of this lawsuit were met.  The governmental entities and/or their agents were on actual notice of plaintiff's tort claims within 180 days, and/or received tort claim notice under the provisions of ORS 30.275(4) and (6).

## VENUE and PARTIES

2.

Venue is appropriate in this Court under 28 U.S.C. § 1391, Local Rule 3.2(a)(3), because all of Plaintiff's claims in this complaint arose in Lane County, Oregon.

3.

Plaintiff is currently, and has been a resident of Lane County, Oregon since 2005 (at all times relevant to this matter).

2 - SECOND AMENDED COMPLAINT

4.

Plaintiff is a graduate of the University of Oregon School of Law (JD) and the University of Liverpool Law School (LLM – International Human Rights Law), and is admitted to practice law in Washington State (WSB#41398).  Plaintiff is currently employed as a Judicial Clerk in the Eugene Division of the United States District Court for the District of Oregon. Plaintiff is aware that recusal of Eugene Division U.S. District Court Judges and/or a change of venue may be requested by the Defendants.

5.

At all times relevant to this complaint, Defendant **University of Oregon (UofO),** was a public body and an agency and instrumentality of the State of Oregon, responsible by law for the acts and omissions of its employees, including those whose actions and conduct is at issue herein.  At all relevant times, UofO's employees were acting within the course and scope of their employment.  The University of Oregon was part of the **Oregon University System (OUS).** UofO is a public employer pursuant to ORS 659A.200 *et seq.*

6.

At all times relevant to this complaint, the **University of Oregon Police Department (UOPD)**, was a department of the University of Oregon, responsible by law for the acts and omissions of its employees, including those whose actions and conduct is at issue herein.  At all relevant times, UOPD's employees were acting within the course and scope of their employment.  The University of Oregon *Police Department* (UO*PD*) was previously known as the University of Oregon *Department of Public Safety* (UODPS), until the department changed its name and became the University of Oregon Police Department (UOPD) on January 1, 2012. The department's current name (UOPD) is used for clarity in this complaint.

3 - SECOND AMENDED COMPLAINT

7.

At all times relevant to this complaint, Defendants **Carolyn McDermed** (Acting Chief),

**Brandon Lebrecht** (Lieutenant), and **Scott Cameron** (Sergeant), were employees of UOPD (a

UofO department as described above), and at all relevant times acted under color of law, as

employees of UOPD, within the course and scope of their agency or employment, and are sued

in their official and individual capacities.

8.

At all times relevant to this complaint, **Linda L. King** (Associate Vice President for

Human Resources), and **Randy Wardlow** (former UofO Employee and Labor Relations

Manager), were employees of the UofO, and at all relevant times acted under color of law, as

employees of UofO, within the course and scope of their agency or employment, and are sued in

their official and individual capacities.

9.

At all times relevant to this complaint, Defendant **Brian Caufield** (OUS Associate

General Counsel for Labor & Employment), was an employee of Oregon University System

(OUS), to which UofO was a member, and at all relevant times acted under color of law, as an

agent of UofO (for OUS), within the course and scope of his agency or employment, and is sued

in his official and individual capacity.

## **JURY TRIAL REQUESTED**

10.

Plaintiff requests a jury trial on all claims and issues to the extent allowed under the law.

4 - SECOND AMENDED COMPLAINT

## SUPPLEMENTAL JURISDICTION

### 11.

This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  Plaintiff's state law claims are so closely related to his federal law claims that they are part of the same case or controversy under Article III of the United States Constitution.

## STATEMENT OF FACTS

### 12.

Plaintiff was first hired by UOPD as a part-time "Auxiliary Public Safety Officer" (APSO) in March of 2010.  In July of 2010, Plaintiff was also hired part-time as UOPD's "Traffic Petitions Officer" (TPO), responsible for reviewing appeals of traffic and parking tickets issued by UOPD Officers.  Plaintiff held both part-time positions (APSO and TPO) until he was hired by UOPD as a full-time "Public Safety Officer" (PSO), in March of 2011, at which point he stopped working as an APSO, but continued as the TPO until a replacement was hired in August of 2011.

### 13.

On 8/18/2011, Defendant Lt. Mike Morrow, who was the Plaintiff's supervisor, emailed Plaintiff to thank him for his service as the TPO.  Morrow emphasized Plaintiff's "...good judgment and sound decisions."

### 14.

During this same time period (and at all times relevant to this complaint), Plaintiff also worked as a Reserve Police Officer with the City of Junction City, Oregon (beginning in January of 2010).  He worked paid and unpaid shifts as a sworn police officer for the Junction City Police Department (JCPD) with the same authority and responsibilities as regular full-time officers.

5 - SECOND AMENDED COMPLAINT

15.

In early summer 2013, Plaintiff transferred to the Coburg, Oregon Police Department, where he continues to work as a volunteer Reserve Police Officer with full police authority.  In February 2014, Plaintiff was promoted to "Solo Status" (the highest Reserve Police Officer status, which does not require direct supervision while on duty, etc.).

16.

Plaintiff has excelled in law enforcement.  He graduated #1 in his six-month Reserve Police Academy class and received an award at graduation in 2010.  Based on his legal education and success in the academy, Plaintiff returned in 2011 to teach law classes.  Plaintiff has received several internal and public commendations and recommendations including a "Letter of Recommendation and Support" signed by *all* of the regular full-time police officers, all Reserve Officers, and dispatchers at the Junction City Police Department.  Plaintiff's UOPD performance statistics also show him to be an extremely productive officer.

17.

Plaintiff has never been formally disciplined or fired from any job, has no formal disciplinary records outside of those created by UOPD, and has never filed any type of complaint, grievance, or lawsuit against any other employer.

18.

When Plaintiff became a full-time PSO with UOPD in March 2011, he began a 6-month Field Training Evaluation Program (FTEP), coinciding with a 6-month Trial Period, ending on or about September 7th, 2011.  During these six months, UOPD was free to terminate Plaintiff *without* having to show Just Cause.  Plaintiff's primary Field Training Officer (FTO) was Michael Drake.  His second FTO was Chris Phillips.  Plaintiff's direct supervisor during this time

6 - SECOND AMENDED COMPLAINT

was Lt. (then Sgt.) Andy Bechdolt.  During this time period, Plaintiff's work was evaluated on a *daily* basis by his FTO and other supervisors via written Daily Observation Reports (DOR's). Plaintiff received very positive DOR's throughout the 6 month FTEP process.  Plaintiff also earned positive "End of Phase Evaluations" on 7/4/11 and 8/22/11, signed by FTO Drake and Field Training Supervisor Sgt. Bechdolt.  These evaluations were very positive and noted his "good officer safety skills" and "knowledge of the law."  Officer Drake reconfirmed that Plaintiff "excelled" during the FTEP, in an email from 4/2/2013, stating Plaintiff was an "*above average*" officer.  Other officers will confirm Plaintiff was well liked and highly competent.

19.

Plaintiff was also later issued a positive 6-Month "Trial Period Evaluation" written by Defendant Lt. Lebrecht, which covered March-September 2011, but which was not actually signed or given to Plaintiff until December 2011.  This evaluation gave Plaintiff scores of "Highly Competent" or "Competent" in 6 of the 7 major categories.  Curiously, when you compare this evaluation to the Plaintiff's first *issued* "Annual Performance Evaluation" given to Plaintiff on 5/31/2012 (*after* Plaintiff told his supervisors he would be filing a grievance through the Union regarding the Letter of Reprimand recently issued to him and while he was demoted and under investigation), the Annual Evaluation issued on 5/31/12 did not give Plaintiff *any* scores within the "Competent" range even though it covered much of the same time period as the Trial Period Evaluation.  The "Trial Period Evaluation" covered March-September 2011.  The "Annual Performance Evaluation" covered March 7, 2011 to March 7, 2012.

20.

Since the filing of this lawsuit, Plaintiff has become aware of a version of his Annual Performance Evaluation that was drafted *before* the one given to him on 5/31/2012.  In this

previously unknown version drafted sometime around April 1, 2012, Plaintiff was given higher scores in 7 of 11 performance categories.

21.

When Plaintiff started working full-time for UOPD in March 2011, he was assigned to the graveyard shift (11pm-7am), commanded by Lebrecht.  Before each shift, Lebrecht would conduct a "Pre-Shift Briefing" with all the officers on the shift (Plaintiff, Kent Abbott, Michael Drake, Adam Lillengreen, Eric LeRoy, and Sgt. Bechdolt).  During many of these briefings, Lebrecht allowed for a discussion of a "Bowl of Dicks List."  This was an actual list of people and entities that participating officers disliked and thought should "eat a bowl of dicks."  The list was kept on LeRoy's cell phone.  The list was discussed and added to on numerous occasions during "Pre-Shift Briefings."  On several occasions, LeRoy and Lebrecht would continue discussing the Bowl of Dicks List in Lebrecht's office after the Pre-Shift Briefing concluded.  On multiple occasions Lebrecht and LeRoy spent the majority of their 8-hour shifts talking inside Lebrecht's office instead of working, as verifiable by Computer Aided Dispatch (CAD) records and UOPD Dispatch audio recordings.

22.

The "Bowl of Dicks List" contained dozens of entries such as; the ACLU, US District Court Judge Ann Aiken, Oprah Winfrey, OJ Simpson, civil rights activist Al Sharpton, Rev. Jesse Jackson, Civil Liberties Defense Center lawyer Lauren Regan, Eugene Mayor Kitty Piercy, Democratic Party politicians including Al Gore and Hilary Clinton, 2010/2011 ASUO Student Body President Amelie Rousseau, UofO Housing Staff and RA's deemed unfriendly to UOPD, defense lawyers, and "dirty hippies," etc.  Plaintiff did not support the making or discussion of the Bowl of Dicks List, as he felt it was reprehensible and an act of waste.  Plaintiff has saved

8 - SECOND AMENDED COMPLAINT

text messages from LeRoy acknowledging the existence of the "Bowl of Dicks" List.  Other officers can also confirm its existence.

### 23.

Plaintiff felt it would be dangerous to complain about the practice at the time, because he was still an "at-will" employee in his Trial Service Period and could be terminated without "Just Cause."  However, Plaintiff did later report this practice to supervisors once he was no longer on trial service, and also on 10/02/12 in a meeting with Brian Smith (UofO Assistant Vice President for Administration) and SEIU Union Steward Lois Yoshishige.  Smith ignored this allegation (and others), and then left the UofO for another job out-of-state within days of the meeting.

### 24.

On or about October 1st, 2011, Defendant Sgt. Scott Cameron became Plaintiff's direct supervisor when Andy Bechdolt became a Lieutenant and moved to a different shift.  Once Cameron became Plaintiff's direct supervisor, Plaintiff became subject to constant harassment and intimidation by Cameron and Lebrecht.

### 25.

Sgt. Cameron once told Plaintiff directly, "I never liked you and never thought they (UOPD) should have hired you in the first place."  Cameron made similar statements to other officers.  Cameron's personal dislike of Plaintiff was common knowledge in the department.

### 26.

On multiple occasions Cameron publicly criticized Plaintiff in front of other officers. It was also reported in an interview with another UOPD officer that Cameron showed a youtube.com video of Plaintiff speaking on behalf of the ASUO (UofO student government) as the Graduate Student Representative against UOPD obtaining Tasers in 2008, while Plaintiff was

9 - SECOND AMENDED COMPLAINT

still in law school.  Cameron knowingly made false statements regarding Plaintiff's opinions on Tasers in order to harass, belittle, and intimidate the Plaintiff.

27.

On at least two occasions Cameron intentionally showed his dislike of plaintiff, by stating that Plaintiff's UofO law degree was "worthless" and a "waste of money."

28.

It was also after Cameron became Plaintiff's supervisor that Lt. Lebrecht was made aware of Plaintiff's previous work history and involvement in Democratic Party politics, i.e., as a motorcade driver for former Vice President Al Gore in 2000 and President Barack Obama when he campaigned in Oregon in 2008, as well as a paid staff member for a Democratic politician in Chicago.   Lebrecht is a pronounced, vehement Republican and made his dislike of Democrats well known.  Plaintiff tried to avoid political discussions in the workplace, especially in front of Lebrecht because Lebrecht would become angry.  Plaintiff also publicly claimed on many occasions that he was no longer involved in politics.  However, in law enforcement jobs, officers are required to disclose all of their prior work history, regardless of its applicability, so Plaintiff's previous history was included in his personnel files.  Lebrecht began discussing politics at work more frequently, despite Plaintiff's repeated requests not to do so.  During Pre-Shift Briefings with other officers present, Lebrecht told Plaintiff that President Obama was "definitely not born in America," and so was not a US Citizen and thus an illegitimate President.  Lebrecht also claimed President Obama was "secretly Muslim."

29.

Lebrecht also once stated publicly during a briefing that Bill and Hilary Clinton ordered the murders of "dozens" of people they did not like or who had evidence of Clintons' crimes.

10 - SECOND AMENDED COMPLAINT

30.

Lebrecht also publically alleged that "Democrats were responsible for the death of Pat Tillman in Afghanistan."

31.

In September 2012, a photocopy of a magazine cover with Ronald Reagan on the cover was posted on a bulletin board inside the officer's East Station briefing room alongside other photos of UO Administrators as part of an organizational structure/hierarchy chart.  Plaintiff had previously seen this magazine on Lebrecht's desk in Lebrecht's office.  Plaintiff took a photo of the bulletin board.

32.

On 10/30/2011, during a briefing overseen by Lt. Lebrecht to discuss UOPD's Operation Plan for dealing with the Occupy Eugene Movement which had been located on UofO property since 10/25/11, another officer likened the Occupy Camp to the movie "District 9" (http://www.d-9.com) because the camp was only full of "dirty hippies," "dirtbags" (criminals), and "lazy democrats who don't want to get a job!"  Plaintiff briefly tried to explain what the Occupy Movement was about and that it included "normal people" such as students, professors, professionals, etc., but was cut-off.  After the briefing, Lebrecht appeared angry and confronted Plaintiff in the hallway and asked, "Why weren't you laughing like everyone else (at the jokes about the Occupy movement)?!"  This episode is even mentioned in Lebrecht's Supervisory Files, wherein Lebrecht states, "I asked Plaintiff why he appeared upset in briefing.  I asked him if it was because other officers referred to Occupy Eugene as 'District 9.'"  Plaintiff tried to avoid confrontation by trying to change the subject and telling Lebrecht that he was not upset by the unprofessional comments, even though he actually was.  Lebrecht continued to press the issue

11 - SECOND AMENDED COMPLAINT

and eventually Plaintiff told him he was upset at the assignment he had been given (to sit inside a parked patrol car all night to keep an eye on the Occupy Camp) because he felt it would be "boring." Lebrecht claims Plaintiff "raised his voice" when he denied being upset by the briefing. Plaintiff denies having raised his voice, but that he was dismayed by his coworkers' distasteful remarks and fearful of further retaliation from Lebrecht.

33.

On 11/04/2011, a few days after the Occupy Eugene events, Lebrecht called Plaintiff into his office and told him he would be issuing Plaintiff a "Clarification of Expectations Letter." Plaintiff received the Clarification Letter on 11/18/2011, which was for violating the department's grooming standards by not shaving often enough (every day) "on at least two occasions," and for "officer safety concerns" including an event almost 3 months prior on 8/27/2011 (Case #11-1664), while Plaintiff was still in training. This was Plaintiff's *first and only* Letter of Clarification.

34.

In regards to the grooming standards, Plaintiff does not dispute his breach of the policy, but does believe it was applied discriminatorily, as other officers would also skip shaving on occasion. Plaintiff also claims that shaving daily caused him to get a rash. Plaintiff has a note from his physician backing this claim that he later submitted to Sgt. Cameron. No other officers in the history of the department have ever been issued a formal letter for violating grooming standards, despite others having also violated the policy.

35.

In the 8/27/11 incident, Plaintiff was accused of allowing a man to reach into his bag to get his phone and call his girlfriend to tell her he was being arrested so he could not meet her as

12 - SECOND AMENDED COMPLAINT

they had planned.  This man had previously been arrested while carrying a "javelin."    Plaintiff

does not deny allowing the phone call, and admits he could have waited until after he handcuffed

him and then make the call for him.  Plaintiff's explanation was that he did not feel threatened at

the time because he did not see a javelin in the vicinity or a bag big enough to contain one.

There were six officers present as well.  Plaintiff said he could see the man's phone lying on top

of his bag, and that he did not search the full contents of the bag because he did not receive

consent to do so, but since Eugene Police (EPD) officers were in route to transport the man to

jail, they would be able to search the bag without consent prior to transporting him.  Plaintiff and

Lebrecht discussed this incident later that same night as part of Plaintiff's training, but Plaintiff

was unaware it would be used against him almost 3 months later in a disciplinary letter, and then

again over a year later when he was terminated.

36.

Plaintiff decided not appeal the letter or attach a rebuttal statement, based on his fear that

doing so might jeopardize his successful completion of the special weekly evaluations.

Plaintiff's decision not to appeal was also based on his reliance on Lt. Lebrecht's promise not to

include or ever reduce to writing, additional minor transgressions such as the "ESPN Gameday"

episode (wherein Plaintiff momentarily placed a pair of discarded angel wings over his uniform

for humor), which was later cited in Plaintiff's Annual Performance Review.

37.

When Plaintiff received this first and only Letter of Clarification on 11/18/2011, he was

also placed on special "weekly evaluation summaries to track your progress" in the same letter.

To Plaintiff's knowledge (based on information requests and interviews), these special "weekly

evaluation summaries" had never been used by the department.  It is believed Lebrecht created them on his own, despite there being no written policy authorizing them.

38.

These evaluations were supposed to last for "8 to 10 weeks," but only lasted five weeks (until 12/17/2011) because during the evaluation period Lebrecht decided it was unnecessary due to Plaintiff's successful improvements.  On his last weekly evaluation, Lebrecht wrote, "Officer Plaintiff's overall performance was at an acceptable level this week. Plaintiff's overall performance continues to improve in all areas. I don't see it as necessary to continue weekly evaluations at this point as Officer Plaintiff immediately took it upon himself to quickly correct the points that were to be addressed. He is working at a level that is equal to that of his peers."

39.

On 12/07/2011 Lebrecht also issued Plaintiff a positive "6-Month Trial Period Evaluation," which described Plaintiff as "Highly Competent" or "Competent" in six of the seven major categories, as previously described.

40.

On 1/18/2012, Chief Doug Tripp and Lt. Mike Morrow both gave speeches "encouraging officers to find and request any additional training opportunities" at an all-staff meeting in the UofO Alumni Center building.

41.

On 1/23/2012, Plaintiff submitted the first five of his eventual 33 total Training Requests to Sgt. Cameron.  Cameron verbally denied all the requests on 1/26/2012.  Plaintiff continued making additional training requests for the next nine months.  In making his training requests, Plaintiff offered to drive himself using his own car and "flex" his schedule so as not to incur

14 - SECOND AMENDED COMPLAINT

overtime.  *All* 33 of Plaintiff's requests were denied or in some cases completely ignored (no response given), as outlined below:

| **Class Title:** | **Date of Training:** |
|---|---|
| 1.  Mobile Dash-Cam Video Tactics | 2/7/12 |
| 2.  Railroad Crimes        & Investigations | 2/9/12 |
| 3.  Sex Assault Drugs (at UO) | 2/27/12 |
| 4.  Youth Alcohol & Drug Culture | 3/5/12 |
| 5.  Concealed Compartments (DEA, free) | 3/8/12* |
| 6.  High-Risk Traffic Stops | 3/9/12 |
| 7.  The Moral Crucible of Policing (Ethics) | 3/13/12 |
| 8.  Use of Force Legal Updates (at UO) | 5/9/12* |
| 9.  Tactical Silence | 4/26/12 |
| 10. 10. Gangs | 5/23/12 |
| 11. Pepperballs | 5/7/12 |
| 12. Active Shooter | 4/28/12 |
| 13. Interdiction | 6/12/12 |
| 14. Search & Seizure Law | 5/14/12 |
| 15. FBI National Academy Spring Training | 5/16/12* |
| 16. Indoor Marijuana Growing | 7/26/12 |
| 17. Reading Body language | 7/26/12 |
| 18. Tactical Silence | 7/27/12 |
| 19. Bullet Proof Mind | 8/13/12 |
| 20. Street Crimes Seminar | 9/10/12 |
| 21. Dealing with Veterans | 9/20/12 |
| 22. Dealing with Veterans II | 9/27/12 |
| 23. Gordon Graham (Safety) | 9/20/12 |
| 24. Identity Theft (free) | 10/2/12 |
| 25. Online Investigative Resources | 10/3/12 |
| 26. Detecting Fraud/Fake IDs | 10/17/12 |
| 27. Gang Trends | 10/30/12 |
| 28. Bike Patrol Tactics | 10/15/12 |
| 29. Assertive Communication (UO ODT) | 10/16/12 |
| 30. Listening Skills (UO ODT) | 11/14/12 |
| 31. Emotional Intelligence (UO ODT) | 11/29/12 |
| 32. Emotional Intelligence II (UO ODT) | 12/12/12 |
| 33. Emergency Man. ICS-800 (UO ODT) | online |

*\*Plaintiff attended anyway, in his capacity as a Junction City Police Officer*

15 - SECOND AMENDED COMPLAINT

42.

Plaintiff submitted four more requests to Cameron shortly after his initial five requests, but did not hear a response for over a month.  So on 2/20/2012 Plaintiff sent an email to Lt. Morrow, who oversees the department's "Professional Standards and Training," to inquire as to the status of his requests and to "seek clarification" on how the request process worked.

43.

Morrow responded the same day by email, acknowledging he was aware of Plaintiff's training requests and explained that an officer's immediate supervisor(s) such as Cameron and Lebrecht could make "recommendations" regarding an officer's training request, but that the "final" review would be made by the Chief (then D. Tripp) or Assistant Chief (then McDermed).

44.

Plaintiff never received any notifications from Chief Tripp or Assistant Chief McDermed regarding any of his 33 training requests.

45.

A few days after Plaintiff emailed Lt. Morrow regarding his training requests, Lebrecht called Plaintiff into his office and asked him to shut the door.  Lebrecht appeared angry and said to Plaintiff, "Don't think you can go behind my back and complain about me to Morrow!  I will always know if you do because I'm friends with Mike (Morrow) and he'll tell me!  I can even show you the email he (Morrow) sent me that you sent to him to prove it!"  Lebrecht was obviously referring to the email Plaintiff sent Morrow on 2/20/12.

46.

Plaintiff alleges that Lebrecht meant this meeting to be a clear threat, in that if Plaintiff ever tried to file a complaint about him to Morrow, Lebrecht would find out from Morrow, even

16 - SECOND AMENDED COMPLAINT

though such internal complaints to Morrow as the "Professional Standards and Training Lieutenant" are supposed to be confidential.  This type of threat is prohibited by UOPD Policy, the Union Contract, the "Respectful Workplace" Memo dated 1/31/2012 from UofO HR, and by law ORS 236.350-370.

47.

On 4/1/2012, Plaintiff responded to a call for service at the UofO's Spencer View Apartments.  This incident did not seem remarkable or troublesome at all and Plaintiff was never advised of any problems with it until he was asked to meet with Lebrecht and Cameron a week later on 4/8/2012.

48.

During this meeting on 4/8/2012, Plaintiff was asked to make statements about the incident without being shown any of the available video footage from his vehicle's dash-camera prior to or at the meeting.

49.

Plaintiff' access to his own videos were also later blocked.  Plaintiff has documented proof of the videos being removed from his view without explanation and in violation of policy.

50.

Plaintiff was led to believe by Cameron and Lebrecht that this 4/8/12 meeting was not a "big deal" and would most likely *not* lead to any form of discipline, and therefore he did not need Union representation, as afforded to him by Union Contract.

51.

Despite these assurances, on 5/18/12, Plaintiff received his first and only Letter of Reprimand from his supervisors Lebrecht and Cameron.

17 - SECOND AMENDED COMPLAINT

52.

The Reprimand referenced an incident at the Spencer View Apartments on 4/1/12,

wherein Plaintiff was accused of "continued failure to follow department standards regarding

officer safety tactics and procedures."

53.

On the same day and time (5/18/12), Plaintiff received another document from Lebrecht

that was signed by Assistant/Acting Chief McDermed, informing him he was being temporarily

"reassigned" (what amounted to a "demotion" and transfer to another department as explained

further below) to parking enforcement duties, pending a "special investigation" concerning

Plaintiff's "ability to safely and legally perform the duties of a Public Safety Officer."

54.

The special Investigation Letter did not outline *who* would be conducting the

investigation or *what* the specific allegations were (as required in Union Contract Article 17,

Section 2(A) and UOPD General Orders 1102.1&2 and by O.R.S. 236.350 to 236.370).

55.

Plaintiff was ordered by Lebrecht to sign both documents that day "without any

discussion."

56.

If Plaintiff's "reassignment" was in fact a demotion to a different job as the Plaintiff and

the Union claimed, it would constitute a breach of contract and a violation of Union Contract

Articles 52 & 53 regarding job reclassification.  If the "reassignment" did *not* to amount to a

demotion, then it would fall under "Investigatory Suspensions with Pay" in Article 17, Section

18 - SECOND AMENDED COMPLAINT

2(B), which would also require written notice of the specific allegations within seven days under Union Contract.

57.

Neither disciplinary document provided Plaintiff with contact information for SEIU Steward(s), as required under Union Contract Article 17, Section 2(C).

58.

On 5/19/12, the day after Plaintiff received his Letter of Reprimand, Plaintiff informed his supervisors of his intent to appeal the Reprimand through the Union's grievance process. After this date, the Defendants began further retaliating against Plaintiff for filing a complaint.

59.

During one of Plaintiff's meetings with Wardlow and Lebrecht (which was also attended by SEIU steward Lois Yoshishige), Lebrecht told Plaintiff that "it didn't have to come to this," insinuating that if Plaintiff had not filed a complaint, that he would not have been subject to continued investigations and discipline.

60.

Beginning 5/18/2012, Plaintiff was subject to the following conditions during his reassignment:

a) Relieved of all job duties (including taking any enforcement actions) except for;  A) writing parking tickets and  B) impounding abandoned bikes.  Both of these activities were duties of UofO Department of Parking & Transportation employees, which became a *separate* department from UOPD.

b) Plaintiff was also not allowed to drive any UOPD vehicles.  Plaintiff was only allowed to drive two trucks clearly marked "Department of Parking and Transportation."

19 - SECOND AMENDED COMPLAINT

c) Plaintiff was not allowed to wear a UOPD badge or regular uniform (*except* for during the Olympic Trials, two baseball games, and one football game because they needed more officers and wanted Plaintiff to look like a regular officer).

d) Plaintiff was revoked access to all three officer key sets (general buildings, student housing, and fire), making it impossible for Plaintiff to carry out many of his original job functions as a Public Safety Officer.  However, in August Plaintiff was allowed access to the general set, because officers were tired of having to open so many doors for him to impound bikes, etc.

61.

While Plaintiff was not allowed to take any "enforcement action" or to back up any officers, he was allowed to report any crimes in progress he witnessed, which is also what he was sworn to do.  During his reassignment period, Plaintiff "called out" on the radio numerous instances of crimes in progress including: trespassing, public intoxication, public nudity, warrant arrests, drug use, etc.  In doing so, every officer on Plaintiff's shift benefited by gaining at least one arrest from something Plaintiff reported.  In fact, there were days when the *only* enforcement actions on record were from incidents Plaintiff alerted other officers to during his shift.

62.

According to interviews with other officers, this type of "reassignment" is unprecedented in UOPD history, and the only other former UOPD employee who was ever subject to this type of demotion (to "parking duties only") was a former employee named McIntyre.  Reportedly, McIntyre was fired around 2005 (by then Chief Herb Horner), but the Union was able to get him reinstated a few months later to a different position.

20 - SECOND AMENDED COMPLAINT

63.

When Plaintiff was "reassigned" he was also removed from a large number of extra

assignments he was scheduled to work including baseball games and special events.

64.

On 5/21/12, Plaintiff met with Cameron in an attempt to try to avoid having to file a

grievance and to try to understand *why* he was being investigated and by *whom*.  Cameron

claimed not to know anything about Plaintiff being investigated or who may have been

conducting the investigation(s).

65.

Although Cameron claimed no knowledge of any investigation(s), Plaintiff later learned

in a tape-recorded interview with Lebrecht on 8/13/12, that Cameron *did* in fact know about the

investigation, but had lied to Plaintiff on 5/21/12.

66.

Plaintiff was never able to ascertain the identity of the investigator involved in the

investigation mentioned in the 5/18/2012 Letter of Investigation because he was given

conflicting answers from different supervisors and other UofO employees.  In fact, it is still not

clear who was conducting the investigation mentioned in the 5/18/2012 Letter of Investigation

because UOPD supervisors and UofO HR employees have continued to give conflicting answers.

67.

Failure to disclose the identity of an investigator was a violation of department policy and

state law (ORS 236.360, known as the "Public Safety Officers' Bill of Rights).  Failure to

disclose the subject matter of the investigation was also a violation of department policy and the

aforementioned state law.

68.

Cameron also told Plaintiff during their 5/21/2012 meeting, that Randy Wardlow (of

UofO HR) "made him" (Cameron) write the Letter of Reprimand, even though Cameron's

personal opinion was that it was "only a training issue."

69.

On 6/13/2012, Plaintiff's Union Stewards (Donna Laue and Lois Yoshishige) met with

Wardlow and told him what Plaintiff said about Cameron (that Cameron told Plaintiff he didn't

want to give Plaintiff the reprimand, but Wardlow told him to). According to the Stewards as

noted in an email on 6/13/12, Wardlow's response was, "That's an interesting statement," and

that Wardlow responded to this query "in a tone that made me think he (Wardlow) was angry... I

asked Randy if he would give a yes or no answer to my question and he said he would not."

70.

On 5/31/12, Lt. Lebrecht gave Plaintiff the aforementioned first *issued* version of his

Annual Performance Review and ordered him to sign it "without discussion, because it was

written by Sgt. Cameron" who was not there. Lebrecht signed this version of the Annual

Performance Review on the supervisor's signature line, even though doing so was a violation of

department policy because he supposedly did not write it and was not Plaintiff's immediate

supervisor.

71.

The "final" version of Plaintiff's Annual Performance Review was signed by Plaintiff on

8/3/2012, but not actually issued to him until 9/6/2012. As previously mentioned and despite

multiple Information Requests through the Union for such information and documents, Plaintiff

was never aware of the *real* first version of his Annual Performance Evaluation drafted sometime

22 - SECOND AMENDED COMPLAINT

around April 1, 2012 that gave him higher scores in 7 of 11 performance categories, as compared to the 5/31/12 version Plaintiff was led to believe was the first version.

72.

Plaintiff's Annual Performance Review was mentioned and used as part of the disciplinary actions and retaliation leading to Plaintiff's termination, despite this being prohibited by Union Contract Article 54 Section 2.

73.

On 6/1/2012, the day after Plaintiff was first issued a draft of his Annual Performance Evaluation, Plaintiff was informed verbally by Lt. Morrow that he was under an internal affairs investigation for "two citizen's complaints," stemming from incidents on 4/1/12 and 4/2/12, which was two months prior to the start of the investigation and alleged "complaints."

74.

Even though no actual citizen complaints were ever filed (they were supposedly "found" and then created in absentia by Lt. Morrow and Lt. Lebrecht), this investigation lasted over four months and eventually was used as a reason to terminate plaintiff.

75.

After Plaintiff announced his intent to file a grievance, he was subject to increased and unfair scrutiny and disparate treatment, which amounted to a reprisal (as prohibited by Union Contract Article 18, Section 9), for his filing of the grievance.  Specifically, the Annual Review and aspects of both investigations amounted to reprisals, since they were received and/or conducted after Plaintiff's supervisors had knowledge of Plaintiff's intent to initiate a grievance. Plaintiff's supervisors' actions also amounted to an "Intimidating Work Environment" as

predicated on the "Letter of Agreement - Inappropriate Workplace Conduct," found on page 87 of the Union Contract.

76.

Plaintiff filed his first grievance of the Letter of Reprimand on 6/18/2012.  Plaintiff always maintained his hope and desire to try to address the grievance "in-house" (within the department at Step-1).  Plaintiff initially came to an agreement over email with AIC Chief Carolyn McDermed on 6/14/2012, to start at Step-1 and address the Letter of Reprimand in a meeting to be set with Sgt. Cameron, Chief McDermed, HR Associate Director Wardlow, and Union Steward(s).  Chief McDermed also agreed to attend a separate meeting between Plaintiff and Sgt. Cameron to facilitate the initial discussion regarding the Annual Performance Evaluation that Plaintiff was entitled to under Union Contract Article 54, Section 2.  McDermed never honored either of these agreements.

77.

McDermed became the "Interim Chief" on 6/21/2012 and from then on (throughout the rest of the relevant time herein) was in the application process for the permanent position.

78.

On 8/15/2012 after UOPD and UofO HR ignored and refused the Union's request for a Step-1 Hearing even after multiple extensions were granted, the Letter of Reprimand Grievance was "bumped" to Step-2 by Plaintiff' Steward, Lois Yoshishige.

79.

On 8/9/2012, the UofO Parking and Transportation Department was transferred out of the UOPD and into the UofO Department of Finance.  Plaintiff continued his parking and

24 - SECOND AMENDED COMPLAINT

transportation duties while driving a truck clearly marked "Department of Parking and Transportation" but was still under UOPD command.

80.

On 8/13/2012, Plaintiff again met with McDermed for almost an hour to discuss his concerns over his treatment by Lebrecht, Cameron, and Morrow, including allegations reasonably believed to be evidence of violations of federal laws, state laws, rules and/or regulations, and acts of mismanagement, abuse of authority, and gross waste of funds, as alleged in this complaint.  McDermed took written notes during the meeting and told Plaintiff she would "look into it" but no action or follow-up was ever mentioned to Plaintiff.

81.

On 8/21/2012, Plaintiff was presented with a special offer from Randy Wardlow (through SEIU Stewards).  The offer was for Plaintiff to participate in a special additional FTEP process, and if he successfully passed it he would be allowed to be a regular officer again.  Plaintiff wanted to know more about the details of the offer, such as how long it would be, what the requirements would be, and who the FTO would be.  Plaintiff's concerns were borne out of his fear that the process may not be fair and would be "rigged" so that he would be sure to "fail" so they could terminate him.  Wardlow did not provide any more details of the deal, but on 9/10/2012 Plaintiff accepted the offer anyway (with noted reservations and concerns).

82.

Wardlow never responded to Plaintiff's acceptance of the offer and it was withdrawn without explanation.

25 - SECOND AMENDED COMPLAINT

83.

On 9/7/12 Plaintiff was ordered by Cameron & Lebrecht (in a closed door meeting) that from now on, he was not allowed to report any crimes in progress that he witnessed, unless it was a felony.  For example: if he saw someone stealing a bike he could not report it.  Or if he saw someone he knew had a UofO Letter of Trespass he could not report it.  Or if he saw people fighting (unless they had weapons, making it a felony) he could not report it.  If he saw a drunk driver (DUII – is only a misdemeanor), he could not report it.  But Plaintiff did keep a record of some of the crimes he witnessed during this period in his field notebook.  This order was in violation of department policy, law enforcement standards and oaths, state law, and federal law known as The Clery Act.

84.

Also on 9/7/12, Plaintiff was told to report to West Station to meet with an "APSO/Auxiliary Public Safety Officer" (a part-time and non-Union represented position) to be trained on "Academic Lock-Up Duties" (going around and locking up all the doors on campus).  When Cameron told Plaintiff to do this, he called it a "promotion."  Plaintiff complied with the further demotion.

85.

On 9/20/12, when Plaintiff arrived at work for his shift he was placed on paid administrative leave and escorted off UOPD property by Mike Morrow.  This was a complete surprise to Plaintiff and the Union.  It was also the Plaintiff's birthday, which the Plaintiff knows that the Defendants were aware of because it was UOPD custom to have all employees sign a card to give to the officer on their birthday.  Plaintiff had received one on his previous birthday.

26 - SECOND AMENDED COMPLAINT

86.

Morrow also told Plaintiff he was no longer entitled to see the results of his "internal investigation" of Plaintiff regarding the supposed "citizen complaints" on 4/1/12, because of Plaintiff's leave status.  Plaintiff was not allowed to see it until days before his termination.

87.

On 9/25/2012, after additional extensions were made, Plaintiff was finally afforded a Step-2 Hearing in front of UofO employee Brian Smith.  Lebrecht, Wardlow, Yoshishige, Smith's assistant "Kelly," and SEIU staffer Sean Brailey were also present.

88.

Plaintiff spent over two hours presenting convincing evidence including photos and videos proving that the allegations made by Lebrecht and Cameron were false and fabricated.

89.

Plaintiff also presented records of two incidents involving identical set of circumstances (same apartment number, tenants and officers) that occurred after the Plaintiff's incident (4/1/12).  These two incidents on 4/16/2012 (case #12-786) and 2/24/2012 (case #12-448) did not result in any inquiries or discipline, which Plaintiff used to show disparate treatment.

90.

As soon as Plaintiff was finished presenting his case at the Step-2 Hearing on 9/25/2012, he was handed a "Notification of Investigatory Suspension" Letter signed by Wardlow, placing him on paid Administrative Leave and pending the results of a yet *another* investigation into three new allegations of "incidents."  No further details regarding the allegations or circumstances of these new "incidents" were provided despite multiple requests by Plaintiff and SEIU Stewards.

27 - SECOND AMENDED COMPLAINT

91.

On 10/4/2012, Brian Smith issued his denial letter for Plaintiff's Step-2 Grievance Hearing.  The letter did not address *any* of the merits of Plaintiff's claims or arguments.  Smith soon left the state (within days) for a new job in San Diego.  Smith's short and unresponsive letter demonstrated the lack of attention paid to the matter.

92.

Plaintiff was placed on unpaid Administrative Leave via a Pre-Dismissal Letter signed by Linda King and Chief McDermed and received by Plaintiff on 10/2/2012.  This letter did not provide the dates or any more details related to the three new allegations of "problematic call-outs."

93.

On 10/12/2012 Plaintiff attended his Pre-Dismissal Hearing with Linda King and Randy Wardlow.  Plaintiff presented additional information but was unable to fully address the three new "problematic call-outs" allegations because he was not given enough information about them, so he had to guess what they were referring to.  Plaintiff did not guess correctly and was therefore *never* allowed to rebut all the claims against him used in his termination (a violation of employment law standards, UofO HR policies, Union Contract, Constitutional Due Process and ORS 236.350-236.370).

94.

On 10/26/2012, Plaintiff received his Letter of Termination from the UofO.

95.

Since termination, Plaintiff and all SEIU employees and Stewards were denied access to UOPD's three separate kinds of "personnel files," despite UOPD policy to the contrary.

28 - SECOND AMENDED COMPLAINT

96.

Plaintiff was never afforded a meaningful hearing to defend against these allegations at any time prior to termination. It became clear that Defendants had set out at the very start to discharge the Plaintiff, regardless of legality, proof, or merit.

97.

On 10/30/12, John Ahlen took over as the steward of record for Plaintiff's Step-3 letter of reprimand grievance hearing on 10/30/12. Ryan Hagemann represented OUS/UofO during this hearing. Plaintiff presented, despite not having all of the information that had been requested of UOPD over 20 times beginning five months earlier. Again, Plaintiff provided substantial proof that the claims were without merit and were instead a form of retaliation by Defendants.

98.

Shortly after Plaintiff was terminated, access to his UofO email account was turned-off without warning or explanation. Plaintiff and Union Stewards made multiple requests to regain access to the account, believing it could contain substantial exculpatory or favorable evidence. All requests were denied or ignored by UofO.

99.

Plaintiff also filed an additional grievance alleging he was denied due process because he was unable to ask questions, interview, or otherwise investigate the accusations levied against him by his accusers. This grievance was denied by OUS, on the grounds that it was not filed at Step-1. SEIU maintained that grievances for terminated employees should be filed at Step-3. Plaintiff then grieved the fact that OUS was unwilling to hold the due process hearing. This was also denied without a hearing, on the grounds that it was not filed at Step-1. Plaintiff was not

allowed to file any grievances at Step-1 because he was no longer a current UofO employee. This "catch-22" amounted to yet another denial of due process.

100.

On 11/12/12, Brian Caufield, representing OUS, granted a partial extension for the termination grievance until 12/10/12 and again assigned Ryan Hagemann to hear the termination grievance. Hagemann asked the Union for permission to finish the letter of reprimand adjudication. Plaintiff and the Union agreed, and thought that is what he had been doing since he heard the case on 10/30/12.

101.

Hagemann was never allowed to finish or submitted his decision because he was prevented from being able to do so by Brian Caufield when Caufield unilaterally took over from Hagemann, despite protests (including a Grievance) from the Union. Once Caufield took over from Hagemann, Plaintiff and the Union were no longer allowed to contact Hagemann directly.

102.

Three more months passed without fulfillment of Plaintiff's information requests, and without receiving notice of an extension, adjudication, or response by OUS, so on 2/7/13 SEIU moved the letter of reprimand grievance to arbitration, via an email to Ryan Hagemann, CC'd to Linda King, Sean Brailey, and Ginger Shaw. Defendants continued to withhold the decision and refused to comply with information requests. SEIU asked to see the adjudication before deciding whether to bundle both matters for arbitration.

103.

On 2/13/13 Caufield *unilaterally* "held in abeyance" the adjudication of the Letter of Reprimand Step-3 grievance, despite protests of illegality and unfair labor practices from SEIU.

30 - SECOND AMENDED COMPLAINT

104.

SEIU filed another Step-3 due process grievance, stating that Plaintiff was denied an opportunity to speak with those responsible for rendering discipline.

105.

The Union Contract mandated that all information used by or considered by the employer in the termination of an employee *must* be turned over to the Union during the grievance/arbitration process.  Throughout the duration of the grievance process and even through arbitration, UofO and OUS continuously denied, delayed, and purposely concealed pertinent evidence and information requested by and/or due to the Union and Plaintiff.  During the arbitration in late 2013, UofO presented the arbitrator with 31 items of evidence that the union had never seen before, despite dozens of Information Requests for over a year.  This lack of transparency denied Plaintiff due process.

106.

On 2/26/13 OUS asked for an extension to schedule the termination grievance hearing the week of March 18th.  On 3/12/13 OUS asked for a termination grievance hearing extension until 4/3/13 from 10am-noon, and continuing from 1–3.  On 3/27/13 Caufield unilaterally and without explanation issued a sequestration order for any witnesses who would be attending the hearing.

107.

On 4/3/13, Plaintiff and his Union Steward John Ahlen met with Caufield for the Step-3 hearing on the Union's Grievance of Plaintiff's termination.  SEIU staffer Sean Brailey also attended via phone but Caufield disconnected the phone line with Brailey without warning *twice*.

31 - SECOND AMENDED COMPLAINT

108.

Before the hearing was to commence, Caufield told Plaintiff and the Union that he had reviewed UOPD's evidence and allegations and that it would be "impossible" for Plaintiff's termination to be overturned at arbitration.  Plaintiff's termination was overturned at arbitration.

109.

Caufield also unilaterally and unexpectedly made unreasonable and arbitrary demands and "ground rules" for "his" (Caufield's) Step-3 hearing.  Although the Plaintiff and the Union had never been notified of these new procedural "rules" Caufield seemingly created out of thin air and believed them to be unreasonable, unfair, and arbitrary, they nonetheless agreed to proceed.  But then Caufield changed his mind and abruptly canceled the hearing.  Caufield's actions denied Plaintiff an opportunity to be heard and to due process.  John Ahlen and Plaintiff took detailed notes of Caufield's shockingly rude and unprofessional behavior and immediately wrote separate accounts documenting the incident.

110.

The Union immediately requested that the Step-3 Hearing be rescheduled and that whatever "ground rules" Caufield wanted to be put in writing so they could be agreed upon and known *before* the hearing.  The Union also requested that Caufield conduct the hearing with a reasonable amount of professionalism and respect.  Caufield refused to reschedule the hearing.

111.

After this incident with Caufield, SEIU filed a grievance based on Caufield's refusal to hold a Step-3 hearing.  SEIU also considered filing an Unfair Labor Practice ("ULP").  Discussions between the Union and OUS were held and it was decided not to file the ULP, but Caufield has not presided over any more UofO-based Step-3 grievance hearings ever since.

32 - SECOND AMENDED COMPLAINT

112.

Caufield also made threats towards Plaintiff's volunteer Union Steward John Ahlen (who is also a UofO employee), telling Ahlen he was going to talk to SEIU management and have Ahlen dismissed and disqualified as a Union Steward for filing "too many" grievances.  Ahlen has since been elected *Chief* Steward at UofO for SEIU.

113.

On 4/22/13, Caufield issued an adjudication of the letter of reprimand and termination grievances together in one decision/letter, even though a Step-3 hearing on the termination was never held and he was not the adjudicator for the reprimand hearing.  Caufield's letter does not address the arguments and merits of any of Plaintiff's claims or defenses.

114.

UofO and OUS did not act in good faith, either with the information requests, or their willingness to hold a termination hearing.  Based on these multiple instances wherein Plaintiff was denied due process, Plaintiff believes Caufield had no intention of letting him have a fair hearing and that UofO never intended to fulfill their obligatory information requests.

115.

Plaintiff communicated all of the concerns and complaints mentioned above to one or more of the following supervisory or administrative officials in the method(s) described: UOPD supervisors **Carolyn McDermed** (Acting Chief) via emails and in meetings on 6/1/2012 and 8/13/2012, **Michael Morrow** (Professional Standards & Internal Affairs Lieutenant) via emails and in meetings on 6/1/2012, 6/18/2012, 7/6/2012, and 9/15/2012, **Andy Bechdolt** (Lieutenant) in a meeting on 6/29/2012, as well as to UofO and OUS administrators **Linda L. King** (Associate Vice President for Human Resources) in a meeting on 10/12/2012, **Brian Smith**

33 - SECOND AMENDED COMPLAINT

(UofO Assistant Vice President for Administration) via email and in meetings on 9/25/2012 and 10/2/2012, **Randy Wardlow** (former UofO Employee and Labor Relations Manager) via emails and in meetings on 6/13/2012, 7/13/2012, 8/13/2012, 8/21/2012, 9/25/2012, and 10/12/2012, **Ryan Hagemann** (OUS Legal Counsel and Secretary to the Oregon State Board of Higher Education) via emails and in a meeting on 10/30/2012, and **Brian Caufield** (OUS Associate General Counsel for Labor & Employment) via email and in a meeting on 4/3/2013. SEIU Union Stewards Lois Yoshishige, Donna Laue, and/or John Ahlen were also present during the majority of these meetings.  Copies of emails have been preserved (except perhaps those emails using Plaintiff's UofO email address, which UofO blocked Plaintiff from accessing after termination and refused to release to Plaintiff or the union in their information requests.)

116.

On 10/5/2012, as follow-up from their 10/2/12 meeting, Plaintiff emailed Brian Smith a four-page statement written by another UOPD officer, detailing additional allegations against Cameron for abuse of force, making illegal arrests, issuing illegal orders, untruthfulness, and waste.  Plaintiff never received a response from Smith and no investigation or action was made.

117.

Shortly after Plaintiff was terminated, another UOPD officer was called to a surprise meeting and told the following by their supervisors: Using Plaintiff's termination as an example, the officer was warned that if they started to complain like the Plaintiff did, they would be fired too.  The metaphor, "The squeaky wheel gets the axe" was used to further convey this point.

118.

Plaintiff vehemently denies the allegations within UOPD's Letter of Reprimand and Letter of Termination.  But even if the allegations listed in the Letter of Termination *were* true,

34 - SECOND AMENDED COMPLAINT

the alleged acts or omissions did not rise to the level of a terminable offense.  A Junction City

Police Officer was assigned to complete an independent investigation into this and he came to

the same conclusion as Plaintiff.

119.

Plaintiff elected to challenge his termination through arbitration.  Arbitration hearings

were held in late 2013 and plaintiff was ordered reinstatement and awarded back pay through the

Arbitrator Rich Ahearn's decision dated 2/24/14 and received on 2/27/14.

120.

In direct response and contrary to the arbitrator's decision, UOPD Chief McDermed

expressly stated that she would not reinstate plaintiff.

121.

In direct response to plaintiff prevailing at arbitration and being ordered reinstated,

Defendants retaliated by concocting a plan to submit "Brady List materials" to the Lane County

District Attorney.

122.

After months of planning, UOPD submitted over 200 pages of Brady List materials to the

Lane County District Attorney in the form of a memo and notebook entitled, "Brady Disqualifier

Review," on or about 6/17/2014.

123.

All of the claims alleged against Plaintiff in the Brady List materials are either false,

baseless, or intentionally misrepresent the facts.  Many of the claims are new and Plaintiff has

*never* had the opportunity to discuss, respond, or refute the allegations.

124.

According to current UOPD Policy #612, if Brady List materials are going to be sent to a district attorney, the officer involved is entitled to prior notification.  Plaintiff was never given prior notice and only learned of it through defense counsel disclosure in this case, over a month *after* it had been submitted.

125.

After the initial disclosure, the Defendants continued to correspond with the District Attorney and submitted additional Brady List materials, again without notice to Plaintiff.

126.

On 6/30/14, a "Formal Determination Letter to Employer" was sent to UOPD by the Lane County DA Alex Gardner.  Gardner's letter confirmed that Plaintiff had been placed on the Brady List, based solely on the information the UOPD provided.  Plaintiff was never afforded due process or the opportunity to respond to the materials prior to the DA's decision. Specifically, the DA's letter stated, "*we are confident of a duty to disclose related information to the defense in any criminal case in which Officer Cleavenger is a potential witness. We are now in the process of determining whether Cleavenger's transgressions are of such significance they rise to the level of eliminating him as a potential State's witness*."

127.

Plaintiff was also never notified of the DA's formal determination until the DA (Alex Gardner) responded to Plaintiff's email inquiry on 8/25/14.

128.

The submission of the Brady List materials was a further attempt to block plaintiff's return to his job and prevent him from being able to get or maintain other law enforcement jobs.

129.

The submission of these materials may also prevent or hinder Plaintiff's ability to practice law and to get or maintain employment in the legal profession.

130.

Chief McDermed was advised by one of her own Lieutenants that her conduct seemed like retaliation.  Nonetheless, McDermed ordered him to put together the Brady List materials and submit them to the district attorney.

131.

At the time that the Brady List materials were submitted to the Lane County District Attorney, the arbitrator's findings favorable to the Plaintiff (such as the Arbitrator ordering the plaintiff to be reinstated and awarded backpay) were *not* included.  Instead, the arbitrator's decision was mischaracterized through the defendant's own interpretation.

132.

It is foreseeable that Defendants will continue or attempt to submit Brady List materials to the Lane County District Attorney and/or other county and municipal prosecutors' offices or state agencies in the future, in an effort to further retaliate against Plaintiff.

133.

On 12/10/2014, a separate additional tort claim notice under the provisions of ORS 30.275 was timely sent to the appropriate governmental entities regarding Plaintiff's retaliation claim based on UOPD's "Brady List Materials" submissions to the Lane County DA.

37 - SECOND AMENDED COMPLAINT

134.

UOPD, UofO, and OUS ratified the conduct of the individual Defendants and their agents alleged herein through their actions and/or inactions.

135.

All the claims and allegations herein are likely to have additional evidentiary support and more definite and certain dates of occurrence after a reasonable opportunity for further investigation through Discovery.  Additional claims and causes of action may also be uncovered during Discovery.

136.

Plaintiff was subject to disparate treatment, harassment, threats, and intimidation from these UOPD Supervisors who instigated his termination.  In addition, UOPD and UofO HR committed a large number of Collective Bargaining Agreement (Union Contract), UOPD policy, state and federal law violations when reprimanding, investigating, and terminating Plaintiff, as outlined in this complaint.  The following is a non-exhaustive list of some of those violations:

Violations of SEIU Collective Bargaining Agreement (Union Contract):

a) Article 17, Section 1 – Discipline shall be imposed only for just cause

b) Article 18, Section 9 – Prohibition against Reprisals (retaliation)

c) Article 17, Section 2 (A-B) – Requirement to inform employees of specific charges in a timely manner

d) Article 17, Section 2(C) – Requirement to list contact information for Steward(s) on disciplinary notices

e) Article 52 & 53 - Reclassification Standards

38 - SECOND AMENDED COMPLAINT

  f) Article 54, Section 2 – Requirement to discuss Annual

   Performance Evaluations (required), and to allow for employee's

   input prior to an Evaluation's initial completion (encouraged)

  g) Article 54 Section 2 – Prohibition against using Annual

   Evaluations for disciplinary actions

  h) "Letter of Agreement - Inappropriate Workplace Conduct and

   Intimidating Work Environment" (page 87 of the Union Contract)

Violations of UOPD & UofO Policy:

  a) General Order 308.2, Part I (B) (4-5)

  b) General Order 1102.1 – Complaints, Inquiries, and

   Commendations Procedures

  c) General Order 1102.2 – Complaints of Misconduct Procedures

  d) General Order 1101.1, Standards of Conduct 2 – Aiding Other

   Members

  e) General Order 1101.1, Standards of Conduct 8 – Cooperation with

   Members

  f) General Order 1101.1, Standards of Conduct 9 – Respect Towards

   Subordinates

  g) General Order 1101.1, Standards of Conduct 10 – Discrimination

  h) General Order 1101.1, Standards of Conduct 11 – Dishonesty or

   Untruthfulness

  i) "Respectful Workplace" Memo dated 1/31/12 from UofO HR

39 - SECOND AMENDED COMPLAINT

    j)   UOPD Policy #612 - "Brady Material Disclosure"

<u>Public Safety Officer's Bill of Rights</u>:

ORS 236.350 to ORS 236.370

<u>The Clery Act</u>:

20 U.S.C. § 1092(f)

137.

The Defendants' conduct caused Plaintiff severe mental and emotional distress from the foreseeable and highly unpleasant emotional reactions including fright, grief, shame, humiliation, embarrassment, anger, disappointment, worry, anxiety, and lack of sleep. In addition, their conduct caused Plaintiff to withdraw from family and friends, which contributed to Plaintiff's separation and from his (now former) wife.

138.

As a result of Defendants' intentional actions, Plaintiff suffered noneconomic damages in an amount to be determined at trial. Plaintiff also requests his costs and disbursements as provided by law.

139.

The Defendants' conduct toward Plaintiff demonstrated a wanton, reckless or callous indifference to the Plaintiff, which warrants an imposition of punitive damages in such amount as the jury may deem appropriate to punish Defendants for their misconduct, and to deter the Defendants from callously injuring the Plaintiff or any other future employees.

140.

All claims for relief as outlined below pertain to all Defendants.

40 - SECOND AMENDED COMPLAINT

## <u>1st CLAIM FOR RELIEF – 42 U.S.C. § 1983 – Freedom of Speech</u>

141.

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

142.

42 U.S.C. § 1983 provides that a party shall be liable when it "subjects, or causes to be subjected, any person of the United States ... deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States."

143.

Defendants violated Plaintiff's right to free speech under the 1st and 14th Amendments. Plaintiff engaged in protected speech as alleged above, including but not limited to:

       a. Plaintiff complained about corruption, wrongdoing, misconduct, abuse of authority, and wastefulness of UOPD employees in violation of the law or policy.

       b. Plaintiff complained about UOPD's violations of the Collective Bargaining Agreement with the union (SEIU).

       c. Plaintiff complained about UOPD's violations of its own policies, procedures, and standards.

       d. Plaintiff complained about the treatment and dehumanization of certain groups of people.

       e. Plaintiff complained about Defendants issuing unlawful orders.

       f.  Plaintiff complained about receiving disparate treatment.

41 - SECOND AMENDED COMPLAINT

g. Plaintiff complained about UOPD's non-compliance and non-

implementation with state laws including but not limited to O.R.S.

236.350 to 236.370.

h. Plaintiff expressed his personal opinions on the use of "Tasers" by

UODPS while Plaintiff was in law school at UofO 2008.  These opinions

were later used by Defendants to justify retaliation, discipline, and

termination.

144.

The subject matter of Plaintiff's protected speech was a matter of public concern.

Plaintiff's statements did not disrupt the efficiency of the office. Defendants took actions to

dissuade and prohibit Plaintiff from engaging in the speech.  Defendants took adverse

employment actions against Plaintiff in retaliation for Plaintiff engaging in this speech.

Plaintiff's speech was a substantial and motivating factor for the adverse employment actions.

145.

At all times relevant to this complaint, the individual Defendants alleged herein, acted or

purported to act in the performance of their official duties, under state, county, or municipal law,

ordinances, or policies on behalf of their respective employers UOPD, UofO, and/or OUS.

UOPD, UofO, and OUS are responsible by law for the acts and omissions of its employees or

agents, and ratified the conduct of them by their actions and/or inactions as alleged.

146.

Defendants' conduct was defined by law and Defendants knew or reasonably should have

known that their conduct was not within the standards prescribed by law and/or policy.

Defendants misused their official powers with a willful and malicious intent to deprive Plaintiff

42 - SECOND AMENDED COMPLAINT

of his due process rights and caused him harm.  In doing so, Defendants deprived Plaintiff of his

due process rights by acting intentionally, knowingly, willfully, and with gross disregard to

Plaintiff's constitutional rights.  At least in part, one or more of these acts or omissions of the

Defendants and their respective officials, was a cause of Plaintiff's injuries.

147.

The above mentioned actions of Defendants, in interfering with and retaliating against

Plaintiff for engaging in protected speech, constitutes a violation of 42 U.S.C. § 1983 for which

Plaintiff is entitled to relief. The violations of 42 U.S.C. § 1983 by Defendants resulted in

Plaintiff being deprived of his rights, privileges, or immunities guaranteed by the Constitution

and laws of the United States.

148.

As a direct and proximate cause of Defendants' violations of Plaintiff's Fourth and

Fourteenth Amendment rights, Plaintiff has suffered economic and noneconomic damages in an

amount to be determined at trial.

149.

Plaintiff seeks recovery of all equitable relief, compensatory damages, and punitive

damages provided by law, in addition to reasonable attorney fees & costs, per 42 U.S.C. § 1988.

150.

The Defendants' conduct toward Plaintiff demonstrated a wanton, reckless or callous

indifference to the constitutional rights of Plaintiff, which warrants an imposition of punitive

damages in such amount as the jury may deem appropriate to punish Defendants for their wanton

misconduct, and to deter the Defendants from callously disregarding the Plaintiff's constitutional

rights, or the constitutional rights of future employees.

## 2nd CLAIM FOR RELIEF – 42 U.S.C. § 1983 – Due Process

151.

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

152.

Plaintiff has constitutional rights under the Fourth and Fourteenth Amendments to be secure in his person, his right of privacy, right to be free from unreasonable searches and seizures, right to be free from involuntary servitude, his right to due process of law, before being deprived his liberty, his right to equal protection under the laws, and his right to be secure in his person. These rights were violated by Defendants. 42 U.S.C. § 1983 provides that a party shall be liable when it "subjects, or causes to be subjected, any person of the United States ... deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States."

153.

Under The UofO and SEIU Collective Bargaining Agreement ("Union Contract"), employees such as plaintiff are provided a grievance process consisting of a Step-1 hearing, Step-2 hearing, Step-3 hearing, and finally culminating in mandatory arbitration.  In order to arbitrate a grievance, the employee is required to proceed through the step hearings process.

154.

Plaintiff's rights were violated as he was never granted a Step-1 hearing, and his rights were further violated in that the Step-2 and Step-3 hearings were either illusory or non-existent. The Oregon University System proceeded to a Step-3 hearing with regard to the letter of reprimand and after the hearing was completed, no decision was made.  OUS intentionally refused to release the decision of Ryan Hagemann.

44 - SECOND AMENDED COMPLAINT

155.

Thereafter, in connection with plaintiff's termination, defendant Brian Caufield was assigned as the Step-3 hearings officer with respect to plaintiff's termination. Defendant Caufield usurped the decision-making authority of the hearings officer (Hagemann) that had presided over the Step-3 hearing on the letter of reprimand, and unilaterally declared that Brian Caufield would be making the Step-3 decisions for both the letter of reprimand and the termination.

156.

Caufield refused to allow plaintiff to present any evidence, and refused to accept plaintiff's offer of evidence, unless plaintiff gave Caufield every single piece of paper in plaintiff's possession--expressly including papers that were wholly unrelated to evidence involving the case. More details regarding this incident are outlined in paragraphs 100-114 of this Complaint.

157.

There is also a procedure for a pre-dismissal hearing at UofO through the HR Department. Plaintiff attended his pre-dismissal hearing and Linda King of the University of Oregon Human Resources Department found against plaintiff. Plaintiff has since learned, from Linda King, that for as long as Linda King has been doing pre-termination hearings, she has *never* found in the employee's favor. These pre-termination hearings are illusory and designed to harass, intimidate, and discourage employees from challenging their termination.

158.

In the recent institutional history (approximately 20 years or more) of UofO Step-3 termination hearings and UofO pre-dismissal hearings, there has never been a hearing decided in

45 - SECOND AMENDED COMPLAINT

favor of the employee.  These hearings are illusory and designed to harass, intimidate, and

discourage employees from proceeding to arbitration.  However, roughly one-half of all recent

SEIU v. UofO-based arbitrations have actually been won by the employees (SEIU).

159.

In an attempt to redress numerous due process violations by defendants, a series of

grievances were filed under the process provided by the Collective Bargaining Agreement and

all of the grievances were addressing due process were summarily denied without a hearing.  The

grievances regarding due process included prohibiting access to witnesses, access to files,

withholding of discoverable information, and the denial of hearings during certain phases of the

grievance process.

160.

Within the union contract and grievance process, an employee is granted the right to

obtain documents pertaining to his employment and everything considered in the employer's

decision to terminate their employment.  Among the documents that an employee is permitted to

request are drafts of their annual evaluations.  It was not until after plaintiff went through Step-3

proceedings, arbitration, filed this litigation and after it was pending for over a year, that

defendants finally provided the actual first draft of plaintiff's annual evaluation for the period

ending March 2012.  The draft of the annual evaluation differed significantly from the actual

annual evaluation that plaintiff was first provided in that his scores had been substantially

reduced in seven of the eleven categories.

161.

Additionally, during arbitration, the University of Oregon used 31 exhibits that had never

been provided or produced before.

46 - SECOND AMENDED COMPLAINT

162.

Additionally, Mike Morrow, the Lieutenant of Standards and Training at UOPD who was investigating allegations against plaintiff *refused* to accept exculpatory evidence when plaintiff physically offered to hand it to him in the presence of Plaintiff's union steward, and via email.

163.

Lt. Morrow and Lt. Lebrecht also intentionally refrained from interviewing material witnesses to the complaints against Plaintiff during their approximate six-month-long investigations of plaintiff for the sole purpose of ensuring that their investigations would lead to findings against Plaintiff.

164.

Due process was also denied Plaintiff in UOPD's failing to notify Plaintiff that Brady List materials were going to be provided to the district attorney, and in further embellishing, exaggerating, and providing false and/or materially misleading information concerning plaintiff within the materials submitted to the DA, as outlined in paragraphs 120-133 of this Complaint.

165.

Plaintiff was also denied his due process rights under Oregon state law found in ORS 236.350-370, collectively known as the Public Safety Officers' Bill of Rights, as alleged herein (failure to notify Plaintiff of investigations' subject matter and investigator, failure to allow Plaintiff to record interviews, failure to allow Plaintiff access to evidence, failure to accept exculpatory evidence from plaintiff, etc.).

47 - SECOND AMENDED COMPLAINT

166.

UOPD has had a long pattern and practice of identifying people who they were going to eliminate and then creating a paper trail of charges that they otherwise would not have created had they not targeted the person for termination.

167.

As this practice pertains to this case, in early May 2012, *prior* to the issuance of Plaintiff's letter of reprimand, UOPD's then Acting Chief (McDermed) emailed the actual Chief at the time (Doug Tripp), stating that plaintiff needed to be terminated.

168.

Defendants misused their official powers with a willful and malicious intent to deprive Plaintiff of his due process rights and cause him grievous injuries thereby. Defendants, in acting to deprive Plaintiff of his due process rights, acted intentionally, knowingly, willfully, and with gross disregard to Plaintiff's rights. Plaintiff was denied process due by law and any process given to him was not meaningful or effectual.

169.

The Defendants' conduct toward Plaintiff demonstrated a wanton, reckless or callous indifference to the constitutional rights of Plaintiff, which warrants an imposition of punitive damages in such amount as the jury may deem appropriate to punish Defendants for their wanton misconduct, and to deter the Defendants from callously disregarding the Plaintiff's constitutional rights, or the constitutional rights of future employees.

170.

UOPD, UofO, and OUS ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

48 - SECOND AMENDED COMPLAINT

## 3rd CLAIM FOR RELIEF – O.R.S. 659A.203 – Whistleblowing

171.

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

172.

Plaintiff reported information he reasonably believed to be evidence of violations of federal laws including the Clery Act, state laws, rules and/or regulations, violations of department and university policies, and acts of mismanagement, abuse of authority, and gross waste of funds, as alleged herein.

173.

In response, the UOPD and UofO threatened to take and took disciplinary action against him in retaliation. UOPD and UofO also discouraged, restrained, dissuaded, coerced, prevented, ignored, and otherwise interfered with Plaintiff's disclosures and complaints as referenced above, and which also constitute retaliation.

174.

UOPD, UofO, and OUS ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

## 4th CLAIM FOR RELIEF – O.R.S. 659A.199 and 659A.030 – Retaliation

175.

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

49 - SECOND AMENDED COMPLAINT

176.

Defendants retaliated against Plaintiff by taking adverse employment actions against him, as set forth in detail above, because of Plaintiff's complaints and oppositional conduct.

177.

Plaintiff engaged in protected activity when he opposed and complained about what he reasonably believed were Defendants' unlawful employment practices as described herein.

178.

UOPD, UofO, and OUS ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

## 5th CLAIM FOR RELIEF – Wrongful Discharge

179.

Plaintiff re-alleges all preceding paragraphs and the facts and allegations therein.

180.

Defendants' unlawful conduct towards Plaintiff was prohibited by law, policy, and employment contract, which culminated in discriminatory and/or adverse employment actions against Plaintiff, to include wrongful termination.

181.

As a result of Defendants' intentional actions (and inactions), Plaintiff suffered economic and non-economic damages in amounts to be determined at trial.  Plaintiff also requests his costs and disbursements as provided by law.

182.

50 - SECOND AMENDED COMPLAINT

UOPD, UofO, and OUS ratified the conduct of the individual Defendants alleged herein through their actions and/or inactions.

## **PRAYER FOR RELIEF**

183.

WHEREFORE, Plaintiff requests the following judgments and relief awarded according to proof:

1. A declaration that Defendants wrongfully discharged and unlawfully discriminated against Plaintiff based upon protected activity (Letter of Exoneration).

2. A permanent injunction enjoining Defendants from engaging in any future discriminatory employment practices as alleged in this complaint.

3. A permanent injunction enjoining Defendant UOPD to adopt written procedures to implement the provisions of ORS 236.350 to 236.370, as required by law under ORS 236.360(1).

4. Economic damages, in an amount to be determined at trial.

5. Non-economic damages, in an amount to be determined at trial.

6. Punitive damages, as alleged herein and as deemed appropriate.

7. Prejudgment and post-judgment interest as appropriate and allowed by law as well as the amount necessary to offset the income tax consequences of any award of damages, pursuant to ORS 659A.885(1) and/or as special damages under common law.

8. Reasonable costs and attorney's fees, as per statute(s).

9. Such other and further relief, either at law or in equity, general or special, that the Court may deem just and equitable.

DATED this 3rd day of March, 2015.

_/s/ Jason Kafoury_

**Jason L. Kafoury (OSB #091200)**
jkafoury@kafourymcdougal.com
**Gregory Kafoury (OSB #741663)**
kafoury@kafourymcdougal.com
**Mark G. McDougal (OSB #890869)**
mcdougal@kafourymcdougal.com
**Attorneys for Plaintiff**

52 - SECOND AMENDED COMPLAINT