# UNITED STATES DISTRICT COURT
# DISTRICT OF OREGON

| | |
|---|---|
| **JAMES M. CLEAVENGER,** **Plaintiff,** **vs.** **UNIVERSITY OF OREGON, ET AL.,** **Defendants.** | **Case No.: CV 13-1908-DOC** **ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [82]** |

Before the Court is Defendants Chief Carolyn McDermed, Lieutenant Brandon Lebrecht, Sergeant Scott Cameron, and Brian Caufield's Motion for Summary Judgment (Dkt. 82).[1] Oral arguments were held on July 24, 2015 (Dkt. 101). Having considered the parties' arguments, the Court hereby grants in part and denies in part Defendants' motion.

## I.    Background

This case arises from Plaintiff James Cleavenger's employment as a public safety officer ("PSO") for the University of Oregon Police Department ("UOPD") from March 2011 to October 2012, when his employment was terminated. Plaintiff claims each individual Defendant retaliated against him for engaging in protected speech in violation of his First Amendment rights. Plaintiff also asserts that each individual submitted information to the Lane County District Attorney on June 17, 2014, violating his substantive and procedural due process rights. He brings claims against Defendants in their individual capacities under 42 U.S.C. § 1983.

The factual record indicates that Plaintiff had a difficult experience at the UOPD. He had conflict with several of his supervisors, was issued warnings about his performance, and eventually was terminated, although his termination was overturned through arbitration.

While employed as a PSO, Plaintiff observed behavior that he found objectionable. Most notably, while in pre-shift briefings, the staff would occasionally devote time to discussing the "Bowl of Dicks" list ("the List") – a list of people who, suffice it to say, were not well liked by those making the List. Declaration of James Cleavenger ("Cleavenger Decl.") (Dkt. 93) ¶ 3. The List contained many names, but Plaintiff observed that most of those on the list were civil rights leaders, minorities, and

---

[1] The Court previously dismissed all claims against the state Defendant, University of Oregon. *See* Order, May 28, 2015 (Dkt. 77).

those with liberal political leanings. *Id.* He also observed myriad other conduct that he took issue with: ranging from Officer Eric LeRoy and Lt. Lebrecht wasting time watching football videos, Cleavenger Decl. ¶ 3, to failure to provide appropriate trainings pursuant to department policy, *id.* ¶ 4.

On November 18, 2011, Plaintiff received a "Clarification of Expectations" letter from Lt. Lebrecht clarifying "UOPD's expectations of safety and grooming standards." Lebrecht Decl. Ex. 1 (Dkt. 84-1). On May 18, 2012, Plaintiff received a written reprimand from Sgt. Cameron. Cleavenger Decl. Ex. 6 ("May 18 Reprimand"). The letter explained that Plaintiff "fail[ed] to follow department standards regarding officer safety tactics and procedures" with regards to an April 1, 2012 incident. *Id.* On the same day, Chief McDermed issued a memo to Plaintiff, temporarily reassigning him to parking duties and indicating that an investigation into his conduct had begun. Statement of Undisputed Facts ("SUF") 32; McDermed Decl. ¶ 11, Ex. 2. He received a performance evaluation on May 31, 2012, *id.* Ex. 7, reflecting areas in which his supervisors indicated he needed improvement.

On September 20, 2012, Lt. Morrow and Associate Human Resources Director Randy Wardlow met with Plaintiff to inform him that he was being suspended with pay pending a supplemental investigation, and he was given written notice of the suspension via a letter dated September 26, 2012. McDermed Decl. ¶ 17, Ex. 5. On October 1, 2012, Linda King, University of Oregon Associate Vice President for Human Resources, and Chief McDermed notified Plaintiff that he was being suspended without pay and that dismissal was recommended by Chief McDermed based on ongoing performance problems. McDermed Decl. ¶ 18, Ex. 6. Plaintiff attended a pre-dismissal hearing with Ms. King on October 12, 2012. SUF 50. On October 25, 2012, Plaintiff received notice of his dismissal via a letter from Ms. King. SUF 51.

Plaintiff alleges that, before and during his employment, he engaged in protected speech and the adverse employment actions referenced above occurred in response to this speech. The instances of speech included:

- In 2008, Plaintiff gave a speech as a law student and member of the student government at the University of Oregon, in which he criticized the decision to provide UOPD officers with Tasers ("Taser Speech"). SUF 74. The Taser Speech was posted online and was available between 2011 and 2012. Cleavenger Decl. ¶ 7. Sgt. Cameron gained access to the speech and showed it to other officers. *Id.*

- In November 2011, Plaintiff complained about Lt. Lebrecht discussing politics in the workplace. Cleavenger Dep. 54:22-25, 55:1-17.

- On February 20, 2012, Plaintiff emailed Lt. Mike Morrow regarding numerous requests for training being rejected. Cleavenger Decl. ¶ 4. Lt. Lebrecht replied to Plaintiff, expressing anger that Plaintiff had gone "behind [his] back." *Id.*

- On August 13, 2012, Plaintiff met with Chief McDermed and reported threats from superior officers, acts of mismanagement, the List, and wasted resources. Cleavenger Decl. ¶ 5; SAC ¶ 80.

- On October 2, 2012, Plaintiff met with University of Oregon Assistant Vice President of Financial Affairs Brian Smith. The meeting was ostensibly a follow up to a September 25, 2012 "Step 2" grievance hearing that Smith conducted pursuant to the terms of Plaintiff's union contract. Declaration of Andrea Coit ("Coit Decl.") (Dkt. 87) Ex. 3. But in this follow-up, Plaintiff sought to disclose "information of public concern not directly related to [his] grievance." Cleavenger Decl. ¶ 2. He discussed the List, concerns about treatment of Occupy Eugene protesters, and individual harassment and intimidation. Cleavenger Dep. at 43-46.

Plaintiff sent a follow-up email to Smith dated October 5, 2012.
Cleavenger Decl. ¶ 10, Ex. 2.

- On October 12, 2012, Plaintiff met with Linda King for his predismissal hearing where he discussed his complaints.
- On October 31 and November 15, 2012, Plaintiff emailed OUS General Counsel Ryan Hageman "pertaining to matters of public concern, in addition to his own personal concerns over the grievance." Cleavenger Decl. Ex. 3.

After being terminated and completing the grievance procedure, Plaintiff presented his case for reinstatement to an arbitrator. SUF 52-54. On February 24, 2014, the arbitrator concluded that Plaintiff's discharge was inappropriate, and that he should have been issued a three-day suspension without pay instead, and ordered Plaintiff reinstated. SUF 55; Coit Decl. Ex. 5 at 5. In an email from Defendants' counsel, dated April 7, 2014, to Marc Stefan, Plaintiff's representative, counsel wrote that "Mr. Cleavenger … is expected to report to UOPD … on April 21, 2014," to accommodate time for Plaintiff to give two-weeks' notice to his then-employer. *Id.* Ex. 6 at 1. In a separate email chain, counsel wrote to Mr. Stefan that Plaintiff could return to his prior position, but noted "his duties in the short term [would] be limited until [Chief McDermed] ha[d] the opportunity to analyze what additional training is needed and available and what limitations … the sustained disciplines have on Mr. Cleavenger's ability to fully perform his job duties." *Id.* Ex. 7. However, the email clarified that Plaintiff would "not lose pay, rank, benefits, seniority, etc. during this period." *Id.* Counsel requested that Plaintiff inform her "if he [would] be returning for work Monday morning [April 21, 2014]." *Id.* Plaintiff never reported to work, and Plaintiff's representative told Defendants' counsel that he had decided not to quit his job as a law clerk at the federal court. Coit Decl. ¶ 8. They reached a settlement in principle around

that time, and began negotiating the details of the settlement of Plaintiff's arbitration-related claims.

On March 10, 2014, shortly after being informed that Plaintiff had been ordered reinstated, Chief McDermed sent an email to other UOPD employees including Lt. Lebrecht regarding the decision, noting that she said the department "would not take him back." Cleavenger Decl. Ex. 15. In response Lt. Andrew Cechdolt's comment that "[t]here are also Brady issues to consider," she noted "Yep. I said that a[s] well in my response." *Id*

In June 2014, prior to signing the final settlement agreement, Chief McDermed provided "*Brady*" materials concerning Plaintiff's "credibility issues" to the Lane County District Attorney ("DA"). McDermed Decl. ¶¶ 25-26; Cleavenger Decl. Ex. 16. The term *Brady* materials references the case of *Brady v. Maryland*, 373 U.S. 83 (1963), and refers to materials regarding officers whose testimony may be potentially unreliable for various reasons. Many prosecutors and law enforcement offices, including Lane County's District Attorney's office, Gardner Dep. at 11:15-20, keep track of which officers have past experiences that may trigger prosecutor's obligation to disclose exculpatory information, including dishonest tendencies.

Lt. Lebrecht assisted Chief McDermed in compiling information to submit to the DA's office, and submitting that information. McDermed Depo. at 199:7-25, 200:1-5; Lebrecht Depo at 75:5-17.

The materials submitted to the DA's office on June 17, 2014 concerned information that could reflect on Plaintiff's veracity. McDermed Decl. ¶ 26, Cleavenger Decl. Ex. 16. Plaintiff asserts that he was never notified that these materials were going to be provided to the DA until a month after, SUF 69, and contends that the materials themselves embellish, exaggerate, and provide false or materially misleading information. SAC ¶ 164. When the DA's office contacted one of Plaintiff's former

employers, Junction City Police Department, about the accusations, it challenged many of the conclusions in the material UOPD submitted. Cleavenger Decl. Ex. 14B.

According to the DA's office, if an officer is drawn to the DA's attention and "flagged," that does not prohibit an officer from testifying. *Id.* at 24:4-5. Being identified in the database is one factor that the DA's office considers in determining whether a witness should testify. *Id.* The DA's office concluded, after seeing the information from Defendants, that it had "a duty to disclose related information to the defense in any criminal case in which Officer Cleavenger [was] a potential witness." Cleavenger Decl. Ex. 21. The DA's office informed the defense counsel in a criminal case in which Plaintiff was a potential witness of "potential Brady evidence" involving Plaintiff. *Id.* Ex. 12.

The parties engage in ongoing negotiations for several months, without the terms of the agreement being substantively altered. Upon signing a settlement agreement in September 2014, Plaintiff resigned his employment from UOPD formally as of June 14, 2013, the date he began work as a federal court clerk. Coit Decl. Ex. 4. As discussed in oral arguments, that date was agreed upon to simplify issues regarding back-pay, and did not reflect the time he ceased work, on October 1, 2012, the date of his termination, on October 25, 2012, the date of his ordered reinstatement, on February 24, 2014, or the date of his agreement in principle to not return to work, around April 21, 2014.

## II.    Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654,

655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

### III.    Analysis

Plaintiff brings claims under 42 U.S.C. § 1983 for violations of his constitutional rights. Section 1983 provides:

> Every person who, under color of any statute … of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of

any rights, privileges, or immunities secured by the Constitution and

laws, shall be liable to the party injured….

To prove a violation under § 1983, Plaintiff must show that: (1) Defendants'

conduct deprived Plaintiff of a right, privilege or immunity secured by the Constitution

or laws of the United States and (2) Defendants committed the act under color of state

law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

The doctrine of qualified immunity protects government officials "from liability

for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v.

Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)). The Court will first address Plaintiff's First Amendment retaliation claims, then

Plaintiff's due process claims.

### A. First Amendment Retaliation

Plaintiff claims that Defendants violated his First Amendment rights by

retaliating against him for complaining about misconduct that he observed while an

employee and for engaging in protected political speech prior to joining UOPD.

### 1.    Legal Standard

"The First Amendment shields public employees from employment retaliation

for their protected speech activities." *Hagen v. City of Eugene*, 736 F.3d 1251, 1257 (9th

Cir. 2013). However, courts have recognized that "the State's interests as an employer in

regulating the speech of its employees" require them to balance the interests of the

public employee as a citizen in commenting upon matters of public concern against the

interest of the State as an employer in promoting the efficiency of public services. *Id.*

(citations omitted).

To arrive at the right balance, courts must consider five factors:

(1) whether the plaintiff spoke on a matter of public concern; (2)

whether the plaintiff spoke as a private citizen or public employee;

> (3) whether the plaintiff's protected speech was a substantial or
> motivating factor in the adverse employment action; (4) whether the
> state had an adequate justification for treating the employee
> differently from other members of the general public; and (5)
> whether the state would have taken the adverse employment action
> even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Plaintiff bears the burden of proving the first three factors, establishing his prima facie case; after Plaintiff meets his burden, the burden shifts to the Defendants to escape liability by establishing one of the final two factors. *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012). "[A]ll the factors are necessary, in the sense that failure to meet any one of them is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc).

"The precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases." *Coszalter v. City of Salem*, 320 F.3d 968, 974-75 (9th Cir. 2003). The goal is "to prevent, or redress, actions by a government employer that chill the exercise of protected First Amendment rights." *Id.* (quoting *Rutan v. Republican Party*, 497 U.S. 62 (1990) (internal quotation marks omitted)). Many different types of employment actions may have an impermissible chilling effect. "Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights." *See id.*

### 2.    Argument

Defendants assert that Plaintiff has wholly failed to establish a prima facie case for liability. They argue that: (1) Plaintiff did not speak on a matter of public concern; (2) Plaintiff did not speak in his capacity as a private citizen; and (3) Plaintiff cannot show that his protected speech was a substantial or motivating factor in any adverse

employment actions taken by any of the individual Defendants. The Court will address each of their arguments in turn.

### a. Matter of Public Concern

Whether an employee's speech addresses a matter of public concern is a pure question of law that must be determined "by the content, form, and context of a given statement, as revealed by the whole record." *Karl*, 678 F.3d at 1069 (quoting *Connick*, 461 U.S. at 147-48 & n.7). Out of these three, "the content of the speech is generally the most important." *Id.* (citing *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103 (9th Cir. 2011)). The Ninth Circuit does not apply a rigid, multi-factor analysis to determining what speech is of public concern; rather courts perform a "generalized analysis of the nature of the speech," to place the speech on "a continuum ranging from matters of public concern to matters of purely personal concern." *Clairmont*, 632 F.3d at 1103. On one end of the spectrum, there is speech that relates to matters of concern to the community, including political or social matters. *Eng*, 552 F.3d at 1070. On the other end, there are individual grievances and personnel disputes that are irrelevant to the public's evaluation of governmental agencies. *Id.*

"In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009) (quoting *Johnson v. Multnomah Cnty., Or.*, 48 F.3d 420, 425 (9th Cir. 1995)); *see also Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 925 (9th Cir. 2004) (quoting the "close case" language of *Johnson*, but deciding that "[t]his is ... not a close case"); *Roe*, 109 F.3d at 586 (applying the "close case" language of *Johnson*).

Defendants argue that the content of Plaintiff's speech is limited to personal working conditions and constitutes solely individual personal disputes and grievances of

no relevance to the public's evaluation of the performance of governmental agencies. Further, Defendants note that Plaintiff's complaints were limited to the workplace, rather than being disseminated to the public. Therefore, they argue that the speech was not on a matter of public concern as a matter of law.

The Court disagrees. Reports of corruption, discrimination, or misconduct within a police force are a matter of public concern. *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009). In *Robinson*, the plaintiff reported misconduct internally on numerous occasions, through conversations with superiors and emails to internal affairs. The Ninth Circuit noted:

> Robinson's email to the office in charge of internal affairs discussing the possibility of an interview about his prior complaints, and his conversations with superior officers reviewing the details of those complaints, clearly addressed at least two matters of public concern: the misconduct itself and the distinct question of whether the investigating officers were, as Robinson argued, sweeping misconduct under the rug.

*Robinson*, 566 F.3d at 823; *see also Connick*, 461 U.S. at 148 (speech merits stronger protection when employee seeks "to bring to light actual or potential wrongdoing or breach of public trust"); *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004) ("Unlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern."); *Johnson*, 48 F.3d at 425 (citing *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1405 (9th Cir. 1988) (The "misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern.")).

Plaintiff has presented evidence that he reported misconduct related to potential political bias, wasted resources, and failure to follow applicable laws and regulations. Specifically, Plaintiff offers evidence that on August 13 and October 2, 2012, he

participated in meetings in which he reported the politically charged List, improper threats of retaliation by superior officers, and wasted resources. Considering the admissible evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's speech activities extended beyond "individual personnel disputes and grievances." *Coszalter*, 320 F.3d at 973. While some of Plaintiff's speech may have been devoted to his working conditions and his own grievance procedures, there is sufficient evidence to suggest that a significant portion of the content of Plaintiff's various complaints or reports were directed at matters of public concern independent of his personal grievances.[2]

Regarding Defendants' argument that Plaintiff's speech was not of public concern because the complaints all took place in the workplace and arose in the context of meetings concerning his own career, Mot. at 17-18, "[t]hat [Plaintiff] chose to convey [his] views privately rather than publicly is not determinative of whether [his] expression is entitled to protection." *Thomas v. City of Beaverton*, 379 F.3d 802, 810 (9th Cir. 2004) ("By expressing her disapproval of the allegedly retaliatory treatment of Perry to those responsible for deciding whom to promote to the vacant position, Thomas aired her views in an effective forum."). Plaintiff communicated his concern regarding alleged waste and abuse to Chief McDermed, the person appearing the most capable of handling the alleged misconduct, as well as to Brian Smith, the University of Oregon Assistant

---

[2] Plaintiff also asserts that his complaint regarding discussing politics at work in 2011, the February 20, 2012 email to Lt. Morrow concerning training, and his October 31, 2012 email to Ryan Hagemann concerning his grievance involve matters of public concern. Applying the relevant factors above, the Court concludes that this speech involved personal employment issues that did not rise to the level of a "public concern." *See Desrochers*, 572 F.3d at 712-13 (complaints that indicate a boss was unpleasant to be around insufficient to merit First Amendment protection). These particular complaints, viewed in context, were in essence private grievances. *Id.* Defendants are therefore entitled to summary judgment as to this speech.

VP of Financial Affairs. The Court finds that the fact that most of the speech occurred in the context of his own disciplinary hearings is not determinative.

Defendants do not dispute that Plaintiff's 2008 Taser Speech is also constitutionally protected, as pre-employment political speech. With regards to the content, Plaintiff appeared to be criticizing the recent decision of the OUPD's decision to carry Tasers, a topic of public discussion at the time. SAC ¶ 26. Furthermore, the speech took place in a public forum – while Plaintiff was speaking as the Graduate Student Representative on behalf of the University of Oregon student government. *Id.* Plaintiff spoke on a topic of general interest in a public context, clearly falling within the purview of a "public concern." *See, e.g.*, *Connick*, 461 U.S. at 148 n.8 (1983); *Hudson v. Craven*, 403 F.3d 691, 699 (9th Cir. 2005) (finding college professor's attendance at a WTO protest met the public concern test, as the WTO meeting and the issues surrounding it were quintessentially matters of public concern, considering that "th[e] event was newsworthy and had quite literally excited widespread public interest was not in dispute.").

Therefore, the Court finds that Plaintiff has presented sufficient evidence that he engaged in speech regarding matters of public concern to create a genuine issue of material fact in support of his First Amendment retaliation claim.

### b.  Speaking in the Capacity of a Private Citizen

"A public employee's speech is not protected by the First Amendment when it is made pursuant to the employee's official job responsibilities." *Karl*, 678 F.3d at 1071 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006)). The Supreme Court has explained that restricting "work product" that "owes its existence to a public employee's professional responsibilities" does not infringe any liberties the employee might have enjoyed as a private citizen. *Garcetti*, 547 U.S. at 421-22. "Statements are made in the speaker's capacity as citizen if the speaker 'had no official duty' to make the questioned

statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'" *Eng*, 552 F.3d 1071.

In evaluating whether a plaintiff spoke as a private citizen, courts must look to the plaintiff's employment responsibilities. *Id*. If there is "an official duty to utter the speech at issue, then the speech is unprotected." *Id*. The Ninth Circuit has recognized that, "because of the fact-intensive nature of the inquiry" regarding professional duties, "no single formulation of factors can encompass the full set of inquiries relevant to determining the scope of a plaintiff's job duties." *Dahlia*, 735 F.3d at 1074.

"In assessing whether there is an official duty to speak within the context of "a highly hierarchical employment setting such as law enforcement," a relevant factor is "whether or not the employee confined his communications to his chain of command." *Id.* at 1074. "When a public employee communicates with individuals or entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties." *Id.* Further, when a report is prepared "pursuant to normal departmental procedure, about a particular incident or occurrence, the employee's preparation of that report is typically within his job duties." *See Garcetti*, 547 U.S. at 421 (holding that a deputy district attorney's preparation of a memorandum regarding the merits of a particular case was not First Amendment protected speech because preparation of such memoranda was a routine part of what he "was employed to do"); *Freitag v. Ayers*, 468 F.3d 528, 546 (9th Cir. 2006) (holding that a correctional officer's "internal reports of inmate sexual misconduct" were not constitutionally protected speech). "By contrast, if a public employee raises within the department broad concerns about corruption or systemic abuse, it is unlikely that such complaints can reasonably be classified as being within the job duties of an average public employee, except when the employee's regular job duties involve investigating such conduct, e.g., when the employee works for Internal Affairs or another such watchdog unit." *Dahlia*, 735 F.3d at 1075.

Defendants contend that because Plaintiff's complaints were made up the chain of command, in the case of the complaints to Chief McDermed, or in meetings held pursuant to a collective bargaining agreement, they were made pursuant to Plaintiff's duties as a public employee. The Court disagrees. Although the speech may have occurred broadly within the "chain of command," Plaintiff has presented evidence that he raised broad concerns within the department regarding ongoing misconduct, and that such reporting was outside the scope of his official duties as a PSO. Further, the Taser Speech, which occurred in 2008 and was merely rebroadcast while Plaintiff was an employee, was also conducted in Plaintiff's capacity as a private individual.

Thus, the Court concludes that Plaintiff has met the second prong of the test.

### c. Adverse Employment Action & Causation

Third, Plaintiff must prove that Defendants took an adverse employment action, and that the speech was "a substantial or motivating factor" in the adverse action. *Freitag*, 468 F.3d 528, 543 (9th Cir. 2006) (citing *Coszalter*, 320 F.3d at 977). On summary judgment in a First Amendment retaliation case, a plaintiff must provide evidence of materially adverse employment actions that are "reasonably likely to deter" protected speech. *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1168 (9th Cir. 2014).

The Ninth Circuit in *Keyser v. Sacramento City Unified School District*, 265 F.3d 741 (9th Cir. 2001), listed three ways in which a plaintiff can show that retaliation was a substantial or motivating factor behind a defendant's adverse employment actions. First, a plaintiff can introduce evidence regarding the "'proximity in time between the protected action and the allegedly retaliatory employment decision,'" from which a "'jury logically could infer [that the plaintiff] was terminated in retaliation for his speech.'" *Id.* at 751 (quoting *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir. 1988) (alteration in original)). Second, a plaintiff can introduce evidence that "his employer expressed opposition to his speech, either to him or to others." *Id.* Third, the

plaintiff can introduce evidence that "his employer's proffered explanations for the adverse employment action were false and pre-textual." *Id.* at 752.

Plaintiff asserts that each individual Defendant took retaliatory actions against him:

### Defendant Scott Cameron

Sgt. Cameron issued the Letter of Reprimand on May 18, 2012 and drafted his May 31, 2012 negative performance evaluation.[3] Prior to that date, the only allegedly protected speech that Plaintiff engaged in was the Taser Speech that was rebroadcast over YouTube. Plaintiff has presented evidence that Sgt. Cameron showed the Taser Speech to others and criticized Plaintiff for it around that time. Cleavenger Dep. Vol. 3 92:12-25. The adverse employment action, the letter and performance evaluation, occurred around that time. This is sufficient to support a finding that Sgt. Cameron's employment actions resulted from the protected speech. *Keyser*, 265 F.3d at 751.

Defendants contend in their Reply that there is an adequate showing that the adverse actions were warranted. In oral argument, Defendants argued that there can be no inference that the retaliatory action took place because of his *preemployment* speech, because under that standard Plaintiff must show that Defendant intended his action to chill Plaintiff's speech. Clearly, that could not have occurred here because (1) the issue of Tasers was resolved by the time Plaintiff was a PSO; and (2) his employment foreclosed him from engaging in such speech. Therefore, there could have been no intent to chill, as there was nothing left to chill.

Plaintiff's speech made while he was an employee, specifically, the complaints to Chief McDermed made in 2012, present no analytical difficulty with the causation analysis. However, there is a dearth of case law on what to do with speech that occurred

---

[3] There is no evidence that he was substantially involved in Plaintiff's termination, or had a pervasive influence on the process. *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797 (9th Cir. 2009).

prior to employment. Plaintiff engaged in lawful speech on a matter of public concern prior to gaining employment with the government in the capacity of a public safety officer. His speech, which was ostensibly critical of the agency to which Plaintiff went on to work for, was recorded and rebroadcast on YouTube. However, Plaintiff did not continue to speak about the issue after 2008; indeed, he could no longer do so while he was employed by UOPD. Taking all inferences in Plaintiff's favor, Scott Cameron saw the speech, did not like it, and began to take actions against Plaintiff in the workplace as a result of Sgt. Cameron's dislike of that speech. Defendants argue that this does not constitute employment retaliation for protected speech.

The Court disagrees. The distinction between the chilling or punishing of speech through employment retaliation, as opposed to chilling of a private citizen's speech, is the denial of a public benefit. When a private citizen is inhibited from speaking, the danger is the inhibition of the speech itself. The right to speak is the benefit the government is withholding. Therefore, for First Amendment purposes, if you allege that government efforts are designed to keep you from speaking, the intent to do so is an element of that claim. *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 14 F.3d 457, 464 (9th Cir. 1994) ("[W]here a plaintiff alleges discrete acts of police surveillance and intimidation directed solely at silencing her or him, a civil rights claim will lie. The defendant's intent *is* an element of the claim." (internal quotation marks omitted) (alterations omitted)).

When a public employee speaks, the calculus is different. The government is conferring the speaker a benefit (employment), and thus, the government has more coercive power over the employee. "For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (citing *Speiser v. Randall*, 357 U.S. 513, 526

(1958)). Thus, the adverse employment action must be intended to retaliate for protected speech, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Thomas v. Carpenter*, 881 F.2d 828, 829 (9th Cir. 1989), but the "[i]ntent to inhibit [ongoing] speech" is not an element of the employment retaliation claim. *Mendocino Envtl. Ctr.*, 192 F.3d at 1300. These protections encompass a broader concern that retaliation will inhibit the free exchange of ideas as to other employees in other venues.

Thus, to state a claim for First Amendment retaliation, Plaintiff does not need to show Defendant Cameron's subjective intent to chill Plaintiff's future speech on that specific issue (Tasers), rather, he must show that the retaliatory actions are "reasonably likely to deter" protected speech and that the protected speech was a substantial or motivating factor in the non-trivial employment action. *Thomas*, 763 F.3d at 1168-69; *see also Coszalter*, 320 F.3d at 973. Here, the appropriate inquiry is not whether it would deter the present speech of the employee, but rather whether those who could apply for government employment could see this retaliatory action and determine they had better refrain from speech, lest their words later justify firing without cause. *Coszalter*, 320 F.3d at 974-75 ("The goal is to prevent, or redress, actions by a government employer that 'chill the exercise of protected' First Amendment rights.") (quoting *Rutan*, 497 U.S. at 73). "These protections reflect our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Elrod v. Burns*, 427 U.S. 347, 357 (1976) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

Such an outcome best protects the fundamental underpinnings of the rights of government employees to be free from retaliatory action stemming from protected speech. Since the advent of the internet, speech from our past is more accessible than ever. Government employers may access that speech and find, perhaps, an opinion article expressing opposition to a war long-ago finished. While the war may be over, the employer's personal distaste for those who speak out against war could have lingered. If

that employer, as a result of the article he viewed online, fires the employee for having exercised her First Amendment rights, a First Amendment retaliation claim may lie.

The parties and the Court have been unable to find cases with similar facts, but the Court's conclusion is unsurprising. Any other result could open the door to rampant self-censorship, as our past speech is more and more entering the domain of our present.

Plaintiff has presented sufficient evidence to suggest that his Taser Speech was a substantial or motivating factor for Sgt. Cameron's non-trivial adverse employment actions against Plaintiff. Defendant's motion is DENIED on this basis as to Sgt. Cameron.

Defendant Brandon Lebrecht

Lt. Lebrecht issued Plaintiff the November 2011 Letter of Clarification and consulted on Sgt. Cameron's May 18, 2012 Letter of Reprimand. In 2014, he submitted *Brady* materials to the DA.

The first two adverse actions took place before any of Plaintiff's protected speech, outside of the Taser Speech. There is no evidence that Lt. Lebrecht saw the speech. Thus, there is insufficient evidence to support a conclusion that Lt. Lebrecht issued the Letter of Clarification and assisted on the letter of reprimand in response to Plaintiff's protected speech.

The release of *Brady* materials took place well after Plaintiff's other protected speech. It also occurred after Plaintiff's employment was terminated – and Plaintiff never rejoined the UOPD. Because of the timing, one could argue that the release of this material could not be considered "employment" retaliation. However, under the peculiar facts of this case, the Court is not inclined to follow a narrow reading of "termination" or "employment." Plaintiff was officially discharged in October 2012 – however, the *process* of his termination continued over several years; through a grievance process and arbitration – all of which his employer was involved with and aware of. There is evidence that the materials were released as part of an effort to ensure that, even after

Plaintiff's termination was overturned, he would never return to UOPD. Strict time limitations do not cut off a claim where there is extrinsic evidence that the materials were disclosed in connection with a termination that in turn occurred because of protected speech.

Lt. Lebrecht' participation in the release of potentially stigmatizing *Brady* material in connection with Plaintiff's termination could be viewed as retaliation for Plaintiff's speech. There is evidence that Lt. Lebrecht recognized that the release could be viewed as retaliatory. Further, the veracity of the content of the materials released were questionable, leading to an inference that the materials were not released for the stated purpose. Given the history of Plaintiff's speech, and Lt. Lebrecht's close contact to Chief McDermed, to whom Plaintiff had previously complained about matters of public concern, the jury may fairly draw an inference that the materials were released in connection with Plaintiff's protected speech. Lt. Lebrecht's request for summary judgment is therefore DENIED as to the speech claim.

Defendant Brian Caufield

Caufield presided over Plaintiff's "Step 3" grievance termination hearing while Plaintiff was no longer an employee. Plaintiff has not presented evidence to establish a causal connection between any protected speech and action taken by Caufield during the grievance hearing, nor that he was Plaintiff's employer. Thus, Defendant Caufield is entitled to summary judgment as to the First Amendment retaliation claim.

Defendant Carolyn McDermed

Chief McDermed took several actions against Plaintiff, including instructing Lt. Morrow to conduct an internal affairs investigation into Plaintiff's misconduct; reassigning Plaintiff to parking duties; and recommending his termination. She later released *Brady* materials to the DA's office, which, under these circumstances, can be construed as an adverse employment action. There is no evidence that the prior two actions occurred in response to any protected speech. However, Plaintiff testified that in

an August 13, 2012 meeting, he reported misconduct by his supervisors and wasting resources. Cleavenger Dep. at 151:19-25, 158:15-24. Plaintiff's termination and the release of *Brady* materials occurred after this meeting. Chief McDermed denies that Plaintiff made these complaints. McDermed Decl. ¶ 12.

While Defendants suggest that "Chief McDermed's recollection of what transpired at this August 13 meeting should be accepted as true" due to prior inconsistencies in the version of events presented by Plaintiff or his agents, Mot. at 23, the Court finds it improper to make such credibility determinations at the summary judgment stage. *Coszalter*, 320 F.3d at 973.

Given the proximity in time between the protected speech at the August 13, 2012 meeting and McDermed's adverse action against Plaintiff, and evidence showing that the reasons for additional adverse actions, such as releasing the *Brady* materials, were pretextual, Plaintiff has presented sufficient evidence to defeat summary judgment as to the First Amendment claim against Chief McDermed. Therefore, her request for summary judgment is DENIED.

### 3.    Qualified Immunity on First Amendment Claims

Defendants argue that, even if there is a constitutional violation, the individuals are immune from liability as the constitutional right was not "clearly established" at the time of the incident.

In a § 1983 action, an officer will be denied qualified immunity "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, showing that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (citing *Saucier v. Katz*, 533 U.S. 194, 201–202 (2001)).

To defeat a claim of qualified immunity, Plaintiff need not show this exact case has occurred before. "[O]fficials can still be on notice that their conduct violates

established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also United States v. Lanier*, 520 U.S. 259, 269 (1997) (to defeat qualified immunity "the prior decisions must give reasonable warning that the conduct then at issue violated constitutional rights.").

In 2011, it was already well established that liability could attach for taking retaliatory action against an employee for engaging in protected speech. *See, e.g.*, *Garcetti*, 547 U.S. at 417; *Coszalter*, 320 F.3d at 97 (noting that the Supreme Court decided *Pickering v. Board of Education,* 391 U.S. 563, establishing that the First Amendment protects employee speech on matters of "legitimate public concern," in 1968); *Connick*, 461 U.S. at 142 ("For at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."). Further, the Ninth Circuit has rejected strict time-limitations for retaliation claims. *Coszalter*, 320 F.3d at 978 ("There is no set time beyond which acts cannot support an inference of retaliation."). Plaintiff's First Amendment right to be free from retaliation for constitutionally protected speech was clearly established at the time of the alleged constitutional violation. Taking all reasonable inferences in Plaintiff's favor, for the purposes of this Motion, the evidence supports a conclusion that Chief McDermed, Lt. Lebrecht and Scott Cameron violated a clearly established constitutional right in taking adverse action against Plaintiff in retaliation for his constitutionally protected speech.

For the reasons above, summary judgment for the First Amendment retaliation claim is GRANTED as to Defendant Caufield, and DENIED as to Defendants Cameron Lebrecht, and McDermed.

## IV.    Due Process Violations

Plaintiff claims that after his employment with UOPD ended, Defendants disclosed to the Lane County District Attorney's Office *Brady*-related materials that were damaging to his career and reputation.

### 1.    Substantive Due Process

"The substantive component of the Due Process Clause 'forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Dunn v. Reynolds Sch. Dist. No. 7*, No. CV-09-1259-HU, 2010 WL 4718781, at *11 (D. Or. Nov. 15, 2010) (citing *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998)). "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994).

The Ninth Circuit has "held that a plaintiff can make out a substantive due process claim if she is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 997 (9th Cir. 2007) *aff'd* 553 U.S. 591 (2008). This claim is available only in "extreme cases." *Id.* Such circumstances include "a government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of an individual in an occupation that requires licensure." *Id.* (quoting *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997)). In order to state a claim, Plaintiff must present evidence of "government employer actions that foreclose access to a particular profession to the same degree as government regulation." *Id.* at 998.

To support a claim, a plaintiff must show "that the character and circumstances of a public employer's stigmatizing conduct or statements are such as to have destroyed an employee's freedom to take advantage of other employment opportunities." *Id.* (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 531 (7th Cir. 2000)) (internal quotation marks omitted). "It is not enough that the employer's stigmatizing conduct has some adverse effect on the employee's job prospects; instead, the employee must show

that the stigmatizing actions make it virtually impossible for the employee to find new employment in his chosen field." *Id.*

> In *Engquist*, the plaintiff worked for the Oregon Department of Agriculture. After a supervisor made repeated statements about planning to fire the plaintiff, during a budget crisis, the supervisor discharged the plaintiff. After being discharged, the plaintiff applied to roughly 200 jobs, and was not offered a position by any employer. After filing suit against her former employer for violation of her substantive due process rights, the plaintiff presented evidence that her supervisors made defamatory statements about her to two or three others in the industry. There was no evidence, however, that the defamatory statements were the cause of plaintiff's inability to procure another job in her given field. Therefore, the Ninth Circuit held that the plaintiff "did not present sufficient evidence to sustain her substantive due process claim."

*Dunn*, 2010 WL 4718781, at *12.

Here, Defendants contend that the evidence is insufficient to show that Plaintiff was deprived of his right to pursue a profession, as he is currently practicing law and volunteering in law enforcement, Cleavenger Dep. Vol. 3 at 32:9-24 (confirming position as reserve police officer). Moreover, they claim it was the DA's decision – not Defendants' – to put Plaintiff on the *Brady* list; the disclosure of information to the "public," or defense counsel in a criminal matter, occurred as a result of a request from the Lane County DA. Gardner Dep. at 39:11-25; 40:1-25. Defendants also argue that Chief McDermed acted reasonably when she provided information to the DA for his review, believing that it was her obligation to report what she believed to be Plaintiff's untruthfulness. McDermed Dep. at 196, 199, 201, 203; McDermed Decl. ¶¶ 24-26. Chief

McDermed further maintains that she was aware, on April 21, 2014, that Plaintiff had chosen to resign from UOPD and had agreed not to reapply. McDermed Decl. ¶ 23.

Plaintiff claims that he does not want to merely volunteer in the law enforcement profession, but to pursue law enforcement as a career. Plaintiff presented evidence that a law enforcement officer who has been "Brady Listed" would be "virtually unhireable as a police officer." Mertz Decl. ¶ 5.

The Mertz declaration lacks foundation and is not clearly applicable to the facts of this case, where the Defendants submitted the *Brady* materials to the DA but did not, themselves, put Plaintiff on the "Brady List." *Cf. Tillotson v. Dumanis*, No. 10CV1343 WQH AJB, 2010 WL 4642061, at *6 (S.D. Cal. Nov. 8, 2010) (allegations that DA's inclusion of the plaintiff in a *Brady* index was arbitrary did not support a claim for violations of Plaintiff's substantive due process). While the materials Defendants submitted may have been misleading, there is no evidence that anyone but the DA could control who went in the *Brady* index.

What is more, there is a notable absence of evidence to support Plaintiff's claim that the submission of *Brady* materials has prevented his employment in law enforcement. Plaintiff was never a police officer, despite applying to numerous positions before working as a PSO for UOPD. Police officers go through separate training and have additional responsibilities. He has presented no evidence that, since the disclosure, he has attempted to obtain a law enforcement position and has been denied. He is currently working as a law clerk to a federal judge, and is volunteering in law enforcement. In sum, he has not presented any evidence that he in fact has been foreclosed from work in the field of law enforcement as a result of Defendants' actions. *See Eaton v. Siemens*, No. CIVS07-315 FCD KJM, 2009 WL 4929262, at *14 (E.D. Cal. Dec. 14, 2009) *aff'd,* 431 Fed. App'x 539 (9th Cir. 2011), *as amended on denial of reh'g and reh'g en banc* (July 12, 2011) (evidence insufficient to support a claim where the plaintiff worked in the field of law enforcement and had secured job interview for a

police position after the release of stigmatizing information, recognizing that substantive due process claims are sustainable only in "extreme cases," such as a government blacklist, where a plaintiff can show a "complete prohibition on entry into a profession"); *Scruggs v. Josephine County Sheriff's Dep't,* 2008 WL 608581, *15 (D. Or. Mar. 4, 2008) (finding the plaintiff's evidence that the defendants may have communicated to prospective law enforcement employers that the plaintiff was terminated for leaking confidential information was insufficient as a matter of law to establish a substantive due process violation since such evidence did not "rise to the requisite level" of demonstrating "stigmatizing" conduct amounting to a "government blacklist which excludes [a] plaintiff from her chosen profession"); *Hogan v. Calvin-Smith*, No. CV 07-555-PK, 2008 WL 183077, at *6 (D. Or. Jan. 16, 2008) (summary judgment warranted where there is no evidence in the record identifying defendants profession of choice with particularity, or establishing that she had been effectively barred from practicing that profession in any setting outside of the position from which she was terminated, which was insufficient to support a conclusion that the plaintiff had been the subject of a *de facto* government blacklist); *cf. Williams v. Madison Cnty., Idaho*, No. 4:12-CV-00561-EJL, 2015 WL 428053, at *7 (D. Idaho Feb. 2, 2015) (evidence sufficient to defeat summary judgment where plaintiff presented testimony regarding his ability to obtain employment in law enforcement in several counties, his application for jobs, and sheriff's testimony that plaintiff would be disqualified from employment in that county). A complete absence of evidence as to a causal connection between the release of materials and his inability to find a job in law enforcement, or that he is currently foreclosed from employment in the field, is fatal to this claim.

Thus, Defendants are entitled to summary judgment as to the claim for substantive due process.

## 2.    Procedural Due Process

The scope of the liberty interest protected by the Fourteenth Amendment is "[i]n a Constitution for a free people ... broad indeed." *Board of Regents v. Roth*, 408 U.S. 564, 572 (1972). Generally, "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). The Supreme Court has:

> [r]ecognized the serious damage that could be inflicted by branding a government employee as 'disloyal,' and thereby stigmatizing his good name. But the Court has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of due process absent an accompanying loss of government employment.

*Paul v. Davis*, 424 U.S. 693, 706 (1976) (footnote omitted).

Therefore, a public employee is entitled to due process protection if the employee's termination includes the publication of stigmatizing charges. *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998). To prove that claim, the "employee must show that '(1) the accuracy of the charge is contested; (2) there is some public disclosure of the charge; and (3) the charge is made in connection with termination of employment.'" *Id.* (citing *Matthews v. Harney Cnty.*, 819 F.2d 889, 891-92 (9th Cir. 1987)). "[T]he reasons for dismissal must be sufficiently serious to 'stigmatize' or otherwise burden the individual so that he is not able to take advantage of other employment opportunities." *Bollow v. Fed. Reserve Bank of San Francisco*, 650 F.2d 1093, 1101 (9th Cir. 1981). "If a liberty interest is thereby implicated, the employee must be given an opportunity to refute the stigmatizing charge." *Mustafa*, 157 F.3d at 1179 (citing *Codd v. Velger*, 429 U.S. 624, 627 (1977)).

Defendants do not dispute that the first element is met. They do dispute the second and third elements. Defendants assert that they are entitled to summary judgment because the *Brady* materials were not publicly disclosed, they were not submitted in connection with Plaintiff's termination, and Defendants are entitled to qualified immunity.

### a. Public Disclosure and Qualified Immunity

Defendants argue that providing allegedly stigmatizing information to another public agency is not a public disclosure.

Courts have found that disclosures of stigmatizing information internally within or between government agencies is not a "public" disclosure. *See Wenger v. Monroe*, 282 F.3d 1068, 1075 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Apr. 17, 2002) (information disclosed between branches of the military were not "public"); *see also Millman v. Inglish*, 461 Fed. App'x 627, 628 (9th Cir. 2011) (notification of allegations of fraud againt other public agencies was not a public disclosure); *Reyes v. City of Pico Rivera*, 370 Fed. App'x 844, 844 (9th Cir. 2010) (disclosure of stigmatizing report to two other city officials did not constitute publication because there was no public disclosure).

If the interagency disclosure is publicly accessible, however, the document may be considered public. For example in *Cox*, the Ninth Circuit held that, where "Washington law provides that a personnel document is a public record, subject to disclosure, if it relates to the conduct of government and to the performance of governmental functions," a document placed in a personnel file constituted "publication." *Cox v. Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004). In addition, the Ninth Circuit has implied that those in law enforcement careers are not required to make the same showing of public disclosure because such a career often requires "confidentiality waivers and extensive background investigations." *Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1130 (9th Cir. 2001), *as amended* (Mar. 14, 2001)

(citing *Lubey v. City and Cnty. of San Francisco*, 98 Cal. App. 3d 340, 347 (1979);
*Murden v. Cnty. of Sacramento*, 160 Cal. App. 3d 302, 308 (1984)).

Plaintiff has not shown that the material UOPD sent to the DA is in fact publicly
available under Oregon law. *See, e.g.*, Or. Rev. Stat. § 192.501(12) (exempting personal
discipline actions from disclosure to the public). In oral argument, Plaintiff appeared to
concede that Oregon law did allow for public disclosure. Instead, he argued that under
federal law the materials must be considered publicly disclosed.

At first blush, this argument is compelling. Based on the nature of the disclosure
(these were *Brady* materials disclosed regarding a person in law enforcement) it was
clear that some information *could* be disseminated outside of the DA's office and would
be available to third parties. *See Brady v. Maryland*, 373 U.S. 83 (1963) (requiring
prosecutors to disclose to defense counsel exculpatory evidence to criminal defendant);
*Benn v. Lambert*, 283 F.3d 1040, 1054 (9th Cir. 2002) (holding that the prosecution's
failure to disclose critical impeachment evidence that could have been used to
undermine a key witness's credibility was sufficient, standing alone, to constitute a
*Brady* violation). But, there is evidence that prior to determining any person should be
"flagged" as someone whose personnel file should be disclosed to defense counsel, the
DA's office conducts an independent investigation. It is the prosecutor's obligation to
disclose this information. While the police disclosure to the DA's office could lead to
the eventual disclosure of information concerning Plaintiff's character for truth to the
public, or at least disclosure to defense counsel for cases in which Plaintiff could
potentially testify, Defendants are not alleged to have disclosed the materials
themselves. Plaintiffs have not cited to any law suggesting that Defendants should be
held responsible for that secondary disclosure.

Of course, as made very clear at oral arguments, there is evidence that the DA
was not truly independent when it came to the Brady information in this case. Further,
there is evidence that this disclosure to the DA was retaliatory, in response to either

Plaintiff's speech or Defendants' personal dislike for him. The current issue, however, is not one of intent or motive, but rather of publication. Public policy would not be well served by dissuading police departments from turning over potential *Brady* materials about police officers to prosecutors due to fears of collateral litigation.

The Court will exercise its discretion to consider the issue of qualified immunity prior to determining whether a constitutional right was actually violated. *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). This inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (internal quotation marks omitted); *see Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful" (internal quotation marks omitted)).

The Court is inclined to agree that "it was not clearly established in July 2014 that providing possible *Brady* information to a prosecutor regarding a former employee also required notice and a name-clearing hearing to the former employee," even if that information is highly misleading, as Plaintiff suggests. Mot. at 34.

While the constitutional right for employees to have access to a name-clearing hearing with regards to a public disclosure of stigmatizing information was established well before Plaintiff's discharge/resignation, *see Cox*, 359 F.3d at 1106 ("the law was clearly established that publication of stigmatizing information without a name-clearing hearing violates due process"), whether *Brady* materials were "public," and the relative impact of the DA's involvement in the review and publication of *Brady* information to defense counsel was not. In fact, existing case law suggested that sending information to a District Attorney was not a public disclosure. *Millman*, 461 Fed. App'x at 628; *Reyes*, 370 Fed. App'x at 844; *Wenger*, 282 F.3d at 1075. Based on the facts of this case, a reasonable officer would not know that turning over potential *Brady* materials about a fellow officer to a district attorney, even misleading ones, would be considered a public

disclosure. *See* Cleavenger Decl. Ex. 11 ("Best Practices for Navigating *Brady v. Maryland* in Oregon," discussing internal protocols DA goes through before determining whether an officer/witness should not testify, including speaking with the witness). Due to the state of the law at the time Chief McDermed made the disclosure of potentially defamatory materials, she was not on notice that release of materials to the DA for his determination of whether to include Plaintiff on a *Brady* index violated Plaintiff's constitutional right to a name-clearing hearing.

### b.   Decision Made in Connection with Termination

Defendants also argue that because Plaintiff was reinstated by an arbitrator, and thereafter voluntarily resigned due to a conflict with new employment, there was no termination – such that no process was due. Plaintiff argues that he was constructively discharged due to the hostile environment created by the individuals' efforts to tarnish Plaintiff's reputation in order to prevent or dissuade him from returning.

The Court will not reach the issue of whether the release of information was in connection with his termination for the purposes of procedural due process, as the Court has concluded that Defendants are entitled to qualified immunity as to the issue of publication.

Summary judgment as to the procedural due process claim is GRANTED as to all defendants.

## V.      Disposition

For the reasons set forth above:

- Regarding Plaintiff's § 1983 claim premised on First Amendment violations, the Motion is GRANTED as to Defendant Brian Caufield and denied as to Chief McDermed, Lt. Lebrecht, and Sgt. Cameron.

- Regarding Plaintiff's § 1983 claim premised on his substantive due process rights, the Motion is GRANTED as to all Defendants.

- Regarding Plaintiff's § 1983 claim premised on his procedural due process rights to a name-clearing hearing, the Motion is GRANTED as to all Defendants.


DATED:      August 06, 2015


_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE