**Jason L. Kafoury (OSB #091200)**
**Mark McDougal (OSB #890869)**
**Kafoury & McDougal**
**411 SW Second Avenue, Suite 200**
**Portland, OR 97204**
**(503) 224-2647**
**Fax: (503) 224-2673**
**jkafoury@kafourymcdougal.com**
**mcdougal@kafourymcdougal.com**
**Attorneys for Plaintiff**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| JAMES M. CLEAVENGER, | Case No. 6:13-cv-01908-DOC |
| Plaintiff, | **PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR** |
| vs. | |
| CAROLYN McDERMED, BRANDON LEBRECHT, and SCOTT CAMERON, | |
| Defendants. | |

Plaintiff hereby responds to Defendants' Alternate Motions for Judgment as a Matter of Law and for New Trial or Remittitur.

TABLE OF CONTENTS

**1. MOTION FOR JUDGMENT AS A MATTER OF LAW**.................................................4

**2. MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, REMITTITUR**............................4

**3. DEFENDANTS' ILLUSORY FACTUAL ARGUMENT** ...................................4

   **II.**   **Plaintiff proved he was harmed.**.........................................................5

      A.   The jury did not award noneconomic damages.........................................5

      B.   Economic damages were supported by the evidence. .................................5

   **III.**   **Defendants are not entitled to judgment as a matter of law.** ..................13

   **IV.**   **Defendants are not entitled to an order remitting the compensatory damages award to nominal damages, nor are defendants entitled to a new trial, as the award is not against the clear weight of the evidence.**.................................................19

   **V.**   **Defendants are not entitled to a new trial or remittitur of punitive damages.** ....................19

      A.   Alleged misconduct of plaintiff's counsel in closing argument has not resulted in a denial of defendant's due process rights. .................................................20

      B.   Defendants waived any argument as to the proportionality of their punitive damage awards. 22

      C.   The punitive damage awards are not constitutionally excessive..............................23

      D.   The jury's award is supported by evidence of reprehensibility. ...............................24

   **VI.**   **Scope of Defendants' Motions for New Trial** .........................................24

      A.   The verdict is valid as to all defendants. ...............................................24

      B.   The issues of liability and damages are separable. ...................................26

**Page 2 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Asarco LLC*, 773 F.3d 1050 (9th Cir. 2013)................................................................. 24

*Auto. Products v. Tilton Eng'g, Inc.*, No. CV 90-5500 KN (EX), 1993 WL 661138, at *3 (C.D.

   Cal. Nov. 18, 1993)........................................................................................................... 27

*Ayuyu v. Tagabuel*, 284 F.3d 1023, 1026 (9th Cir. 2002)............................................................ 25

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422 (1996)........................... 19

*Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1347 (9th Cir. 1984)................................. 27

*Estate of Schwarz ex rel. Schwarz v. Philip Morris Inc.*, 348 Or. 442, 460, 235 P.3d 668, 678

   *adhered to on reconsideration*, 349 Or. 521, 246 P.3d 479 (2010).......................................... 27

*Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931) ..................................... 26

*Glendale & 27th Investments, LLC v. Delos Ins. Co.*, 610 F. App'x 661, 663 (9th Cir. 2015) .... 24

*Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) ................................................... 27

*Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 777 (9th Cir. 1990) ........................................... 26

*Mitchell v. Cty. of Los Angeles*, 332 F. App'x 369, 370 (9th Cir. 2009)...................................... 25

*Patriot Rail Corp. v. Sierra R. Co.*, No. 2:09-CV-0009-TLN-AC, 2015 WL 4662720, at *12

   (E.D. Cal. Aug. 5, 2015) ................................................................................................... 21

*Real v. Cont'l Grp., Inc.*, 627 F. Supp. 434, 452 (N.D. Cal. 1986)............................................. 27

*Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 517 (9th Cir. 2004)........................................ 21

*Thomas v. Cty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014) ............................................. 14

*Traver v. Meshriy,* 627 F.2d 934, 938 (9th Cir.1980)................................................................. 26

*Wharf v. Burlington N. R. Co.*, 60 F.3d 631, 638 (9th Cir. 1995) ............................................... 27

### 1.  MOTION FOR JUDGMENT AS A MATTER OF LAW

Because defendants failed to make a Rule 50(b) motion with regard to the sufficiency of evidence to support an award of damages, defendants have waived their ability to move for judgment as a matter of law on that grounds.  Defendants simply made a catch-all motion that there was insufficient evidence to support liability.

### 2.  MOTION FOR NEW TRIAL OR, IN THE ALTERNATIVE, REMITTITUR

Defendants stipulated to the verdict form, and accordingly did not object to the form of the verdict, thereby waiving any appeal or objection to the unsegregated compensatory damage award, and any proportionality argument with regard to the punitive damages award. Additionally, the $650,000 economic damage award does not warrant a new trial in that defendants have not shown the award was clearly not supported by the evidence or grossly excessive.

### 3.  DEFENDANTS' ILLUSORY FACTUAL ARGUMENT

The defendants assert a version of facts that was rejected by the jury.  This was a long trial with numerous facts.  Plaintiff submits those facts that pertain to defendants' specific arguments that should be viewed in the light most favorable to plaintiff in the appropriate sections below.  Plaintiff does not in any way agree to defendants' interpretation of the "facts" as described in pages 7-16 of their motion. [1]

---

[1] By way of examples:

1.      Defendants contend that the stop of the assistant dean was unlawful.  However, Lt. Bechdolt of Standards and Training testified that such stops were within Cleavenger's statutory authority.  (See Defendants' Facts Memo at pg. 2).

**Page 4 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

## II.     Plaintiff proved he was harmed.

   A.     <u>The jury did not award noneconomic damages.</u>

Defendants make much of the fact that the jury did not award noneconomic damages. The parties do not, and will never know why no noneconomic damages were awarded. Who knows what noneconomic damages would have been awarded, had the jury not awarded economic and punitive damages? This is the sole province of the jury.

   B.     <u>Economic damages were supported by the evidence.</u>

   1.     Defendant Cameron did have involvement in the Brady materials and a reasonable juror could conclude that Cameron's actions affected plaintiff economically.

Cameron had involvement with additional adverse actions that (i.e. his negative performance evaluations, participation and interviews in multiple internal investigations of plaintiff, Cameron's statements regarding plaintiff's stance on Tasers, etc.) that a jury could find affected plaintiff economically. Defendants first contend that defendant Cameron had no involvement in the Brady materials. This is untrue, because the 5/18/12 Spencer View written reprimand issued by Cameron (Ex. 1), and the 11/18/11 letter of clarification (Ex. 3) also involving Cameron were both discussed in the Brady materials submitted to the District Attorney, and the District Attorney stated in his 6/30/14 letter to Chief McDermed that these materials (Ex. 150 - Brady materials) would all be turned over to a criminal defense lawyer

---

2.     The Arbitrator found "no just cause" for terminating Cleavenger. Arbitrator Award, Ex. 178, pg. 2 and 28. Contrast that with defendants' characterization of the award. (See Defendants' Facts Memo, pg. 5.)

3.     Cleavenger testified and the jury could have found that he was allowed and ordered to transport the armed woman with a gun. Tr. 1411-1418. Defendants' facts assume he engaged in wrongdoing. Defendants' Facts Memo, pg. 5.)

**Page 5 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

anytime plaintiff was to testify in court as a witness for the state. (Ex. 170 - 6/30/14 letter sent by DA Gardner to UOPD Chief McDermed).

However, more importantly defense counsel stipulated to the verdict form and we will never know specifically what the jury awarded damages for because the jury was not asked to identify what specific adverse employment action related to what damages. Therefore, we do not know if the damages were awarded for the written reprimands, negative evaluations, the termination, the retaliation for filing this lawsuit, or the Brady listing.  As an example, the jury found all defendants took adverse employment actions against plaintiff for some protected speech that was prior to plaintiff's termination (i.e. complaints about Officer Bill of Rights, the legality of his order to report felonies only, and for Cameron for plaintiff's Taser speech, etc.). The jurors could also have awarded damages for a combination of factors related to plaintiff's employment and Brady listing.

There was a wealth of evidence over the multi-week trial that the submission of the Brady materials by defendant McDermed and Lebrecht would impact the career of plaintiff. First, the jurors heard from multiple witnesses that Mr. Cleavenger's goal in life was to work in law enforcement and be a police chief. Mr. Cleavenger, himself, stated that his career goal before all this happened at the University of Oregon "was to become a chief eventually." Tr. 1278:25 – 1279:9.  Plaintiff's ex-wife, Chelsea Brandenberg, was asked what Mr. Cleavenger's long-term career plan was when he was working at the University of Oregon, and she responded, "At one time, he wanted to be a chief." Tr. 2504:5 – 8.  His coworker and University of Oregon Department of Public Safety Field Training Officer, Michael Drake, testified that Mr. Cleavenger had a desire to work in law enforcement as a career.  Tr. 1571:6 – 8.  His coworker at Junction City, Corey Mertz, testified that prior to the incidents occurring at the University of

Oregon, James was "a very eager person. He looked forward to, you know, becoming a full-time police officer. It was very clearly his goal, his dream, it was something he was striving to obtain." Tr. 860:10 – 18.

This was also confirmed by his long-time friend, Tim Ranger, who testified that the plaintiff went to law school in order to become a police officer. Tr. 849:8 – 15. Ranger confirmed that plaintiff's long-term goal was to run his own police department, and Ranger said Cleavenger wanted the "top job" of being a police officer in relation to running his own department. Tr. 852:24 – 853:3. Finally, the jurors heard from plaintiff's father, Michael Cleavenger, who worked in law enforcement starting in 1970 for many years as a police detective and sergeant. Michael Cleavenger testified that James Cleavenger first expressed interest in working with law enforcement when he was "seven or eight years old, when he would ride with his father on patrols." His father also confirmed that even while his son was studying in college and in law school, that his son "always was set on wanting to be a police chief somewhere." Tr. 935:7 – 939:9.

Further, a reasonable juror could also conclude that because plaintiff had attained a college degree and two separate law degrees, he was more likely to move up the ranks in law enforcement and become a chief of police. As his father Michael Cleavenger testified to, his son "wanted to use his law degree to become a police chief somewhere," that "a lot of time would be spent going to college, between college and going to law school," and that plaintiff "knew he was going to have to start someplace and work his way up the ranks." Tr. 938:22 – 939:6. In fact, Coburg Police Chief Larson told the jury he sent the plaintiff to "a field training evaluation programs class so he could actually become one of my training officers" and sent plaintiff to take a "class on video cameras because I knew he also had a law degree, so he can try to help me to

**Page 7 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

make sure I'm good on my policies and procedures." Tr. 982:17 – 983:11. Even defendant
Cameron admitted on the stand that he "did see the good in having an officer with a law degree."
Tr. 2535:20 – 22.

Defense counsel next claims there was only speculative evidence about how much a
police chief earns. In fact, plaintiff himself testified that police chiefs in Oregon "generally make
anywhere from $100,000 to almost $200,000," and plaintiff went on to point out he was basing
this knowledge on documents he had "seen posted because the job postings are online at
DPSST." Tr. 1506:17 – 21. Therefore, the jury was told by five witnesses in addition to the
plaintiff himself that his career goal was to work in law enforcement and be a police chief.
Jurors were also given the statistics from the plaintiff on how much police chiefs make a year.
There is ample evidence in this record that a jury could use to determine how these adverse
employment actions against the plaintiff led to $650,000 in the economic damages they awarded.
There was also evidence in the record showing plaintiff's wages and benefits at the time of his
termination. (See Ex. 376 – Exhibit A of Settlement Agreement).

It should also be noted that defendants never objected to any of the testimony about
plaintiff's career goals or about the dollar amounts that police chiefs in this state are paid.
Defendants did not move for dismissal of the economic damages claim at the close of plaintiff's
case, or the trial itself with allegations that these economic damages were too speculative. Only
after they lost the case did they first raise this issue of speculative economic damages.

Defendants continue to claim even after the trial that plaintiff was not placed on any
"Brady list." Defense brief, pg. 20. They rely on this assertion by quoting D.A. Alex Gardner
saying that there is "no Brady list" and that plaintiff is therefore "not Brady listed." Defense
brief, pg. 20. As the trial made clear, this is just a difference of semantics because even in their

own brief, they admit that plaintiff's Brady materials were put into the Lane County District Attorney's "database."  Defense brief, pg. 29.  Whether it is a physical list or names in database does not matter.  The point is, once the materials were submitted to the District Attorney, James Cleavenger was red-flagged and anytime he as a law enforcement officer would have to testify in Court, that information would be turned over to the criminal defense lawyer, which is precisely what happens after someone has been Brady-listed.  Even District Attorney Gardner admitted on direct exam that after he reviewed the materials submitted in regards to Mr. Cleavenger, that in his opinion, that information, he would be obliged to turn over to a criminal defense attorney. Tr. 1993:11 – 1994:12.  Gardner also sent a letter to UOPD on 6/30/14 stating his office was "confident of a duty to disclose related information to the defense in any criminal case in which Officer Cleavenger is a potential witness."  Ex. 170.  And his office did exactly that on 7/3/14. See Ex. 248 - Witness Disqualification email sent to Deputy DA on 7/3/2014.

Gardner went on to outline the process in his testimony of how Lane County maintains the Brady database through a "data management program" and anyone who has "Brady-related concerns" can be flagged within their system.  Tr. 1997:6 – 13.  Further, plaintiff testified himself he was told by Gardner "that he was put on Brady list at the first tier where everything has to be turned over to the defense attorney in any case." Tr. 1498:11-17. The jury also received various documents into evidence which made clear that the plaintiff was actually Brady-listed as a result of the submission of the materials by defendants to the Lane County District Attorney's office.  See, Ex. 212 - Emails to/from DA Office to Cleavenger between 7/29/14 and 8/25/14, Ex. 230 - Email chain dated 7/11/14 regarding Brady documents, Ex. 248 - Witness Disqualification email sent to Deputy DA on 7/3/2014, Ex. 250 - 1st email from DA Gardner to UOPD re Cleavenger's Brady Response. Sent on 8/29/14, Ex. 251 - 2nd email from DA Gardner

**Page 9 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

to UOPD re Cleavenger's Brady Response. Sent on 8/29/14, Ex. 266 - 7/11/14 Email chain re:

Brady materials, Ex. 373 - Letter from DA Gardner to McDermed sent on 6/30/14

    Jurors heard from many witnesses called by both sides who testified that being dishonest
as a police officer and being flagged for a Brady disclosure was sufficient to end someone's law
enforcement career. District Attorney Gardner pointed out that historically, the phrase in law
enforcement was "You lie, you die. Professionally, of course." Tr. 2000:12 – 14. Gardner
confirmed that once he received the materials from the defendants, that he had a duty to disclose
those materials and would continue to disclose those materials in the future regardless of the
outcome of this trial. Tr. 2008:18 – 25. District Attorney Gardner went on in his testimony to
explain the difference between law enforcement and other careers when he stated "an
indiscretion which shows a character weakness or a lapse in truthfulness," unlike other
professions," it's "a career-ender in law enforcement." Tr. 1991:13 – 22.

    The jurors also heard from defense witness Chief Chase, the acting chief of the Junction
City Police Department. Chief Chase confirmed that at Chief Association meetings, District
Attorneys have discussed the consequences of an officer being Brady-listed, and that if an officer
were Brady-listed, "that would prevent him from testifying and therefore it would prevent the
chief of police from employing that person in a capacity out in the field where they were
interviewing people and taking reports because then he couldn't testify in court because his
credibility wasn't any good." Tr. 2034:8 – 23. Chase went on to discuss how police chiefs like
to have a third-party person (i.e. the District Attorney) make a decision about whether or not an
officer is Brady-listed because "it means their career." Tr. 2035:13 – 23. Chief Chase then told
the jury that as a member of the board of the Oregon Chiefs Association and that "in the last five
years in Oregon . . . the statistics for Oregon are like there's been over 80 officers that have been

de-certified and lost their jobs over truthfulness issues" and that those statistics were "the highest in the country." Tr. 2036:2 – 17.

Jurors also heard from UOPD Captain Pete Desphonde, who was second in command below Chief McDermed, who testified that Brady listing "can be a black mark, the death knell of the officer's career." Tr. 1864:10 – 14. Defendant McDermed in her own testimony even confirmed that she knew Brady-listing was "a very serious matter and she knew it could "end their career." Tr. 1206:13 – 17. Defendant Lebrecht also admitted on the stand that when he prepared the Brady materials, he knew the consequences of being put onto a Brady list had the potential to end Cleavenger's career. Tr. 1119:23 – 1120:8.

Jurors also heard from Cory Mertz who has worked in law enforcement for 19 years and has done background investigations as part of his training and experience, for potential employees. Tr. 862:18 – 25. Mertz confirmed that as an officer in charge of hiring, if an applicant was on the Brady list, Mertz would make a recommendation that they not be hired. Tr. 863:10 – 16. Mertz confirmed that being on a Brady list "would essentially make a candidate not able to be a police officer" because "credibility is the only thing a police officer has to always have, and if you're putting somebody on a list that's saying they don't have credibility, then you're ruined." Tr. 863:22 – 864:12.

Plaintiff's father, Michael Cleavenger, also testified that he conducted background investigations as part of his law enforcement career and as a sergeant to determine fitness for hiring employees as police officers. Tr. 945:15 – 22. Michael Cleavenger made it clear that if someone is on a Brady list, they are "unemployable in law enforcement." Tr. 945:23 – 25.

We also heard from Lt. Casey Boyd who testified she was aware of Brady-listing back when she was in the police academy in 2000. Tr. 719:10 – 15. Boyd stated that in her

**Page 11 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

experience, once you are "on the Brady list, it typically "ends your profession in law

enforcement because it is about your integrity, and that's all you have and when somebody's put

on the Brady list, it's extremely rare they continue on."  Tr. 722:5 – 14.

There was also evidence before the jury that being Brady listed would make it nearly

impossible for plaintiff to be hired as a full time police officer. It is undisputed plaintiff lost his

job at Junction City Police Department because of his termination from the University Of

Oregon Department Of Public Safety. Plaintiff did continue to work as a volunteer reserve

officer for the Coburg Police Department, however jurors heard from Chief Larry Larson, the

police chief for Coburg Police Department, who made it clear that the Brady listing would

probably prohibit plaintiff from being hired as a full-time paid police officer.  Tr. 991:6 – 8.

Larson also indicated that being Brady-listed would qualify as a failed background check.  Tr.

991:13 – 15.  Larson also confirmed that if the District Attorney decided the plaintiff deserved to

be disqualified from testifying altogether (the next and highest tier of Brady listing), that Chief

Larson might have to terminate the plaintiff.  Tr. 991:16 – 992:3.

Even the University of Oregon Police Department's own internal documents showed how

the Brady listing would impact a potential officer.  In the University of Oregon's police officer

job description, that the jury received as Ex. 149, one of the special requirements for being a

police officer at the University of Oregon was "under Brady v. Maryland, UOPD employees

must be able to render credible testimony in a court of law."  Special Requirements, pg. 2, Ex.

149.

Finally, defendants cite plaintiff's testimony about the effects of his decision to file a

lawsuit and get a job as only speculative evidence.  This section is completely taken out of

context.  For the full context of the implications for his future career, please see Tr. 1505:9 – 1508:23.

The wage claim involves attempting to discern what will happen in the future.  Such an exercise is always shrouded in uncertainty and incapable of precise proof.  We have a legal system that does not allow one to come back later, after losses have occurred in the future, and sue again to recoup those losses.  The system having been so designed, substantial leeway must be given to a litigant who is forced to prove future losses.  Determining what may more likely than not happen in the future could be deemed by some to be speculation – but it is actually a well-established time-honored task for juries.  The jury was so instructed without objection.

### III.      Defendants are not entitled to judgment as a matter of law.

### A.  Adverse actions prior to *Brady* submissions

The definition of "adverse employment action" included in the jury instructions was thoroughly briefed on summary judgment, and argued well into the night during trial.  With respect to the speech as a public employee, "[a]n action is an adverse employment action if a reasonable employee would have found the action materially adverse, which means it might have dissuaded a reasonable worker from engaging in protected activity."  Jury Instruction 15 (Docket Number 166).  With respect to Defendant Cameron's retaliation for speech that occurred while the plaintiff was a private citizen, the adverse action need not have been an employment action at all, but merely an adverse action "reasonably likely to deter protected speech."  Jury Instruction 17 (Docket Number 166).  These were questions of fact that the jury resolved in the plaintiff's favor, based on the substantial evidence before it.

Plaintiff disagrees that his "claim of actual damages was based solely on the submissions of *Brady* materials". Defendants' Motions at p. 24. As demonstrated by the mountain of evidence presented at trial, the plaintiff was unfairly reprimanded, disciplined, subjected to multiple unwarranted and illegal investigations and issued inaccurate performance evaluations designed to facilitate his termination, transferred to a less desirable job assignment, placed on leave, terminated, and then retaliated against for filing this lawsuit. All of these adverse employment actions took place after his speech on TASERs, and most of it after his other protected speech began. The jury specifically found that the plaintiff's complaints about violations of the Public Safety Officer's Bill of Rights were a motivating factor for the adverse employment actions taken by Defendants McDermed and Lebrecht. Verdict at p.1-2 (Docket Number 167). The plaintiff first engaged in protected speech on this issue June 1, 2012. Jury Instruction 16 (Docket Number 166). It is therefore logical to conclude that the jury's verdict encompassed the adverse employment actions taken by McDermed and Lebrecht after June 1, including disciplining plaintiff, then placing the plaintiff on leave and subsequently terminating him, as well as the two internal investigations conducted against the plaintiff over the summer. See *Thomas v. Cty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014) (upholding as adverse employment action an internal investigation where the "supposed justification for the investigation was sufficiently thin and subjective that a reasonable juror might, particularly in light of [the plaintiff's] other allegations, find that the supposed justification was in fact pretextual.").

      B.      The *Brady* submissions

The defense has been steadfast in its conviction that the motive behind the *Brady* submissions was proper; the defendants did no more than their duty, no more than what was required of them under the law.  It is evident from the verdict that the jury did not believe them.

Lieutenant Lebrecht himself admitted to having an improper motive behind the preparation of the materials:

> Q:      Now, Lieutenant Lebrecht, in this email chain, you're not just casually watching your partners discussing *Brady*-listing my client. You're contributing ideas to what else could be included in the *Brady* list material.  Isn't that right?
>
> A:      That's not right.
>
> Q:      Okay.  Well, *Brady* issues and the other large-scale investigation that wasn't part of the termination.  Isn't it true that you didn't say, "Hey, guys.  We don't want to *Brady*-list him at this point.  This might look like retaliation?"  You didn't write that here, did you?
>
> A:      No.  That's in response to the part that you're not showing that talked about a global settlement; that I thought we could use this stuff to negotiate with Mr. Cleavenger.
>
> Q:      Okay.  So let's talk about this for a moment.  My client does his First Amendment protected speech by filing a lawsuit in this case, right? He's got a right to file a lawsuit, doesn't he?
>
> A:      I would assume, yes.
>
> Q:      Okay.  And he named you and the chief and Scott Cameron as defendants in that lawsuit; right?
>
> A:      Yes.
>
> Q:      Okay.  Now, you're talking about *Brady*-listing him to force him to settle his claim.  Is that what you're telling this jury?
>
> A:      No.  I'm not talking about *Brady*-listing.  I was talking about discussing with him there's a potential to try to get him to settle before coming back to the department.
>
> Q:      Okay.  Let's be a hundred percent clear about this.  You just testified that the reason you're putting all this out there is because you wanted to get a global settlement to put pressure on him, aren't you, to

settle this lawsuit?  That's why you're responding here to a global settlement?

A:    My intention was to try to get a global settlement, correct.

Tr. 2426:2 – 2427:11 (discussing Plaintiff's Exhibit 276 / Defendants' Exhibit 412).

The court may recall that Exhibit 276/412, the full version of the "Cleavenger Arbitration Decision" email chain which included Lt. Lebrecht's *Brady* comment, was not produced until the middle of trial.  Although the portion of this email chain containing UO General Counsel Doug Park's comments was arguably privileged until Chief McDermed broke that privilege on the stand, the portion containing Lt. Lebrecht's comments was not privileged.  In any event, it was never included in any of the defendants' privilege logs, and the defense readily produced the unredacted comments of other non-attorneys from the same email chain.  See Plaintiff's Exhibit 168.  To this day, plaintiff's counsel has not received a satisfactory answer to why Lt. Lebrecht's email was withheld for so long.[2]  As further evidence of motive on which the jury may have relied, Lt. Lebrecht initially testified (at a time when only Exhibit 168 was available to the plaintiff) that he did not comment on the email chain.  Tr. 1112:19 – 1113:6.  Only once Exhibit 412 was produced did he admit to the existence of his comment.

The defense persists in claiming that the decision to place the plaintiff on some tier of the *Brady* list rested entirely with the District Attorney, in the face of their own witness, Alex Gardner's testimony.

Q:    You get the *Brady* materials?

A:    Yes, sir.

---

[2] When asked to explain why the emails contained in Exhibit 412 had been BATES-stamped but never produced, Mr. Hood explained, in an email on 9/13/15, that 412 had been "marked as not responsive."  See Kafoury Decl., Ex. B.

**Page 16 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

> Q:      You could say, "I believe Mr. Cleavenger is the most honest man in the world.  This is crazy."
>
> A:      Yes, sir.
>
> Q:      You've still got to give them over?"
>
> A:      That's true. You're right, sir.  That's accurate. It's not my personal opinion that matters in that context.

Tr. 2003:14 – 22.

Mr. Gardner went on to testify that he relied on the assumption that the *Brady* submission was truthful and accurate.  Tr. 2006:10 – 13.  On cross-examination, however, Lt. Lebrecht admitted to multiple areas in which he altered or re-characterized the IA investigations findings. Tr. 2432 - 2441.  He also mischaracterized the Arbitrator's decision and did not include it in the hundreds of pages of material he submitted to the DA.  Exhibit 168 also demonstrated a very close temporal connection between Defendant McDermed learning of the arbitration order to reinstate plaintiff and her supposed sudden realization that she had a duty to disclose under *Brady*, from which the jury could have deduced an improper motive.  On this same email chain is a comment from one of the Chief's subordinates, that "whether or not [the plaintiff] would ever end up working for the UOPD again is not relevant.  He may seek employment in a law enforcement capacity elsewhere."  Exhibit 168, p.3.  This also tends to suggest an improper motive for the submission of *Brady* materials.  Here we have the submission of *Brady* materials to the District Attorney, prepared and submitted in bad faith, riddled with inaccuracies and deliberate mischaracterizations, timed so as to coerce settlement of a lawsuit to which the preparers are defendants, and delivered with the expressed intent to prevent employment by a different police department or reemployment at UOPD.

Lastly, Defendant Lebrecht's contention that a portion of Mr. Cleavenger's testimony expressing regret for being overly critical of him in an email to the DA's office required a

judgment in his favor does not withstand analysis.  To begin with, even if the plaintiff did testify

to a lack of belief that Lebrecht had a retaliatory motive, it would not be dispositive of this issue.

It would be evidence for the jury to weigh against the rest.  But more importantly, the plaintiff

testified to no such thing.  The portion cited by the defense is taken out of context.  What the

plaintiff testified was: ". . . I wrote some things to the DA that I actually regret.  I said something

about that Lieutenant Lebrecht is one of the most vindicative [sic] people I've known, et cetera.

And if I could take anything back, I would take that back, because at the time I didn't know that

it was Chief McDermed who actually ordered Lebrecht to do this."  Tr. 1504:20 – 25.[3]

   The letter the plaintiff was referring to is an email that is in evidence, as Exhibit 212.

The actual quote Cleavenger made to the DA about Lt. Lebrecht is, "I've never met a more

dishonest, hateful, and vengeful person in all my life."  Plaintiff's Exhibit 212 at p.4.  That is the

statement the plaintiff wanted to take back.  Furthermore, this testimony was given before the

defense had disclosed Exhibit 412 and the existence of Lebrecht's comments on the *Brady* plan

(see above).  At the time plaintiff gave this testimony, Lt. Lebrecht's testimony was that he had

not commented on the plan.

   C.   Other adverse employment actions after October 2013

   The defense is also incorrect that the *Brady* submission is the only adverse employment

action the jury could have found which occurred after the filing of this lawsuit.  Chief

McDermed's reaction to the arbitrator's ruling – "I said we would not take him back!" – is

evidence of a refusal to honor the plaintiff's employment rights, and taints the months of

---

[3] The plaintiff clarified, on cross-examination, that he still believes the Brady submission was
retaliatory.  Tr. 170124 – 1702:2.

**Page 18 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS
FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

negotiations that followed, throughout which the plaintiff remained in the dark as to the Chief's maneuvering to prevent him from returning to his position.  See Exhibit 168, 276, and 412.

**IV.    Defendants are not entitled to an order remitting the compensatory damages award to nominal damages, nor are defendants entitled to a new trial, as the award is not against the clear weight of the evidence.**

Because defendants failed to make a rule 50(B) motion with regard to the sufficiency of evidence to support an award of damages, defendants have waived their ability to move for judgment as a matter of law on that grounds.  Defendants simply made a catch-all motion that there was insufficient evidence to support liability.

Defendants cite to *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422 (1996).  Viewing the case and the jury verdict from plaintiff's perspective, the relevant holdings from that opinion are as follows:

> . . . we allow substantial deference to a jury's finding of the appropriate amount of damages. [ . . . ]  We must uphold the jury's finding unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.
>
> *        *        *
>
> Because the City has not shown that the damages award is grossly excessive, clearly not supported by the evidence, or speculative, we affirm the district court's denial of the City's motion for a new trial on damages.

*Del Monte Dunes*, 95 F.3d at 1435.

Similarly, here, where defendants have not shown that the award is grossly excessive and clearly not supported by the evidence, a new trial should not be granted.

**V.    Defendants are not entitled to a new trial or remittitur of punitive damages.**

A.    Alleged misconduct of plaintiff's counsel in closing argument has not resulted in a denial of defendant's due process rights.

In order to support defendants' claim that plaintiff's counsel violated their due process rights through misconduct in closing argument, defense counsel points to two paragraphs in plaintiff's counsel's closing argument.  The first excerpt concerning Michael Drake pertains to an objection that was considered when Michael Drake was mentioned.  However, the Court concluded that the comment would be appropriate for a different reason "concerning credibility."

This is borne out when the entire paragraph is quoted:

> Think of the courage of all the people that are still at this department that came into this courtroom and told you the truth.  Black.  Royce Myers. Can we show 204?  Michael Drake.  This is critical.  When you talk about punitive damages – Michael Drake was deposed.  He was the only officer before this lawsuit – before this courtroom, that testified on behalf of my client that was deposed in this case, and what happened after his deposition?

Tr. 2808:7 – 14.

Defendants only point to one other aspect of plaintiff's counsel's closing argument as depriving them of a fair trial.  As defendants once again only give a partial quote, the full language complained of is as follows:

> What's left at this department?  There are no female officers left.  In opening, defense counsel said McDermed was very concerned about the female student that my client stopped on 4/2.  How concerned was McDermed when the first complaint of sexual harassment against Cameron came in?  How concerned was she on the second one?  How concerned was she on the third one?  The guy was there for five years. Four allegations of sexual harassment.  What's going on at this department, ladies and gentlemen?  It's got serious problems – this department does.  It's clear.
>
> If you feel in the last three weeks that what you've heard about this department is unacceptable and its leaders, if you don't think that they're leaders of a public institution and this is the way they should act, only you can let them know with your verdict. I can tell you this right now. Chiefs

> of police around this state, good and bad, are watching this. Honorable
> officers around this state are watching this. The media is watching this.
> The community is watching. As jurors, you have the power of a
> thunderbolt but the lifespan of a gnat. I suggest you use your power
> wisely.

Tr. 2827:1 – 20.

As can be seen, there was no objection at trial. Perhaps because the comments are not

objectionable. Plaintiff's counsel was well within his rights to comment on defense counsel's

statement in opening statement, and then contrast it to how Chief McDermed responded to

complaints against Cameron versus complaints against the plaintiff. Consider:

> There is an even "high[er] threshold" for granting a new trial where, as
> here, defendants failed to object to the alleged misconduct during trial.
> *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 (9th
> Cir.1986). A higher threshold is necessary for two reasons: "First, raising
> an objection after the closing argument and before the jury begins
> deliberations 'permit[s] the judge to examine the alleged prejudice and to
> admonish ... counsel or issue a curative instruction, if warranted.'"
> *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir.2002) (quoting
> *Kaiser*, 785 F.2d at 658). Second, "allowing a party to wait to raise the
> error until after the negative verdict encourages that party to sit silent in
> the face of claimed error." *Id*. We thus review for plain or fundamental
> error where no contemporaneous objection was made. Plain error review
> requires: (1) an error; (2) that the error be plain or obvious; (3) that the
> error have been prejudicial or affect substantial rights; and (4) that review
> be necessary to prevent a miscarriage of justice. *Id*.

*Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 517 (9th Cir. 2004).

Consider further:

> Second, the attorney's closing statements are argument not evidence. The
> jury was instructed as such during the liability phase of this trial. Thus, the
> Court finds that Sierra's argument does not warrant a new trial. See
> *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 516–17 (9th Cir.2004)
> ("A new trial should only be granted where the flavor of misconduct ...
> sufficiently permeate[s] an entire proceeding to provide conviction that the
> jury was influenced by passion and prejudice in reaching its verdict.")
> (internal quotations omitted).

*Patriot Rail Corp. v. Sierra R. Co.*, No. 2:09-CV-0009-TLN-AC, 2015 WL 4662720, at *12

(E.D. Cal. Aug. 5, 2015).

**Page 21 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS
FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

Additionally, assuming *arguendo* there was a problem with the closing argument, defendants did not request a curative instruction.  A mistrial is unwarranted.

B.      Defendants waived any argument as to the proportionality of their punitive damage awards.

Defendants plainly waived any argument as to the lack of any proportionality/ratio between the jury's damage award and the punitive damage award, to wit:

> MR. MCDOUGAL: The initial comment on the verdict form, the number one change, after we get past the categories of speech, is the way the damages are set forth.
>
> THE COURT: The way the what?
>
> MR. MCDOUGAL: The way the damages are set forth.
>
> THE COURT: Okay.
>
> MR. MCDOUGAL: My verdict form had damages per defendant. This one has them all lumped together.
>
> THE COURT: Okay.
>
> (*      *      *)
>
> MR. MCDOUGAL: Let me make a real clear record. I think we've reached an agreement, but plaintiffs and defendants agree that all the damages may be lumped together. Defendant, having been advised by plaintiff counsel that that might take away arguments on appeal, including proportionality or the argument that punitive damages have to be individualized to each individual's conduct, has agreed to stipulate and waive any grounds of appeal on that basis. Is that a fair statement?
>
> THE COURT: But you need to consult your clients, don't you?
>
> MS. COIT: I need to consult general counsel, but --
>
> THE COURT: Well, call them. We're right here. Go out in the hallway and talk about it. Let's get this resolved tonight.
>
> (*      *      *)

MR. MCDOUGAL: Thank you. Your Honor, we have a resolution on the verdict form on damages.

THE COURT: Why don't you just state that on the record and then I'll redraft it tonight.

MR. MCDOUGAL: Number seven should be reworded, "Should the plaintiff be awarded punitive damages against" --and then --

THE COURT: "Should the punitive damages against ."

MR. MCDOUGAL: Colon. And then I'll hand you this right when I'm done.

THE COURT: Okay.

MR. MCDOUGAL: A: Carolyn McDermed? Yes? No? If yes, in what amount? Dollar sign. B: Brandon Lebrecht, same repeat. C: Scott Cameron, same repeat. But at the intro, after question six, it should say you only -- answer subpart A, B, or C if you found the defendant liable above.

THE COURT: Is that acceptable?

MR. MCDOUGAL: That's acceptable to the plaintiff .

THE COURT: Is that acceptable to the defendants ?

MS. COIT: Yes.

Tr. 2577:24 – 2580:15.

     C.    <u>The punitive damage awards are not constitutionally excessive</u>.

Given that waiver (and even if there was no waiver), the jury's awards of punitive

damages are not constitutionally excessive.  Consider:

> Nor did the jury award an unconstitutionally excessive amount of punitive damages. The Supreme Court has recognized that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution," than are awards ranging into the double-and triple-digit ratios. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). The ratio of punitive to compensatory damages in this case was roughly 3.5 to 1. Both the Supreme Court and this court have repeatedly

**Page 23 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

> held that ratios such as these are constitutionally permissible. See, e.g.,
> Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life
> Activists, 422 F.3d 949, 962 (9th Cir.2005) ("In cases where there are
> significant economic damages and punitive damages are warranted but
> behavior is not particularly egregious, a ratio of up to 4 to 1 serves as a
> good proxy for the limits of constitutionality." (citing State Farm, 538
> U.S. at 425, 123 S.Ct. 1513)). Delos has not demonstrated any compelling
> reason for us to deviate from that conclusion in the present case.

*Glendale & 27th Investments, LLC v. Delos Ins. Co.*, 610 F. App'x 661, 663 (9th Cir. 2015).

Additionally, while not directly on point, the Ninth Circuit's recent opinion in *Arizona v. Asarco LLC*, 773 F.3d 1050 (9th Cir. 2013), upheld a ratio of 300,000 to 1 between the punitive and nominal damages. Here, the punitive damages are far less than the compensatory damages. The defense has not cited to any case where an award of punitive damages less than compensatory damages was found excessive.

     D.     <u>The jury's award is supported by evidence of reprehensibility</u>.

There is ample evidence from which the jury could find that the defendants acted intentionally and that their retaliation was a malicious intent to punish plaintiff for his free speech behavior. Defendants complain that the jury did not make particular special findings to support reprehensibility, but that is meaningless, because they were not requested to make these particular findings. Meanwhile, the jury was properly instructed without objection on the standard for punitive damages and there can be little doubt that the evidence construed in the light most favorable to plaintiff supports a jury determination of reprehensibility giving rise to punitive damages as defendants' conduct harmed plaintiff and the jury could even find that it was "particularly reprehensible because it also "posed a substantial risk of harm to people who are not parties to this case." Jury Instruction #21.

     **VI.**     **Scope of Defendants' Motions for New Trial**

     A.     <u>The verdict is valid as to all defendants.</u>

1.      The defendants stipulated to a general compensatory damages award.

The defendants should be foreclosed from attacking the verdict on the grounds that the compensatory damages award was general.  In the evening following testimony on the ninth day of trial, the parties argued over the verdict form.  Plaintiff's counsel warned defense counsel, on the record, that agreeing to lump the damages together waives certain arguments on appeal.  Tr. 2578:19 – 25.  After Ms. Coit consulted with the University's general counsel, counsel for both sides agreed the verdict form should break down punitive damages by individual defendant, but leave compensatory damages lumped together.  Tr. 2579:21 – 2580:15.  It was defense counsel who proposed, and stipulated to, the form of the general damages award she now attacks.  Tr. 2578:5 – 6.  The defendants should not be permitted to benefit from this sort of gamesmanship.

FRCP 51, as interpreted by the Ninth Circuit, prohibits any party from appealing the verdict form unless that party objects thereto before the jury retires to deliberate.  *Ayuyu v. Tagabuel*, 284 F.3d 1023, 1026 (9th Cir. 2002).  In *Ayuyu*, the court held: "Because no objection to the instructions are found in the record, they are deemed waived."  *Id.*  See also *Mitchell v. Cty. of Los Angeles*, 332 F. App'x 369, 370 (9th Cir. 2009) ("defendants waived any right to separate damages for the claims by agreeing to a general verdict").  In the present case, the defendants not only failed to object to the general verdict before deliberations, but affirmatively stipulated to it.

2.      Defendants' argument is internally inconsistent

The defense argues that "[the jury] could have intended a majority of its award to represent harm flowing from plaintiff's written reprimand and his recommended termination, but not to harm flowing from the submission of *Brady* materials to the District Attorney – or it could have intended just the opposite."  Defendants' Motions at p. 35.  A short while earlier, they say

just the opposite: "[A]s submitted to the jury, plaintiff's claim of actual damages was based solely on the submissions of *Brady* materials to the District Attorney by Defendant McDermed, assisted by defendant Lebrecht."  Id. at p. 24.  They can't have it both ways – if the plaintiff presented no evidence of harm from any adverse action other than the *Brady* submission, then the only conclusion we can reach is that the jury's award was based solely on the *Brady* submission, which leaves no parsing of theories to do. Even if the defendants had not stipulated to a general verdict, and even if there were an invalid theory of liability among those submitted to the jury, the court "may construe a general verdict as attributable to one of several theories if it was supported by substantial evidence and was submitted to the jury free from error."  *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 777 (9th Cir. 1990) (citing *Traver v. Meshriy,* 627 F.2d 934, 938 (9th Cir.1980)).

   B.   The issues of liability and damages are separable.

   *Gasoline Products* was noteworthy not because it carved out an exception to the rule allowing partial new trials, but because it established the rule allowing partial new trials. *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931).  The petitioner in that case argued that the Seventh Amendment, read in light of the common law as it existed at the time the Bill of Rights was passed, prohibited any court from ever resubmitting to the jury the issue of damages alone.  *Id.* at 497.  The Supreme Court disagreed, holding that "where the requirement of a jury trial has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again."  *Id.* at 499.  The Court then explained why the general rule allowing partial trials could not be applied to the case before it, as detailed in Defendants' brief in support of their present motions.

**Page 26 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

In the decades since *Gasoline Products*, the Ninth Circuit has allowed trial courts great leeway in evaluating the separability of damages from liability.  Courts have "broad discretion to grant new trials on all or only some issues."  *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981).  New trials have been ordered on damages only, even where the second jury must negotiate around an intervening cause of economic harm not before the first jury (*Wharf v. Burlington N. R. Co.*, 60 F.3d 631, 638 (9th Cir. 1995)); where the case involved complex antitrust statutes (*Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1347 (9th Cir. 1984)); where the jury erred in calculating economic damages but not non-economic or punitive damages (*Real v. Cont'l Grp., Inc.*, 627 F. Supp. 434, 452 (N.D. Cal. 1986)); where the verdict was upheld as to liability and compensatory damages and the second jury would decide only the issue of punitive damages (*Auto. Products v. Tilton Eng'g, Inc.*, No. CV 90-5500 KN (EX), 1993 WL 661138, at *3 (C.D. Cal. Nov. 18, 1993)).  The Oregon Supreme Court, as well, has upheld a new trial on the issue of punitive damages only.  *Estate of Schwarz ex rel. Schwarz v. Philip Morris Inc.*, 348 Or. 442, 460, 235 P.3d 668, 678 *adhered to on reconsideration*, 349 Or. 521, 246 P.3d 479 (2010).

//

//

//

//

//

//

//

**Page 27 – PLAINTIFF'S RESPONSE TO DEFENDANTS' ALTERNATE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR**

In the present case, the defendants' argument against the jury's determination of damages boils down to: a) the economic damages award was speculative and should be reduced to zero, and b) in light of (a), the punitive damages award was excessive and not supported by the evidence.  In no way are those questions intertwined with the jury's findings that each of the defendants violated the plaintiff's free speech rights in the ways indicated on the verdict form.

DATED December 29, 2015.

/s/ Jason Kafoury
_____

**Jason L. Kafoury (OSB#091200)**
**Mark McDougal (OSB #890869)**
**Kafoury & McDougal**
**411 SW Second Ave., Ste. 200**
**Portland, OR 97204**
**(503) 224-2647**
**Fax: (503) 224-2673**
**jkafoury@kafourymcdougal.com**
**mcdougal@kafourymcdougal.com**
**Attorney for Plaintiff**

## CERTIFICATE OF SERVICE

I certify that on December 29, 2015, I served or caused to be served a true and complete copy of the foregoing **PLAINTIFF'S SECOND MOTION TO EXTEND MOTION REPLY DEADLINES** on the party or parties listed below as follows:

Andrea Coit
Andrea.coit@harrang.com
Harrang Long Gary Rudnick P.C.
360 E 10th Ave, Ste 300
Eugene  OR 97401-3273

☐        Via CM / ECF Filing

*/s/ Mark McDougal*

**Jason L. Kafoury (OSB#091200)**
**Mark McDougal (OSB #890869)**
**Kafoury & McDougal**
**411 SW Second Ave., Ste. 200**
**Portland, OR 97204**
**(503) 224-2647**
**Fax: (503) 224-2673**
**jkafoury@kafourymcdougal.com**
**mcdougal@kafourymcdougal.com**
**Attorney for Plaintiff**