# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **JAMES M. CLEAVENGER,**<br>　　　**Plaintiff,**<br><br>　　vs.<br><br>**UNIVERSITY OF OREGON, ET AL.,**<br>　　　**Defendants.** | **Case No.: CV 13-1908-DOC**<br><br><br>**ORDER DENYING DEFENDANTS' ALTERNATIVE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL OR REMITTITUR [186]** |

Before the Court are Defendants Chief Carolyn McDermed ("McDermed"), Lieutenant Brandon Lebrecht ("Lebrecht"), and Sergeant Scott Cameron's ("Cameron") (collectively, "Defendants") Alternative Motions for Judgment as a Matter of Law and for New Trial or Remittitur ("Motion for JMOL" and "Motion for New Trial," respectively) (Dkt. 186).[1]

## I. Background

This case arises from Plaintiff James Cleavenger's employment as a public safety officer ("PSO") for the University of Oregon Police Department ("UOPD") from March 2011 to October 2012, when his employment was terminated. In his Third Amended Complaint ("TAC") (Dkt. 79), Plaintiff alleged Defendants McDermed, Lebrecht, Cameron, and Brian Caufield ("Caufield") retaliated against him for engaging in protected speech in violation of his First Amendment rights. *See* TAC ¶¶ 141–50. Plaintiff also claimed violations of his substantive and procedural due process rights. *See id.* at 151–70. Plaintiff brought his claims against Defendants in their individual capacities under 42 U.S.C. § 1983.

Before trial, on August 6, 2015, the Court granted in part and denied in part Defendants' Motion for Summary Judgment ("Summary Judgment Order") (Dkt. 105). Specifically, the Court granted summary judgment as to all claims except Plaintiff's § 1983 claim premised on First Amendment violations as to Defendants McDermed, Lebrecht, and Cameron.[2]

The jury trial began September 8, 2015. At the close of Plaintiff's evidence, Defendants moved for judgment as a matter of law pursuant to Rule 50(a), *see* Trial Tr. (Dkts. 211–22) 1788–97.[3] The Court denied Defendants' motion. The jury was instructed on September 24, 2015 (Dkt. 164).

---

[1] Defendants' renewed Motion for Judgment as a Matter of Law and Motion for New Trial and Remittitur are alternative motions in the same document.
[2] Defendant Caufield was therefore dismissed from the suit.
[3] Defendants' Rule 50(a) motion was an oral motion – no written briefs were filed.

On September 25, 2015, the jury returned a verdict finding all three remaining Defendants liable ("Jury Verdict") (Dkts. 167, 168).[4] Specifically, when asked whether McDermed took "an adverse employment action against the plaintiff for which the plaintiff's speech on a matter of public concern was a substantial or motivating factor," the jury answered "[y]es." *Id.* at 1. The jury found the following speech motivated McDermed to take adverse employment action against Plaintiff: "Complaints that he thought he was not being afforded his rights under the Public Safety Officers' Bill of Rights, in violation of state law," "Complaints concerning the legality of his order to only report felonies in September 2012," and "Filing a lawsuit in October 2013 and its contents." *Id.* at 1. The jury's findings against Lebrecht were identical. *Id.* at 2. When asked, "[d]id Scott Cameron take an adverse action, which was reasonably likely to deter protected speech, against the plaintiff in retaliation for plaintiff's speech about TASERs?" the jury answered, "[y]es." *Id.*

The jury awarded $650,000 in economic damages and awarded punitive damages against McDermed in the amount of $36,000, against Lebrecht in the amount of $51,000, and against Cameron in the amount of $18,000. *Id.* at 3. On September 29, 2015, judgment was entered ("Judgment") (Dkt. 172).

On October 27, 2015, Defendants filed the instant Motion. Plaintiff filed his Response on December 29, 2015 (Dkt. 208), and Defendants replied on January 22, 2016 (Dkt. 225).

## II.     Renewed Motion for Judgment as a Matter of law

### A. Legal Standard

Under Federal Rule of Civil Procedure 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue," a court may grant

---

[4] Docket number 167 contains the redacted Jury Verdict, while docket number 168 contains the unredacted version.

judgment as a matter of law ("JMOL") as to any claim or defense in issue that, "under controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a); *see also Lawson v. Umatilla County*, 139 F.3d 690, 692 (9th Cir. 1998).

If a court does not grant the relief and instead allows the case to go to the jury, a party may make a renewed motion for JMOL pursuant to Rule 50(b). A party cannot raise arguments in its renewed motion for JMOL that it did not raise in its Rule 50(a) motion. *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

A renewed motion for JMOL should be granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002) (internal quotation marks omitted)). The jury's verdict "must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *Id.*

In reviewing a renewed motion for JMOL, the Court must scrutinize the entire evidentiary record. *Id.* However, the Court "must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008). The Court "must draw all reasonable inferences in favor of the nonmoving party and 'disregard all evidence favorable to the nonmoving party that the jury is not required to believe.'" *Escriba*, 743 F.3d at 1242–43 (quoting *Harper*, 533 F.3d at 1021).

**B. Discussion**

Defendants move for JMOL pursuant to Rule 50(b) on the following bases: (1) the acts Defendants Lebrecht and McDermed took did not constitute adverse employment actions; (2) there is no evidence from which a reasonable jury could find Defendant Lebrecht acted with retaliatory intent; and (3) there is no evidence from

which a reasonable jury could find a causal connection between any of Defendants'
actions and any compensable harm. Mot. at 1; Reply at 2. The Court will address
Defendants' arguments in turn.

### 1. Adverse Employment Actions – Defendants McDermed and Lebrecht

Defendants assert that Defendants McDermed and Lebrecht are entitled to
judgment as a matter of law because their *Brady*-related conduct did not constitute an
actionable adverse employment action. Reply at 3.

To succeed on a First Amendment retaliation claim, the plaintiff must prove that,
*inter alia*, the defendant took an adverse employment action against the plaintiff "for
which [his] protected speech was a substantial or motivating factor." *Karl v. City of
Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012). "To constitute an adverse
employment action, a government act of retaliation need not be severe and it need not be
of a certain kind." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) (quoting
*Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003) (internal quotation marks
omitted)). "The precise nature of the retaliation is not critical to the inquiry in First
Amendment retaliation cases." *Coszalter v*, 320 F.3d at 974–75. The goal is "to prevent,
or redress, actions by a government employer that 'chill the exercise of protected' First
Amendment rights." *Id.* 5 (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 73,
110 S. Ct. 2729 (1990)). Therefore, "the proper inquiry is whether the action is
"reasonably likely to deter employees from engaging in protected activity." *Dahlia*, 735
F.3d at 1078 (quoting *Coszalter v*, 320 F.3d at 976) (internal quotation marks omitted).

This legal standard was incorporated into the Jury Instructions, which explained
"[a]n action is an adverse employment action if a reasonable employee would have
found the action materially adverse, which means it might have dissuaded a reasonable
worker form engaging in protected activity." Jury Instruction No. 15. Defendants do not
challenge this jury instruction. However, they argue "the act of compiling information

about instances of dishonesty and violation of UOPD policies by Mr. Cleavenger for purposes of consideration by the District Attorney under *Brady* . . . and the decision to send that information to the District Attorney for his consideration under *Brady* . . . do not rise to the level required under the Ninth Circuit's cases." Reply at 4. The Court disagrees. As it concluded in its Summary Judgment Order with respect to Defendants McDermed and Lebrecht, the *Brady*-related conduct at issue – preparing and releasing *Brady* materials to the District Attorney's ("DA") Office – "under these circumstances, can be construed as an adverse employment action." Summary Judgment Order at 21; *see also id.* at 20, 22.

Defendants' reliance on *Nunez v. City of Los Angeles*, 147 F.3d 867 (9th Cir. 1988) is unavailing, particularly because Defendants downplay the consequences of sending *Brady* materials to the DA. In *Nunez*, the Ninth Circuit determined the plaintiff had not suffered an adverse employment action where he alleged that because he made certain complaints, "his superiors retaliated by scolding him and threatening to transfer or to dismiss him." *Nunez*, 147 F.3d at 874. The situation here far different. Given the substantial evidence that the submission of *Brady* materials to the DA can ultimately "end[] your career and your future in law enforcement," Trial Tr. 722:13–14 ("Casey Boyd Direct Examination"), and "probably prohibit" your "chances of getting hired as a full-time paid police officer," *id.* at 991:6–8 ("Larry Larson Direct Examination"),[5] the

---

[5] *See also* Trial Tr. 991:6–15 ("Larry Larson Direct Examination") ("Q: What does a *Brady* listing mean for my client's chances of getting hired as a full-time paid police officer? A: I think it would probably prohibit that from happening. Q: And why do you think that is? A: Well, you have to be truthful in law enforcement and be able to testify under oath that you're being truthful and honest. Q: Is it your understanding that being *Brady*-listed would qualify as a failed background check? A: Yes."); *id.* at 1206:13–17 ("Carolyn McDermed Direct Examination") ("Q: And this was a very serious matter, *Brady*-listing someone; correct? A: Yes, sir. Q: You knew it could end their career? A: Yes, sir."); *Id.* at 1864:10–14 ("Pete Desphonde Cross Examination") ("Q: There's two very serious things about *Brady*-listing. I want to see if you agree with this. One is it can be a black mark, the death knell of the officer's career; correct? A: Correct. Correct."); *id.* at 722:5–14 ("Casey Boyd Direct Examination") ("Q: What is your understanding, once you're on the *Brady* list, of how that affects your possible future employment in law enforcement? A: Typically, it ends your profession in law enforcement . . . . And when somebody is put on that *Brady* list, it's extremely rare they continue on. . . . [P]retty much that ends your career and your future in law enforcement.").

Court cannot conclude Defendants' *Brady*-related conduct is analogous to mere scolding, threats, or harsh words such that it does not constitute an adverse employment action as a matter of law.

To further support the argument that their conduct did not constitute an adverse employment action, Defendants McDermed and Lebrecht seek to distinguish their actions – *preparing* and *submitting* the *Brady* materials to the DA's Office – from the DA's subsequent actions. *See* Reply at 4. Specifically, Defendants state that all Defendants Lebrecht and McDermed did "was merely to provide information to the District Attorney" and emphasize that the "authority to '*Brady*-list' plaintiff rested *solely* with then-District Attorney Alex Gardner." *Id.* at 4 (citations omitted). The Court is unconvinced that, under the circumstances of this case, such a distinction compels the conclusion that "merely" disclosing and releasing *Brady*-related materials to the DA's Office does not constitute an adverse employment action. Indeed, the jury received substantial evidence indicating Plaintiff was *Brady* listed as a result of Defendants' submission of the materials to the District Attorney's Office. *See, e.g.*, Declaration of Jason Kafoury ("Kafoury Decl.") (Dkt. 209) Ex. 14 ("Plaintiff's Ex. 373 – Letter from DA Gardner to Defendant McDermed") ("Dear Chief McDermed: We are in receipt of information with Brady implications concerning your former officer James Cleavenger. Based on the information reviewed to date, we are confident of a duty to disclose related information to the defense in any criminal case in which Officer Cleavenger is a potential witness."); *id.* Ex. 12 ("Plaintiff's Ex. 250 – 1st Email from DA Gardner to UOPD re Cleavenger's *Brady* Response") ("[W]e have enough information to create a duty of disclosure in any case in which Mr. Cleav[e]nger is a potential witness."); Trial Tr. 2008:18–22 ("Alex Gardner Cross Examination") (Q: If Mr. Cleavenger was called as a witness the day after you got these materials, you would have had to disclose them? A: Yes, sir.").

Based on the foregoing, the Court concludes there was substantial evidence to support a finding that providing the *Brady* materials to the DA's office was reasonably likely to deter protected speech.

The jury also could have found Defendant McDermed took another adverse employment action – recommending that Plaintiff be terminated from UOPD. In its Summary Judgment Order, the Court concluded Defendant McDermed's termination recommendation constituted an adverse employment action. *See* Summary Judgment Order at 21–22. Defendants do not appear to challenge this conclusion; they do not argue the termination recommendation does not constitute an adverse employment action under Ninth Circuit law. Nor do Defendants argue the jury could not have found, on the record before it, that Defendant McDermed's termination recommendation constituted an adverse employment action.

The Court concludes the jury's verdict could have encompassed this additional adverse employment action. First, the Court notes the Jury Verdict form did not ask the jury to identify which adverse employment action each Defendant took. Rather, with respect to Defendant McDermed, the relevant portion of the Jury Verdict reads: "Did Carolyn McDermed take an adverse employment action against the plaintiff for which the plaintiff's speech on a matter of public concern was a substantial motivating favor?" Jury Verdict at 1. Thus, the jury could have concluded Defendant McDermed took one or more adverse employment actions. Further, the jury did specifically find that Plaintiff's "[c]omplaints that he thought he was not being afforded his rights under the Public Safety Officers' Bill of Rights" motivated Defendant McDermed to take adverse employment action(s) against Plaintiff. *Id.* During the trial, Plaintiff argued he first made such complaints concerning his rights under the Public Safety Officers' Bill of Rights before Defendant McDermed recommended termination on October 1, 2012. *See* Trial Tr. 1425:13–21. Jury Instruction No. 16; Declaration of Andrea D. Coit ("Coit Decl.")

(Dkt. 187) Ex. 3 ("Plaintiff's Ex. 80 – Termination Recommendation").[6] The jury also specifically found Plaintiff's "[c]omplaints concerning the legality of his order to only report felonies in September 2012" – which also occurred prior to Defendant McDermed's termination recommendation – motivated Defendant McDermed to take adverse employment action(s) against Plaintiff. Jury Verdict at 1. Thus, the Court concludes there is substantial evidence to support a finding by the jury that Defendant McDermed's termination recommendation constituted an adverse employment action.

For the reasons set forth above, the Court concludes the jury's finding that Defendants McDermed and Lebrecht took adverse employment actions against Plaintiff, *see* Jury Verdict at 1–2, is supported by substantial evidence. Thus, Defendants' renewed Motion for JMOL on the ground that Defendants McDermed and Lebrecht's actions did not constitute adverse employment actions is DENIED.[7]

### 2. Retaliatory Intent – Defendant Lebrecht

Next, Defendants argue Defendant Lebrecht is entitled to judgment as a matter of law "for the further reason that plaintiff failed to present evidence from which a reasonable juror of fact could infer that he acted with a retaliatory motive." Reply at 10.

---

[6] Plaintiff argued he complained specifically to Defendant McDermed about his rights under the Public Safety Officers' Bill of Rights on June 1, 2012 and August 13, 2012. *See* Jury Instruction No. 16; Trial Tr. 1426:25–1427:4.

[7] In their Reply, Defendants raise arguments they did not raise in their Motion. Specifically, Defendants argue that, because a prosecutor's acts of disclosing *Brady* materials and deciding to place an individual on a *Brady* list are entitled to absolute liability from immunity in tort, Reply at 9, police officers "cannot be held liable for informing the District Attorney of dishonesty for purposes of complying with the State's *Brady* obligations," Reply at 6. The Court "decline[s] to consider new issues raised for the first time in a reply brief." *Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 (9th Cir. 2003) (citation omitted); *see also United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) ("We decline to consider this issue here because 'arguments not raised by a party in its opening brief are deemed waived.'") (quoting *Smith v. Marsh,* 194 F.3d 1045, 1052 (9th Cir. 1999)). However, even if the Court were to consider these improperly raised arguments, the Court would find them unavailing here, particularly given the evidence concerning the context in which Defendants prepared and released the *Brady* materials to the DA. As discussed below, there is evidence in the record from which the jury could conclude the *Brady* materials were prepared and disclosed for pretextual reasons. The Court cannot arrive at the sweeping conclusion that police officers cannot be held liable for disclosing *Brady* materials (whose veracity is contested) to the DA when there is substantial evidence indicating such disclosure was in retaliation for protected speech.

To succeed on a First Amendment retaliation claim, the plaintiff must not only prove the defendant took at adverse employment action against him, but also that the speech "was a substantial or motivating factor" in the adverse action. *Karl*, 678 F.3d at 1068. "To establish that retaliation was a substantial or motivating factor behind an adverse employment action, a plaintiff may introduce evidence that (1) the speech and adverse action were proximate in time, such that a jury could infer that the action took place in retaliation for the speech; (2) the employer expressed opposition to the speech, either to the speaker or to others; or (3) the proffered explanations for the adverse action were false and pretextual." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1062 (9th Cir. 2013) (citing *Coszalter,* 320 F.3d at 977). "Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." *Id.* (quoting *Coszalter*, 320 F.3d at 978) (internal quotation marks omitted).

After reviewing the record, the Court concludes there is substantial evidence to support a finding by the jury that Defendant Lebrecht acted with retaliatory intent. For example, Defendant Lebrecht testified about an email chain in which various members of the UPOD command staff discussed the Cleavenger arbitration decision and the UOPD's next steps. Kafoury Decl. Ex. 15 ("Plaintiff's Ex. 276 / Defendants' Ex. 412 – Emails re Cleavenger Arbitration Decision"). In the context of that email discussion, Defendant Lebrecht stated there were "Brady issues" to consider along with "the other large scale investigation that wasn't part of the termination." Kafoury Decl. Ex. 15. *Id.* During Defendant Lebrecht's cross examination, the following exchange took place:

> Q: Now, Lieutenant Lebrecht, in this email chain, you're not just casually watching your partners discussing *Brady*-listing my client. You're contributing ideas to what else could be included in the *Brady* list material. Isn't that right?
>
> A: That's not right.

> Q: Okay. Well, *Brady* issues and the other large-scale investigation
> that wasn't part of the termination. Isn't it true that you didn't say,
> "Hey, guys. We don't want to *Brady*-list him at this point. This
> might look like retaliation?" You didn't write that here, did you?
> A: No. That's in response to the part that you're not showing that
> talked about a global settlement; that I thought we could use this
> stuff to negotiate with Mr. Cleavenger.

Trial Tr. 2426: 2–15 ("Brandon Lebrecht Cross Examination"); *id.* at 2426:16–2427:11.
The Court concludes a reasonable juror could view Defendant Lebrecht's contribution to
the "Cleavenger Arbitration Decision" email chain and his testimony about that email
correspondence – including his statement that "I thought we could use this stuff to
negotiate with Mr. Cleavenger" – as evidence that the reasons for preparing and
releasing the *Brady* materials were pretextual. Although Defendant Lebrecht's testimony
might not be so black and white as to constitute an outright admission he acted with
retaliatory intent, as Plaintiff asserts, the Court concludes the jury could infer retaliatory
intent from such testimony.

The Court also notes the full version of the "Cleavenger Arbitration" email chain
– the version that included Defendant Lebrecht's comment about *Brady* issues – was not
produced until the middle of trial. Response at 16. Before Plaintiff had the complaint
version of the email chain, Defendant Lebrecht testified that, although "my name is in
the email chain," "I don't comment on this." Trial Tr. 1113:1–6 ("Brandon Lebrecht
Direct Examination"); *see also id.* at 1113:9–10 ("I wasn't involved in the contents of
that email conversation.") (referring to Plaintiff's Ex. 168). This discrepancy in
Defendant Lebrecht's testimony further supports a finding he acted with retaliatory
intent.

Further, there is additional evidence from which the jury could infer the *Brady*
materials were not prepared and released to the DA for the stated purpose. The jury

heard testimony that could lead it to question the veracity of the *Brady* materials sent to the DA. Indeed, Plaintiff argues that Defendant Lebrecht, in preparing the *Brady* materials, re-characterized the Internal Investigation ("IA") findings and "also mischaracterized the Arbitrator's decision and did to include it in the hundreds of pages he submitted to the DA." Response at 17 (citing Trial Tr. 2432–41). Indeed, in his testimony, Defendant Lebrecht agreed there were differences between the IA findings and what he wrote. For example:

> Q: Let's look at what Morrow said about the car quickly accelerating and then we will look at what you said saying that my client was lying.
>
> At the next intersection, Kincaid Street, the sedan briefly signaled for a left turn, then changed to a right signal, and made a right turn, the sedan quickly accelerated, and then made the signal for a right turn on East 14th Avenue.
>
> Let's look at what you wrote.
>
> You wrote: The video also did not indicate that the vehicle quickly accelerated away, as Cleavenger claimed.
>
> So you're putting into this report for the *Brady* materials that my client is lying about this when Lieutenant Morrow and the IA said the exact opposite; that the sedan quickly accelerated.
>
> A: I'm aware what they put, but I watched the video and I did not see it accelerate quickly at all.
>
> Q: So this isn't really based on Lieutenant Morrow. This is based on Lieutenant Lebrecht's interpretation of these videos and your take on whether my client was being honest or not. Is that what you're telling us?

A: The IA submitted, and it does have some of my opinion in this as well.

Q: Your opinion about my client's honesty, that's what this is all about, isn't it?

A: In some of these things, that's what it is.

Trial Tr. 2436:2–2437:2 ("Brandon Lebrecht Cross Examination"). These differences or mischaracterizations could have led the jury to question the veracity of the *Brady* materials and to infer the materials were not prepared for their stated purpose and that Defendant Lebrecht acted with an improper motive.

To support their argument that Plaintiff failed to present evidence demonstrating Defendant Lebrecht acted with a retaliatory motive, Defendants point to Defendant Lebrecht's testimony that he did not make the decision to submit materials to the DA and that he was uncomfortable when Defendant McDermed asked him to prepare a *Brady* report on Cleavenger. Reply at 11; *see* Trial Tr. 1109:23–1110:7 ("Brandon Lebrecht Direct Examination"). Defendants also highlight Defendant McDermed's testimony that she, rather than Defendant Lebrecht, initiated the *Brady* listing. Reply at 11; Trial Tr. 1208:8–9 ("Defendant McDermed Direct Examination") ("Q: And you initiated the *Brady* listing? A: I did. It was my decision."). The Court concludes Defendant McDermed's testimony that it was her decision to submit the materials to the DA and Defendant Lebrecht's testimony that he "voiced some concern" that "doing this *Brady* material" "might look like retaliation," Trial Tr. 1111:14–1112:3 ("Brandon Lebrecht Direct Examination"), did not foreclose inferences by the jury about whether Defendant Lebrecht's acted with a retaliatory motive, particularly in light of the evidence discussed above.[8]

---

[8] Plaintiff's testimony that Defendant Lebrecht was ordered to do "this *Brady* list stuff," Trial Tr. 1505:2–6, ("James Cleavenger Direct Examination"), which Plaintiff notes took place before "defense had disclosed Exhibit 412 and the existence of Lebrecht's comments" on the Cleavenger arbitration decision email chain, is also not dispositive of this issue.

The Court cannot conclude the evidence "permits only one reasonable conclusion" that is "contrary to the jury's verdict" as whether Defendant Lebrecht acted with retaliatory intent. *Escriba*, 743 F.3d at, 1242 (quoting *Pavao*, 307 F.3d at 918) (internal quotation marks omitted). Drawing all interferences in favor of the nonmoving party, the Court concludes there is substantial evidence from which the jury could infer Defendant Lebrecht acted with retaliatory intent. Accordingly, the Court DENIES Defendants' renewed Motion for JMOL on this ground.

### 3.    Whether Defendants' Acts Caused Compensable Harm

Finally, Defendants argue Plaintiff "failed to offer evidence from which a reasonable juror could find that defendants' acts caused compensable harm, and that plaintiff is therefore entitled to no greater than nominal damages." Reply at 13. Specifically, Defendants now assert the jury could not conclude Defendant Cameron's actions "caused plaintiff a loss of future earnings," Reply at 14, that there is no evidence "plaintiff's termination was the cause of any loss in earning capacity or any other economic loss," *id.* at 15, and that "plaintiff failed to offer any evidence that compensable harm resulted from the actions of Defendants McDermed and Lebrecht," *id.* at 14.

Plaintiff argues Defendants waived this argument because they failed to raise it in their Rule 50(a) motion. Therefore, the Court must first address whether Defendants' argument is properly before the Court.

A party cannot raise arguments in its renewed motion that it did not raise in its Rule 50(a) JMOL motion. *Freund*, 347 F.3d at 761; *see also Coach, Inc. v. Siskiyou Buckle Co.*, No. 03:11-CV-486-HZ, 2012 WL 3309719, at *1 (D. Or. Aug. 10, 2012) (citation omitted). Upon reviewing Defendants' Rule 50(a) motion, *see* Trial Tr. 1788–97, the Court agrees with Plaintiff that Defendants did not raise arguments concerning compensable harm and damages in their Rule 50(a) motion. Nowhere in their Rule 50(a) motion did they argue "[t]here is no evidence from which a reasonable jury could find a

causal connection between any of defendants' actions and any compensable harm." Reply at 2. Defendants did not even mention compensable harm or loss of future earnings in their previous motion. Yet in the section of their Rule 50(b) Reply labeled "Causation," Defendants argue Plaintiff failed to offer evidence that compensable harm resulted from Defendants' actions. The Court concludes Defendants have waived these arguments because they failed to raise them in their 50(a) motion.[9] Accordingly, Defendants' renewed Motion for JMOL on this ground is DENIED.

### C. Conclusion

For the foregoing reasons, Defendants' renewed Motion for JMOL is DENIED as to all Defendants.

## III. Motion for New Trial or Remittitur

### A. Legal Standard

Pursuant to Rule 59, a court may grant a motion for new trial "on some or all of the issues" after a jury trial, "for any reason for which a new trial has been granted in an action at law in federal court." Fed. R. Civ. P. 59(b). The court may "invade the province of the jury only if the verdict is contrary to the clear weight of the evidence, is based upon false or pernicious evidence or to prevent a miscarriage of justice." *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012) (internal quotations omitted); *see also DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010). However, a court may not grant a new trial simply because it would have arrived at a different verdict. *Silver Sage Partners Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). "A jury's verdict must be upheld if it is supported by substantial

---

[9] In their Reply, Defendants argue they have not waived any arguments at issue and that evidence of damages is the subject of Defendants' Rule 59(e) Motions. Reply at 16–17. However, in the section of their Reply brief labeled "Motions for Judgment as a Matter of Law," Defendants specifically make the arguments concerning compensable harm and damages discussed above. *See, e.g.*, Reply at 13 ("All defendants therefore *move for judgment as a matter of law* on the basis that plaintiff failed to offer evidence from which a reasonable juror could find that defendants' acts *caused compensable harm*, and that plaintiff is therefore *entitled to no greater than nominal damages*.") (emphasis added). Accordingly, the Court construes Defendants' moving papers as moving for judgment as a matter of law on those grounds.

evidence, which is evidence adequate to support the jury's conclusions, even if it is also possible to draw a contrary conclusion." *Pavao*, 307 F.3d at 918.

### B. Discussion

Defendants move for a new trial or remittitur, arguing: (1) the compensatory damages award cannot stand because it is against the clear weight of the evidence and is impermissibly based on speculation; and (2) the punitive damages award cannot stand because (a) the deficiency of proof on the compensatory damages award means the punitive damages award is against the clear weight of the evidence and is constitutionally excessive, (b) there is insufficient evidence of reprehensibility to support such an award, and (c) the award arose from arguments that encouraged the jury to impermissibly punish for conduct directed at, and that allegedly caused harm to, non-parties. Reply at 2. Alternatively, Defendants argue the Court should remit the economic damages award to an award of nominal damages and remit the punitive damages to an amount that is not constitutionally excessive. *Id.*

A court must "uphold the jury's finding [as to damages] unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996) *aff'd*, 526 U.S. 687, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999); *see also In re First All. Mortgage Co.*, 471 F.3d 977, 1001 (9th Cir. 2006).[10]

### 1.    Economic Damages

Jury Instruction Number 18 defined damages as "the amount of money that will reasonably compensate the plaintiff for any injury you find was caused by the defendant" and directed the jury to consider "[t]he reasonable value of wages which with

---

[10] The Court notes that expert testimony is not required to prove damages. *Cf. Hounshel v. Battelle Energy All., LLC*, No. 4:11-CV-00635-BLW, 2013 WL 6073878, at *2 (D. Idaho Nov. 18, 2013) (Even if Hounshel has not disclosed an expert to testify on this issue of lost earning capacity, the Court is not foreclosing Hounshel from presenting other forms of competent evidence on this issue."); *Scruggs v. Josephine Cty.*, No. CIVIL 06-6058-CL, 2008 WL 5262770, at *1 (D. Or. Dec. 17, 2008).

reasonable probability were lost after June 16, 2018." The jury awarded Plaintiff $650,000 in economic damages. The Jury Verdict form did not ask the jury to identify what specific adverse employment action taken by which Defendant related to what amount of economic damages. *See generally* Jury Verdict. Defendants argue the jury's economic damages award is improper because it is against the clear weight of the evidence and because it is based on speculation. Reply at 17–18. Plaintiff responds that the economic damages award is supported by the evidence, including evidence of Plaintiff's wages and benefits at the time of his termination, Plaintiff's career goals and family history, and the impact of *Brady* listing on Plaintiff's law enforcement career. The Court agrees with Plaintiff.

A review of the record indicates Plaintiff offered evidence of his wages and benefits at the time of his termination. *See* Kafoury Decl. Ex. 16 ("Defendants' Ex. 376 – Settlement Agreement"). Plaintiff also testified he was thirty-seven-years old. Trial Tr. 1505:16 ("James Cleavenger Direct Examination"). Further, the jury heard extensive evidence concerning Plaintiff's career goals. Specifically, Plaintiff submitted substantial evidence he intended to work in law enforcement and that his overarching career goal was to become a police chief. *See, e.g.*, Trial Tr. 1279:3–6 ("James Cleavenger Direct Examination") ("My goal was to become a chief, eventually, and I wanted to put in all the necessary steps. . . . I wanted to start at the bottom and work my way up."); *id.* at 860:15–18 ("Cory Mertz Direct Examination") ("He looked forward to, you know, becoming a full-time police officer. It was very clearly his goal, his dream."); *id.* at 2504:5–8 ("Chelsea Brandenberg Cross Examination") ("Q: What was Mr. Cleavenger's long-term career plan when he was working at the University of Oregon? A: At one time he wanted to be a chief."). The jury also heard testimony that Plaintiff came from a family of people involved in law enforcement. *Id.* at 934:10–23 ("Michael Cleavenger Direct Examination") (Q: Tell us a little bit about law enforcement background [sic] within your family. A: There are 12 members of my family that were in law

enforcement, starting with my great grandfather, and ending with James, my son . . . ."); *id.* at 938:5–22 (Michael Cleavenger Direct Examination") ("I thought he was destined to be in law enforcement because he – way back when he was seven and eight years old he would actually ride with me on patrol and loved to come to the police department. . . . [H]he had an interest in . . . at a very young age of being in law enforcement. . . . [H]e was always set on wanting to be a police chief somewhere.").

In addition, the jury heard testimony from Tim Ranger, Plaintiff's long-time friend, suggesting he even went to law school to become a police officer. *See id.* at 849:2–15 ("Tim Ranger Cross Examination"). Plaintiff's father similarly testified that Plaintiff "wanted to use his law degree to become a police chief somewhere" and "knew he was going to have to start someplace and work his way up the ranks." *Id.* at 938:22– 939:6 ("Michael Cleavenger Direct Examination").

There was also evidence from which a reasonable juror could conclude that, because Plaintiff had a law degree, he was potentially more likely to move up the law enforcement ranks. For example, Coburg Police Chief Larry Larson ("Larson") testified he "sent James to take a class on video cameras because I know that he also has a law degree, so he can try to help me to make sure I'm good on my policies and procedures," and also "sent him to a field training evaluation programs class so he could actually become one of my training officers." *Id.* at 938:22–939:6 ("Larry Larson Direct Examination"); *see also id.* at 2535:20–22 ("Scott Cameron Direct Examination") ("I did see the good in having an officer that has a law degree.").

Plaintiff also offered testimony concerning how much police chiefs in Oregon generally make. Indeed, Plaintiff testified that police chiefs in Oregon "generally make anywhere from [$]100,000 to almost [$]200,000." Trial Tr. 1506: 19–20 ("James Cleavenger Direct Examination"). He based this answer on "what I've seen posted, because the job postings are online on [Oregon Department of Public Safety Standards and Training ("DPSST")] when they're up and available." *Id.* at 20–21.

Further, as discussed above, there was substantial evidence concerning how the submission of *Brady* materials would impact Plaintiff's career in law enforcement. Specifically, the jury heard testimony that being *Brady* listed had the potential to end any sort of career in law enforcement – not just that being *Brady* listed would prevent an individual from moving up the law enforcement ranks. For example, the following exchange took place during Chief Larson's direct examination:

> Q: What does a *Brady* listing mean for my client's chances of getting hired as a full-time paid police officer?
>
> A: I think it would probably prohibit that from happening.
>
> Q: And why do you think that is?
>
> A: Well, you have to be truthful in law enforcement and be able to testify under oath that you're being truthful and honest.
>
> Q: Is it your understanding that being *Brady*-listed would qualify as a failed background check?
>
> A: Yes.

*Id.* at 991:6–15 ("Larry Larson Direct Examination"). Defendant McDermed similarly testified that she knew *Brady* listing someone could end his career. *Id.* at 1206:13–17 ("Carolyn McDermed Direct Examination"); *see also id.* at 722:5–14 ("Casey Boyd Direct Examination") ("Q: What is your understanding, once you're on the *Brady* list, of how that affects your possible future employment in law enforcement? A: Typically, it ends your profession in law enforcement . . . . And when somebody is put on that *Brady* list, it's extremely rare they continue on. . . . [T]hat pretty much ends your career and your future in law enforcement.").[11]

---

[11] *See also* Trial Tr. 1505:11–24 ("Direct Examination of James Cleavenger") ("Q: Let's talk a little bit about how – how you think this is going to impact your future career. A: I really have – I have no idea. Obviously, I've never been *Brady*-listed before. So I've got a year and a half left of the job that I have now, but it's limited. I mean it's nothing – I can't – there's no way around it. It's federal law. What I'm going to do after this, I don't know, because I was focusing on law enforcement. Now I'm 37 years old, trying – I'm back to square one. Yeah, it's tough. I just – I don't know how I'm going to go into interviews anywhere, let alone police departments, but any law firm and say,

Further, the acting chief of the Junction City Police Department, Mark Chase, testified that being *Brady* listed "would prevent [an officer] from testifying, and, therefore, it would prevent the chief of police from employing that person in a capacity out in the field where they were interviewing people and taking reports" because "then he couldn't testify in court, because his credibility wasn't any good." *Id.* at 2034:18–23 ("Mark Chase Direct Examination"); *see also id.* at 2036:14–17 ("In the last five years in Oregon, I think . . . the statistics for Oregon are like there's been over 80 officers that have been decertified and lost their jobs over truthfulness issues."); *id.* at 863–64 ("Cory Mertz Direct Examination") ("So my understanding of what the *Brady* list is is [sic] that it's a list of – if the district attorney has exculpatory evidence that a law enforcement officer has told a lie, then the district attorney is mandated by law to disclose that information to the defense counsel during a trial. And, as a result of that, it would essentially make a candidate not able to be a police officer.").

In addition, the jury heard testimony concerning the impact of Plaintiff's termination from the University of Oregon Department of Public Safety on his employment at the Junction City Police Department. Charles Salsbury – who was a police sergeant with the Junction City Police Department – testified as follows:

> Q: Did my client disclose that he was in trouble and under investigation while still employed at the University of Oregon Police Department?
>
> A: Yes, he did.
>
> . . .
>
> Q: And did he disclose to you that he had been terminated from the University of Oregon?
>
> A: He did, yes.

'Hi. I'm James Cleavenger, if you Google me' . . . . 'this lawsuit is going to come up.' And they're notice, 'Oh, he was *Brady*-listed? This guy is a liar? Do we want a lying attorney in our firm?'").

Q: Where you asked to investigate the allegations on behalf of
Junction City that had been put forward by the University of Oregon
Police Department?

A: Yes, I was.

. . .

A: I was tasked to look into the investigation to determine suitability
of James remaining on as a reserve officer with the City of Junction
City.

. . .

A: [Chief Chase] did say that James would need to be put on . . .
some type of leave, indefinitely, until the outcome of that U of O
investigation was completed.

*Id.* at 2738:7–2740:20 ("Charles Salsbury Direct Examination").

Further, the jury saw internal documents from the UOPD further indicating how
*Brady* listing could impact a potential officer's career. Kafoury Decl. Ex. 5 (Pl. Ex. 149
– Police Officer 1 Job Description). Specifically, the UOPD job description for "Police
Officer 1" states that one of the "Special Requirements" for being a UOPD police officer
is as follows: "Using the US Supreme Court case Bardy v. Maryland, 373 U.S. 83
(1963) as a guideline, UOPD employees must be able to render credible testimony in a
court of law." *Id.*

Defendants emphasize the jury "awarded Mr. Cleavenger lost future earnings
from a job he had never held" – police chief. Reply at 21; *id.* at 20. However, the jury
did not necessarily calculate the economic damages award based on the earnings of a
police chief in Oregon – the Jury Verdict form did not ask the jury to specify anything
about the economic damages award. Thus, the jury may have calculated economic
damages after considering the substantial evidence that being *Brady* listed would end
*any* type of law enforcement career. *See, e.g.*, Trial Tr. 991:6–15 ("Larry Larson Direct

Examination"); *id.* at 2738:7–2740:20 ("Charles Salsbury Direct Examination"); *id.* at 1505:11–24 ("Direct Examination of James Cleavenger").

In addition, the evidence the jury received is distinguishable from the testimony a court found insufficient in *Hounshel v. Battelle Energy All., LLC*, No. 4:11-CV-00635-BLW, 2013 WL 6073878 (D. Idaho Nov. 18, 2013). In *Hounshel*, the court concluded that "[Plaintiff's] testimony that he believes having 'to explain away' his EAP file 'may' affect employment, which 'may affect income—is sheer speculation, and is not enough to justify presenting the issue of lost earning capacity to the jury." *Id.* at *1. Here, the jury heard extensive testimony from various law enforcement personnel – including chiefs of police – concerning the severe impact of the submission of *Brady* materials on Plaintiff's career in law enforcement. That evidence is a far cry from "mere conjecture" or "sheer speculation," *id.*, as to how the release of *Brady* materials impacts Plaintiff's ability to have a career in law enforcement.

Based on the evidence in the record, the Court does not find the economic damages award is clearly unsupported by the evidence. Nor does the Court find the award "grossly excessive or monstrous" or "based only on speculation or guesswork." *Del Monte Dunes at Monterey, Ltd.*, 95 F.3d at 1435; *cf. Scruggs*, 2008 WL 5262770, at *1. Accordingly, the Defendants' Motion for New Trial or, in the Alternative, Remittitur of the economic damages award is DENIED.

### 2. Punitive Damages

The jury awarded punitive damages against Defendant McDermed in the amount of $36,000, against Defendant Lebrecht in the amount of $51,000, and against Defendant Cameron in the amount of $18,000. Jury Verdict at 3. Defendants move for a new trial or, in the alternative, a remittitur of these punitive damages awards.

Punitive damages "are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 1519 (2003). The "Constitution imposes certain limits, in respect both to procedures for awarding punitive

damages and to amounts forbidden as 'grossly excessive.'" *Philip Morris USA v. Williams*, 549 U.S. 346, 353, 127 S. Ct. 1057, 1062 (2007). No "simple mathematical formula" exists for determining the "constitutional line." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582, 116 S. Ct. 1589 (1996). However, the Supreme Court has pointed to three guideposts to guide courts in assessing whether a punitive damages award is grossly excessive: "(1) the degree of reprehensibility of the defendant's conduct; (2) whether the award bears a reasonable relationship to the actual and potential harm caused by the defendant to the plaintiff; (3) and the difference between the award and sanctions authorized or imposed in comparable cases." *S. Union Co. v. Irvin*, 563 F.3d 788, 791 (9th Cir. 2009) (quoting *State Farm*, 538 U.S. at 418). In considering these guideposts, a court's "goal is to determine whether the punitive damages achieve their ultimate objectives of deterrence and punishment, without being unreasonable or disproportionate." *Id.*

Above, the Court found there was sufficient evidence to support the jury's economic damages award. Thus, Defendants' argument that "the deficiency of proof on compensatory damages described above means the award of punitive damages is against the clear weight of the evidence and is constitutionally excessive," Reply at 24, fails. In addition, the punitive damages awards are much less than the economic damages award. Thus, the Court cannot conclude that, based on the ratio of punitive to compensatory damages, the punitive damages are constitutionally excessive. *Cf. State Farm*, 538 U.S. at 425 ("Single-digit multipliers are more likely to comport with due process."); *Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005).

Defendants also argue "there is insufficient evidence of reprehensibility to support such an award." Reply at 25. As Defendants correctly state, to determine the reprehensibility of a defendant, courts consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

disregard of the health or safety of others; the target of conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins.*, 538 U.S. at 419 (citation omitted). Upon reviewing the record, the Court concludes there is sufficient evidence of reprehensibility. For instance, there was sufficient evidence from which the jury could find that the harm was the result of intentional malice. *See, e.g.*, Kafoury Decl. Ex. 15 ("Plaintiff's Ex. 276 / Defendants' Ex. 412 – Emails re Cleavenger Arbitration Decision"); Trial Tr. 2426:2–2427:11 ("Brandon Lebrecht Cross Examination") (testimony concerning post-arbitration decision email chain); *id.* at 2432–41 (testimony concerning differences between the *Brady* materials submitted to the DA's Office and the Internal Investigation findings and the fact); *id.* at 1132:17–20 ("Brandon Lebrecht Direct Examination") ("Q: You didn't make any comment about the arbitrator's decision on my client's honesty in your hundreds of pages of *Brady* materials, did you? A: About his honesty in the arbitrator decision, no.").

Finally, Defendants argue the "punitive damages award arose from arguments encouraging the jury to impermissibly award punitive damages for conduct not at issue in this case and for harm caused to persons other than plaintiff." Reply at 27–28. Specifically, Defendants assert that, in closing argument, Plaintiff described harm to Michael Drake and Casey Boyd that "was not harm alleged to have resulted from the conduct at issue in this case." *Id.* This argument is unavailing. First, the jury was specifically instructed as follows:

> In considering the amount of any punitive damages, consider the degree of reprehensibility of the defendant's conduct, including whether the conduct that harmed the plaintiff was particularly reprehensible because it also caused actual harm or posed a substantial risk of harm to people who are not parties to this case.

> *You may not, however, set the amount of any punitive damages in order to punish the defendant for harm to anyone other than the plaintiff in this case.*

Jury Instruction No. 21 (emphasis added).[12] "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727 (2000). Even if Plaintiff's counsel's closing argument touched on "harm to people who are not parties to this case," the Court finds this insufficient to overcome the presumption that the jury followed its instructions, particularly given the evidence in the record that could support a finding there was reprehensible conduct toward Plaintiff.

The Court also notes that Defendants, in support of their argument, cite *Philip Morris*, in which the Supreme Court held that "a jury may not punish for the harm caused others." 549 U.S. at 356–57. In that case, the district court actually rejected a proposed punitive damages jury instruction that specified the jury could not seek to punish the defendant for injury to persons not before the court and instead told the jury that "[p]unitive damages are awarded against a defendant to punish misconduct and deter misconduct," and "are not intended to compensate the plaintiff or anyone else for damages caused by the defendant's conduct." *Id.* at 350 (internal quotation marks and citation omitted). Here, unlike in *Philip Morris*, the Court explicitly told the jury it could not punish Defendants for having caused injury to others. *See* Jury Instruction No. 21. By giving that jury instruction, the Court actively protected against the risk that the jury would improperly impose punitive damages. *Id.* at 357. Thus, the Court DENIES Defendants' Motion on this ground.

---

[12] *See Philip Morris*, 549 U.S. at 355 ("Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible—although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse. Yet for the reasons given above, a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties.").

On the record, the Court finds the punitive damages award is supported by the evidence and is not grossly excessive, monstrous, or shocking to the conscience. *See Drew v. Equifax Info. Servs., LLC*, Case No. C 07-00726 SI, 2010 WL 5022466, at *10 (N. D. Cal. Dec. 3, 2010). Accordingly, Defendants Motion for New Trial or, in the Alternative, Remittitur of the punitive damages award is DENIED.

### C. Conclusion

For the foregoing reasons, Defendants' Motion for New Trial or Remittitur is DENIED.

### IV. Disposition

For the reasons set forth above, Defendants' Alternative Motions for Judgment as a Matter of Law and for New Trial or Remittitur are DENIED.

DATED:      February 29, 2016

/s/ David O. Carter
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE